IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

LIBERTARIAN PARTY OF ARKANSAS,      )
SANDRA CHANEY RICHTER,                   )
MICHAEL PAKKO,                             )
RICKY HARRINGTON, JR,                 )
CHRISTOPHER OLSON, and              )
MICHAEL KALAGIAS,      ......Plaintiffs )
                                      )

   v.                                 )      Case No. 4:19-cv-214-KGB
                                      )

JOHN THURSTON, in his official capacity as   )
Secretary of State for the State of Arkansas,   )
                       .....Defendant.)

PLAINTIFFS' BRIEF IN SUPPORT OF THEIR COMPLAINT
AND MOTION FOR PRELIMINARY INJUNCTION

I. STATEMENT OF THE CASE

The instant case is a ballot access and election law case on behalf of five registered

Arkansas voters and supporters of the Libertarian Party in the State of Arkansas and the Libertarian

Party of Arkansas, which, unlike the two major political parties, must successfully complete a

petition drive for political party recognition and then, if successful, conduct a political party

convention under Arkansas law in order to nominate candidates for elective office. The Plaintiffs

are asking in the case at bar that the Libertarian Party of Arkansas (hereinafter "LPAR") be

permitted to conduct a petition drive for political party recognition with a constitutional petition

signature requirement of 10,000 valid petition signatures of registered Arkansas voters along with

a constitutional petition signature deadline and petition collection period for the general election

to be conducted on November 3, 2020. Previously to the current law going into effect by way of

an emergency clause passed by the General Assembly and signed by the Governor in February of

this year, the petition signature requirement for recognition of a new political party required either

the lesser of 3% of the last total vote for Governor in Arkansas or a maximum petition signature requirement of 10,000 signatures of Arkansas registered voters.  Under the new laws challenged herein, the alternative of 10,000 petition signatures was deleted and the petition signature deadline for political party formation was moved further away from the general election and the preferential primary election dates to September 4, 2019, for the election cycle that will involve the Arkansas general election on November 3, 2020.

The facts and witnesses which will be presented to the Court at the hearing on Plaintiffs' Motion for Preliminary Injunction will show the effects on the LPAR of requiring an excessive and unnecessary 26,746 valid petition signatures of registered Arkansas voters (3% of the total vote cast for Governor in Arkansas in the last gubernatorial election) which must be collected during a ninety day period, and with a petition signature deadline of no later than September 4, 2019, which is more than fourteen months before the November 3, 2020, general election. Additionally, it will be shown that when the petition requirement for political party formation in Arkansas was solely 3% of the previous total vote for Governor of Arkansas, no political party was ever successful in meeting that requirement and only achieved recognition and ballot access by having the law declared unconstitutional and being ordered placed on the Arkansas ballot by court order.  This case concerns the important question of whether Arkansas may require a minor political party to submit petition signatures for political party recognition which are at least 2.6 times what was previously required and with a submission deadline of September 4, 2019, which is fourteen months before the general election and more than five and a half months before the major parties select their nominees at a preferential primary election. Answering this question poses the constitutional issue of whether the Arkansas requirements in question are necessary to

further a compelling state interest or were passed simply to eliminate and restrict political competition.

The laws in question effective for the 2020 Arkansas general election cycle are as follows, to-wit:

Ark. Code Ann. § 7-7-101

The name of no person shall be printed on the ballot in any general or special election in this state as a candidate for election to any office unless the person shall have been certified as a nominee selected pursuant to this subchapter.

Ark. Code Ann. § 7-7-203(c)(1)

(c)(1) The party filing period shall be a one-week period beginning and ending on the following dates and times:

(A)  For years in which the office of Governor will appear on the ballot at the general election, beginning at 12:00 noon one (1) week prior to the first day in March and ending at 12:00 noon on the first day in March; and

(B)  For years in which the office of President of the United State [sic] will appear on the ballot at the general election, beginning at 12:00 noon on the first Monday in November preceding the general primary election and ending at 12:00 noon on the seventh day thereafter.

Ark. Code Ann. § 7-7-205(a)(2)

(a)(2)  The petition shall contain at the time of filing the signatures of registered voters in an amount that equals or exceeds three percent (3%) of the total votes cast for the Office of Governor in the immediately preceding general election for Governor.

Ark. Code Ann. 7-7-205 (a)(4)(B)

(a)(4)(B)  No signature that is dated more than ninety (90) days before the date the petition is submitted shall be counted.

Ark. Code Ann. 7-7-205(a)(6)

(a)(6)  A new political party that wishes to select nominees for the next general election shall file a sufficient petition no later than sixty (60) days before the party filing period.

Ark. Code Ann. 7-7-205 (c)(3)

(c)(3)  A candidate nominated by convention shall file a political practices pledge with the Secretary of State or county clerk, as the case may be, during the party filing period.

## II. STANDARD OF REVIEW

In deciding whether or not to grant Plaintiffs' Motion for Preliminary Injunction filed herein, the trial court must consider both the standard of review to be applied in a preliminary injunction request as well as the standard of review required in evaluating ballot access and election laws.  The standard of review to be used in judging whether or not Plaintiffs are entitled to a preliminary injunction requires that the Plaintiffs demonstrate that: (1) they have a substantial likelihood of prevailing on the merits; (2) they will suffer irreparable injury if the preliminary injunction is not issued; (3) the threatened injury to the Plaintiffs must outweigh what other injuries the Defendant would suffer if the preliminary injunction issues; and (4) issuance of the proposed preliminary injunction would not be adverse to the public interest. *United Industries Corporation v. Clorox Company*, 140 F.3d 1175, 1178-1179 (8th Cir. 1998); *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).

As to the standard of review in a ballot access and election law case, the analytical test applied by the United States Supreme Court in *Anderson v. Celebrezze, Id.*, is appropriate.  In *Anderson* the United States Supreme Court set forth a standard to be used in determining whether election laws are unconstitutionally oppressive of potential voter's rights. The Supreme Court held that such constitutional challenges to specific provisions of a state's election laws cannot be resolved by litmus-paper tests that will separate valid from invalid restrictions, but rather that the trial court " ... must resolve such a challenge by an analytical process that parallels its work in ordinary litigation." *Anderson v. Celebrezze*, 406 U.S., at 789; also see *Moore v. Martin*, 854 F.3d

4

1021, 1025 (8th Cir. 2017).  The Supreme Court then set forth three criteria which the trial court is

expected to follow:

> It must first consider the character and magnitude of the asserted injury to the rights
> protected by the First and Fourteenth Amendments that the Plaintiff seeks to
> vindicate. It then must identify and evaluate the precise interests put forward by the
> State as justifications for the burden imposed by its rules. In passing judgment, the
> Court must not only determine the legitimacy and strength of each of those interests;
> it also must consider the extent to which those interests make it necessary to burden
> the Plaintiffs rights. [quoted with approval by the Eighth Circuit in *Moore v. Martin, Id.*]
> Only after weighing all these facts is the reviewing Court in a position to decide whether
> the challenged provision is unconstitutional. *Anderson v. Celebrezze*, 460 U.S., at 789.

As the United States Court of Appeals for the Eighth Circuit has also stated:

> [W]e review the statute under a form of strict scrutiny referred to as the "compelling
> state interest test" by first determining whether the challenged statute causes a
> burden of some substance on a plaintiff's rights, and if so, upholding the statute
> only if it is "narrowly drawn to serve a compelling state interest." *Libertarian Party
> of N.D. v. Jaeger*, 659 F.3d 687, 693 (8th Cir. 2011) (quoting *McLain v. Meier*, 851 F.2d
> 1045, 1049 (8th Cir. 1988)). In such cases, the State bears the burden of showing that the
> challenged statute is narrowly drawn to serve the State's compelling interest.  See *Eu v.
> S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 222, 109 S.Ct. 1013, 103 L.Ed.2d 271
> (1989)." *Moore v. Martin*, 854 F.3d at 1026.

Thus, both the U. S. Supreme Court and the Eighth Circuit have set forth the standard

which the trial court is to use in analyzing specific provisions of ballot access laws as are involved

in the instant action.  In fact, " ... because the interests of minor parties and independent candidates

are not well represented in state legislatures, the risk that the First Amendment rights of those

groups will be ignored in legislative decision-making may warrant more careful judicial scrutiny."

*Anderson v. Celebrezze*, 460 U.S., at 793, n.16.   After all, "the State may not be a 'wholly

independent or neutral arbiter' as it is controlled by the political parties in power, 'which

presumably have an incentive to shape the rules of the electoral game to their own benefit.'"

*Blackwell*, 462 F.3d at 587 (quoting from *Clingman v. Beaver*, 544 U.S. 581, 603 (2005)

(O'Conner, J., concurring).   Since the case at bar involves election laws that burden a minor

political party, and the corresponding constitutional right of individuals to political expression and association, the appropriate standard of review which is required for this Court is strict scrutiny, so that state laws cannot stand unless they "further compelling state interests . . . that cannot be served equally well in significantly less burdensome ways." *American Party of Texas v. White*, 415 U.S. 767, at 780-781 (1974).

Further, the U.S. Supreme Court has noted that the First and Fourteenth Amendments establish "[t]he right of citizens to create and develop new political parties." *Norman v. Reed*, 502 U.S. 279, 288 (1992).  See also *Green Party of Arkansas v. Priest*, 159 F.Supp.2d 1140, at 1144 (E.D. Ark. 2001).  "[T]he right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes." *Williams v. Rhodes*, 393 U.S. 23, at 31 (1968).  "New parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past." *Williams v. Rhodes*, 393 U.S. at 32.

> It is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status. * * *
>
> "A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment.  It discriminates against those candidates and—of particular importance—against those voters whose political preferences lie outside the existing political parties . . . . By limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, such restrictions threaten to reduce diversity in competition in the marketplace of ideas.  Historically, political figures outside the two major parties have been fertile sources of new ideas and new programs; many other challenges to the status quo have in time made their way into the political mainstream. . . . In short, the primary values protected by the First Amendment—"a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254, at 270 (1964)—are served when election campaigns are not monopolized by the existing political parties." *Anderson v. Celebrezze*, 460 U.S. at 793-794. (quoted with approval of four Eighth Circuit judges in *Manifold v.*

*Blunt*, 873 F.2d 178 (8th Cir. 1989)).

Therefore, the first consideration this Court must look to is the character and magnitude of the asserted injury to the Plaintiffs' First and Fourteenth Amendment rights. Since in the instant case the injury to the rights of the Plaintiffs would impact the LPAR and its supporters in their petitioning for ballot access for the Arkansas ballot, there cannot be a dispute in the least that the damage would be substantial and of a fundamental nature. Federal Appellate Courts have noted that when election deadlines are far in advance of an election, they force minor parties to recruit candidates at a time when major party candidates are not known and when voters are not politically engaged. See *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 594 (6th Cir. 2006) and *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 880 (3rd Cir. 1997).

The next step the Court must look to under the *Anderson* test is the identification and evaluation of the precise interests put forth by the State of Arkansas as justifications for the burden imposed by the laws in question. While Arkansas does have a right to properly supervise elections in Arkansas, election restrictions which impact minor political parties and their supporters must be necessary to serve a compelling state interest. The teaching of the United States Supreme Court is that:

> "even when pursuing a legitimate interest, a state may not choose means
> that **unnecessarily restrict** constitutionally protected liberty," *Kusper v.
> Pontikes*, 414 U.S. 51, 58-59 (1973), and we have required that states
> adopt the **least drastic means** to achieve their ends. *Lubin v. Panish*, 415
> U.S. 709, 716 . . .; *Williams v. Rhodes*, 393 U.S. at 31-33 . . . . **This
> requirement is particularly important where restrictions on access
> to the ballot are involved**. The states' interest in screening out frivolous
> candidates must be considered in light of the significant role that third parties
> have played in the development of the nation. [Emphasis added]. *Illinois
> State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, at 185
> (1979).

III. ARGUMENT AND AUTHORITIES

Because the Plaintiffs would suffer irreparable injury if they are not allowed to conduct a

petition drive for political party recognition with a requirement of 10,000 valid petition signatures,

instead of the 26,746 required under the new law for the LPAR for the Arkansas General Election

of November 3, 2020, there is no possible constitutionally recognized injury to the Defendant

which would be greater than the grave injury to the fundamental rights which would be suffered

by the Plaintiffs if they are not allowed a constitutional petition signature requirement for new

political party recognition in Arkansas.  Further, issuance of the proposed preliminary injunction

would be in the public interest rather than adverse to the public interest.  Particularly, the harm to

voters and the public is the damage to "political dialogue and free expression" that is done when

political parties are unnecessarily restricted from participating in the public discourse.  *Libertarian*

*Party of Ohio v. Blackwell*, 462 F.3d 579, at 594 (6ᵗʰ Cir. 2006).  As the Eighth Circuit Court of

Appeals has stated in reviewing election laws: "our primary concern is not the interest of [the]

candidate . . . but rather, the interest of the voters who choose to associate together to express their

support for [that] candidacy and the views . . . espoused." *Miller v. Moore*, 169 F.3d 1119, 1123

(8ᵗʰ Cir. 1999), quoting *Anderson v. Celebrezze*, 406 U.S. 780, 806 (1983).

Also, the trial court in deciding whether or not to grant Plaintiffs' request for a preliminary

injunction should concentrate primarily on the issue of whether or not the Plaintiffs are likely to

prevail on the merits in the instant case.  Therefore, the trial court should next look to the standard

of review in judging ballot access and election laws which affect minor political parties, their

candidates, and their supporters and potential voters--particularly as same relate to the recently

increased and excessively high and unnecessary number of petition signatures required for political

party recognition in Arkansas, the unnecessarily early petition signature deadline, the limitation as

to petitioning time, the relationship of the aforesaid requirements to the time period in which the major political parties are selecting their candidates, and the date of the general election, as well as the particular facts in the instant case.

The LPAR is the only minor political party to obtain recognition for ballot status in Arkansas for recent election cycles (viz., 2016 and 2018). Because the LPAR, if it were successful in its petition drive in 2019, would be a new political party in Arkansas, it would not nominate its candidates for the general election at a preferential primary election, but must nominate its candidates by convention. Ark. Code Ann., § 7-7-205(c)(2). Any candidates nominated by the convention are currently required to file a political practice pledge with the Secretary of State or County Clerk during the party filing period. Ark. Code Ann., § 7-7-205(c)(3). The party filing period (which for the Republican and Democratic parties determines who has chosen to submit themselves to be party candidates in the preferential primary election) is currently set for the 2020 election cycle for a one-week period beginning at noon on the first Monday in November preceding the General Primary Election (viz.: November 4, 2019) and ending at noon on the 7th day thereafter (viz.: November 11, 2019). The new, earlier petition deadline for political party recognition in Arkansas has been moved several times in recent years, and is now September 4, 2019. The Arkansas General Assembly (composed mostly of Republican members) has passed this newer deadline for new political parties so as to require the petitioning new political party to conduct a petition drive at least fourteen to seventeen months before the general election. Additionally, the number of minimum petition signatures required has been increased by a factor of more than 2.6.

The new political party recognition requirements are simply a throwback to what has previously been declared unconstitutional by this Court. *Citizens to Establish a Reform Party in Arkansas v. Priest*, 970 F.Supp. 690 (E.D. Ark., 1996); and *Green Party of Arkansas v. Daniels*,

445 F.Supp.2d 1056 (E.D. Ark., W.D. 2006).  In fact, the new deadline for petition signatures of September 4, 2019, is far worse than the January 2, 1996 deadline declared unconstitutional in *Priest*, 970 F.Supp. at 692-693, 698, ¶ 17, and the 26,746 signatures required by the new law challenged herein is also worse than the 21,505 signatures condemned in *Priest*, 970 F.Supp. at 691, ¶ 2, 698-699, or the 24,171 condemned in *Daniels*, 445 F.Supp. 2d, at 1059-1060, 1061-1063, when 150 days was allowed for the petitioning period rather than the current 90 day period.[1]

The Arkansas election scheme for the recognition of new political parties results in a deadline which is fourteen months, or approximately 425 days, before the general election.  In the Eighth Circuit decision of *McLain v. Meier*, 851 F.2d 1045, 1049 (8th Cir. 1988), the Eighth Circuit Court was troubled by a third-party filing deadline "more than 200 days before the November election."  Arkansas has now far exceeded with the new September 4, 2019, deadline the 200 days which troubled the Eighth Circuit in *McLain*.  As the Eighth Circuit said in an earlier McLain case, the ". . . Constitution requires that the access requirements as to both party-backed and independent candidates be reasonable." *McLain v. Meier*, 637 F.2d 1159, 1165 (8th Cir. 1980).  Restrictions on ballot access "may not go beyond what the state's compelling interests actually require," *McLain v. Meier*, 637 F.2d at 1163, and must be "narrowly drawn to serve a compelling state interest." *Libertarian Party of N.D. v. Jaeger*, 659 F.3d at 693 (quoting *McLain v. Meier*, 851 F.2d at 1049). "In such cases, the State bears the burden of showing that the challenged statute is narrowly drawn to serve the State's compelling interest." *Moore v. Martin*, 854 F.3d at 1026.

---

[1] While no new political party complied with the 3% requirement from 1977 through 2007 when the 10,000 signature alternative was put in place, there also was no compliance with the first petition requirement in place from 1971 to 1977 when it was 7% of the last gubernatorial vote.  The 7% requirement and the filing dates of February 7 or March 6, 1976, were struck down and held unconstitutional in *American Party v. Jernigan*, 424 F.Supp. 943 (E.D. Ark. 1977).

As set forth in Plaintiffs' Complaint [ECF No.1], three of the individual Plaintiffs (Sandra Chaney Richter, Ricky Harrington, Jr., and Michael Kalagias) are not only Arkansas registered voters, but are also Libertarian candidates for elective office in Arkansas for the November 3, 2020 general election.  The other individual Plaintiffs (Michael Pakko and Christopher Olson) are the current Chair and Vice Chair of the Plaintiff LPAR and, thus, are familiar with the negative impact of having such an early petition deadline and high petition signature requirement.  All the individual Plaintiffs wish to have the right to cast their votes effectively for Libertarian candidates in Arkansas in 2020.  Of course, under either the old 10,000 petition signature requirement or the current petition signature requirement of 26,746 signatures, many more petition signatures will have to be gathered in order to ensure that there will be sufficient valid petition signatures.  See Plaintiffs' Exhibit "1" hereto, Affidavit of Michael Pakko, ¶ 10.

Specifically, what the Plaintiffs are asking for in affirmative relief from the Court is that they be allowed to conduct a petition drive pursuant to the petition signature requirement that existed before the election laws were changed in February of 2019.  This remedy is necessary because of the unnecessarily early petition signature deadline, limitation of petitioning time to ninety days, and 3% petition signature requirement based on the total vote of the last gubernatorial election in Arkansas—which has never been successfully complied with.  Testimony as to the LPAR petition drive will be presented at the hearing for preliminary injunction.  As demonstrated in the Affidavit of Michael Pakko attached to Plaintiffs' Motion for Preliminary Injunction (Plaintiffs' Exhibit "1"), there is harm in having a petition drive well before the general election and the preferential primary election of the major parties in Arkansas.  Many of the political issues for the next election are not yet well formed or known.  Not only are

new political developments constantly occurring, but there is no necessity to have minor political

parties petition so early in the political season and with a petition signature requirement that is

unnecessary and was never complied with in regard to the 3% requirement when it was

previously the only requirement for political party petitions.  In fact, the evidence will show that

Arkansas was never been plagued by an overcrowded ballot—particularly as to new and minor

political parties—when the petition signature requirement for political party formation was

10,000 signatures.  See Plaintiffs' Exhibit "1", Affidavit of Michael Pakko, ¶¶ 6 and 7.  Under

the circumstances, it would certainly be a reasonable supposition that the only reason that the law

was changed earlier this year was to prevent the LPAR from having a reasonable opportunity to

obtain ballot access.

> When the State imposes only reasonable and genuinely neutral restrictions
> on associational rights, there is no threat to the integrity of the electoral
> process and no apparent reason for judicial intervention.  As such restrictions
> become more severe, however, and particularly where they have discriminatory
> effects, there is increasing cause for concern that **those in power may be using
> electoral rules to erect barriers to electoral competition**.  In such cases, **applying
> heightened scrutiny helps to ensure that such limitations are truly justified and
> that the State's asserted interest are not merely a pretext for exclusionary or
> anti-competitive restrictions**.  [Emphasis added]  *Clingman v. Beaver, Id.*

## IV. CONCLUSION

Considering the facts in the case at bar, the more restrictive and unnecessary

requirements of the new law, the past history of ballot access in Arkansas for minor political

parties, and the past decisions by various Judges of the U.S. District Court for the Eastern

District of Arkansas, the Court might consider the appropriateness and application of the

following quote by a previous decision of this Court to the instant case.

> A review of Arkansas' election code demonstrates that the statutes individually and in
> combination place unreasonable and burdensome obstacles in the path of new political
> parties seeking ballot access.  Those obstacles do not serve any compelling state interest
> or even any legitimate state interest, but rather serve to make unduly difficult the

creation of a new political party in Arkansas. *Citizens to Establish a Reform Party in Arkansas v. Priest*, 970 F.Supp. at 697.

WHEREFORE, premises considered, the Plaintiffs herein pray that this Court, after proper hearing herein, will grant the relief requested in their Complaint filed herein by declaring the ballot access and election laws in question herein unconstitutional, grant Plaintiffs' Motion for Preliminary Injunction forthwith by ordering the LPAR to be recognized as a political party in Arkansas if the LPAR turns in to the Arkansas Secretary of State 10,000 valid petition signatures of Arkansas registered voters, and such other and further relief as the Court finds equitable and just.

Respectfully submitted this 3rd day of May, 2019.

LIBERTARIAN PARTY OF ARKANSAS,
SANDRA CHANEY RICHTER,
MICHAEL PAKKO,
RICKY HARRINGTON, JR.,
CHRISTOPHER OLSON, and
MICHAEL KALAGIAS, Plaintiffs

/s/ James C. Linger
JAMES C. LINGER, OBA#5441
1710 South Boston Avenue
Tulsa, OK 74119-4810
(918) 585-2797 Telephone
(918) 583-8283 Facsimile
bostonbarristers@tulsacoxmail.com

W. Whitfield Hyman, ABN # 2013-237
King Law Group
300 North 6th Street
Fort Smith, Arkansas 72901
(479) 782-1125 Telephone
(479) 316-2252 Facsimile
william.hyman@gmail.com

*Counsel for Plaintiffs*

## CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that a true and exact copy of the foregoing has been served on all counsel of record via the Court's CM/ECF e-mail notification system on the 3rd day of May, 2019.

/s/ James C. Linger
James C. Linger

14