

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | |
|---|---|
| LIBERTARIAN PARTY OF ARKANSAS, )<br>SANDRA CHANEY RICHTER, )<br>MICHAEL PAKKO, )<br>RICKY HARRINGTON, JR, )<br>CHRISTOPHER OLSON, AND )<br>MICHAEL KALAGIAS, ……Plaintiffs )<br>)<br>v. )<br>)<br>JOHN THURSTON, in his official capacity as )<br>Secretary of State for the State of Arkansas, )<br>…..Defendant.)<br>_____)| Case No. 4:19-cv-214-KGB |

### AFFIDAVIT OF RICHARD WINGER

STATE OF CALIFORNIA        )
                           ) ss.
COUNTY OF SAN FRANCISCO    )

Richard Winger, being duly sworn, deposes and says that:

1. I am a resident of San Francisco, California, over 18 years of age, and make this Affidavit with the knowledge that it is to be used at the hearing on June 4, 2019, in support of Plaintiffs' Motion for Preliminary Injunction filed in this case on May 3, 2019. Because of previously made reservations for a boat trip on the Great Lakes, I will not be available to testify in person on June 4, 2019, in Little Rock, Arkansas, because I will be flying to Toronto on May 30 and not returning to San Francisco until June 12, 2019. I make this Affidavit based on my own personal knowledge and research that I have conducted in regard to the election and ballot access laws of Arkansas and the election history of Arkansas.



2. I consider myself an expert in the field of minor political parties, independent candidates, and election and ballot access laws in the United States, and have been so recognized by the Wall Street Journal, Time Magazine, Congressional Quarterly, and numerous Federal and State courts. I hold an A.B. Degree in Political Science from the University of California at Berkeley, have done further graduate study in Political Science at the University of California at Los Angeles, and have written numerous articles and various publications and journals on the subject of ballot access for minor parties and independent candidates and third party and independent candidate political statistics. Since 1985, I have been the publisher of Ballot Access News, a non-partisan newsletter that reports on developments in some areas of election law. As to my study, work, or testimony in the instant case, I will not be requesting any compensation to be paid me for any study, testimony, or work in this case. Further, I will not be requesting any compensation for any travel time or any time spent in the preparation of my Affidavit or any Court hearing or trial. However, I will be requesting compensation for any travel or lodging expenses for either testifying in person or by deposition. Examples of travel or lodging expenses which I would request compensation on, if necessary, would be airline tickets or a hotel bill.

3. I am familiar with the election laws of all 50 states and the District of Columbia as to ballot access for political parties and independent candidates. I am further familiar with the election results in the United States as to the major and minor political parties, and independent candidates for elective office. I have conducted research in this area for many years, and have made a particular study for the purpose of this Affidavit of the ballot access laws of the State of Arkansas, both past and present, and the history of major and minor political parties and independent candidates in Arkansas. Also, in preparation for this Affidavit, I have read and

reviewed various pleadings and documents filed in the instant case, namely: the Plaintiffs' Complaint, Defendant's Answer, Plaintiffs' Motion for Preliminary Injunction, Plaintiffs' Brief in Support of their Complaint and Motion for Preliminary Injunction, the Affidavit of Michael Pakko attached thereto, Defendant's Response to Plaintiffs' Motion for Preliminary Injunction, the Appendix of Deadlines for the 2020 Election attached thereto, the Declaration of Peyton Murphy with attached exhibits, and the Declaration of M.V. Hood III.

4. As an expert witness, I have testified in Federal Court in behalf of a number of ballot access lawsuits as set forth in my Curriculum Vitae, marked Exhibit "2" to this Affidavit, and made a part of this Affidavit as though fully set forth herein. In addition, I have advised various third party and independent candidates in regard to ballot access laws. Some of these parties and candidates include John Anderson's 1980 Independent Campaign for President, the Libertarian Party, the Green Party, the Reform Party, the Prohibition Party, the Socialists Workers' Party, the National Unity Party, the Conservative Party, the Populist Party, the American Independent Party, the New Alliance Party, the Communist Party, and the Constitution Party. I have been accepted as an expert witness in U.S. District Courts in ten states. More specifically, I testified and was accepted as an expert witness in two cases before the United States District Court for the Eastern District of Arkansas which have particular bearing on the instant case before this Court, namely: *Citizens to Establish a Reform Party in Arkansas v. Priest*, 970 F.Supp. 690 (E.D. Ark., 1996) and *Green Party of Arkansas v. Daniels*, 445 F.Supp.2d 1056 (E.D. Ark., W.D. 2006).

5. In the 1996 case of *Citizens to Establish a Reform Party in Arkansas v. Priest*, the 3% requirement in effect at that time required a new political party seeking recognition to turn in 21,505 valid signatures. I was one of two experts testifying in the *Reform Party* case, the other

being Allan J. Lichtman, Ph.D. At the time of the *Reform Party* decision in 1996, no new political party had been able to successfully qualify as a political party in Arkansas since a requirement had been established for party recognition of turning in petition signatures equal to 3% of the total vote in either the previous gubernatorial election or presidential election in Arkansas. The Reform Party, while turning in 28,546 signatures, only had 17,262 valid signatures, which left them 4,243 signatures short of the required number of petition signatures of 21, 505. There was some dispute as to the deadline for turning in petition signatures of either January 2, 1996, or May 7, 1996, but in either event the deadline was way after the current deadline in the instant case of either September 4 or 5 of the year before the general election. However, because the statutes and the District Court found the January 2, 1996, deadline to be the proper one, it was found that the deadline was 4 ½ months before the preferential primary election, more than 5 months prior to the general primary election, and 10 months preceding the general election of November 5, 1996. In contrast, the September 4 or 5, 2019, petition deadline we are concerned with in this case is now 6 months before the preferential primary election on March 3, 2020, almost 7 months before the general primary election on March 31, 2020, and about 14 months before the general election of November 3, 2020.

  6. Between the beginning of government-printed ballots in Arkansas in 1891, until 1971, any political party could be on the Arkansas general election ballot for all offices merely by holding a convention, certifying its nominees, and sending the paperwork to the Arkansas Secretary of State. No petition was needed before 1971. In 1971, the Arkansas General Assembly imposed a petition requirement on political parties that had not polled as much as 7% of the vote in the last election. The new petition requirement was 7% of the last gubernatorial

vote. No new political party ever succeeded in completing the 7% petition. With one exception, there was never a problem with overcrowding. From 1971 through 1977, with a 7% petition requirement, no new political party successfully petitioned for ballot access without court intervention. From 1977 through 2007, with a 3% petition requirement, no new political party successfully petitioned for ballot access without court intervention, even with 150 days in which to collect petition signatures. As I testified in the *Green Party of Arkansas* case in 2006, the 3% signature requirement is not necessary to avoid a crowded or cluttered ballot. At that time, there had been only two independent candidates for statewide office in the 30 years since 1977 that had successfully petitioned for ballot access using a requirement of 10,000 valid petition signatures. See the current Ark. Code Ann., § 7-7-103(b)(1)(B). Subsequent to the *Green Party of Arkansas* case in 2006 and until now (2019), only a third independent candidate for statewide office (Trevor Drown) would successfully gather the 10,000 valid petition signatures in order to be an Independent candidate on the Arkansas ballot in 2010 for U.S. Senator.

7. The one exception as to ballot overcrowding referred to in paragraph 6 above relates to independent candidates for President of the United States on the Arkansas ballot from 1980 through 1996. In 1979, the Arkansas Attorney General wrote an opinion saying that the State of Arkansas had a gap in its ballot access laws because it was impossible for an independent Presidential candidate to get on the ballot. He said that until Arkansas passed a law for independent Presidential candidates to get on the ballot that Arkansas would be vulnerable to a lawsuit. In response to this, Arkansas for all Presidential elections from 1980 through 1996 let any group or any independent Presidential candidate on the ballot with no petition whatsoever. With no petitions required at all for a Presidential candidate who was not the nominee of either

the Republican or Democratic parties to get on the Arkansas ballot, the Arkansas ballot had the following number of Presidential candidates for the following years: 1980-7; 1984-10; 1988-6; 1992-13; and 1996-13. The aforesaid numbers included the nominees of the Republican and Democratic parties. Therefore, in my opinion Arkansas did have a crowded election ballot **for President only** in 1992 and 1996. In 1997, the Arkansas General Assembly passed a bill saying that a group that just wanted to be on the Arkansas ballot for President needed to submit 1,000 valid petition signatures. Technically, the Arkansas General Assembly still had not provided a procedure for independent Presidential candidates. After I brought that to the General Assembly's attention, they finally passed another law saying independent Presidential candidates also needed to submit 1,000 valid petition signatures. This resulted in parallel laws in Arkansas so that unrecognized minor parties or independent Presidential candidates needed only 1,000 valid petition signatures to appear on the Arkansas ballot as a candidate for President of the United States. Since the 1,000 petition signature requirement was put in place, there has never been a Presidential election in Arkansas which had as many Presidential candidates on the ballot as appeared in 1992 and 1996.

8. Even under the previous law from 2007 through 2018 that allowed a new political party to be recognized with 10,000 valid petition signatures, the Arkansas ballot was not crowded. For the elections in 2008, 2010, 2016, and 2018, only one new political party qualified by petitioning for the Arkansas ballot. In 2012 and 2014, two new political parties qualified by petitioning for the Arkansas ballot (the Libertarian Party and the Green Party). There is so little competition for Arkansas partisan elective offices that only 34 of the 100 State Representative offices for the Arkansas General Assembly had a contested election on the November 2016

general election ballot. Further, in 2016, with only the Libertarian Party qualifying as a new party on the Arkansas ballot, in three of the four U.S. Representative races that year the only candidates in the November general election were the nominees of the Republican Party and the Libertarian Party. If not for the Libertarian Party being recognized in 2016, only one of the four U.S. Representative races in Arkansas would have been contested in the November 2016 general election. In 2018, there was only a slight improvement with 45 of the 100 State Representative offices for the Arkansas General Assembly being contested on the November 2018 general election ballot.

9. The U.S. Supreme Court ruled against a February petition deadline for newly-qualifying parties, in *Williams v. Rhodes*, 393 U.S. 23 (1968). The single most important issue in *Williams v. Rhodes* was the early petition deadline for newly-qualifying parties, because the plaintiffs in that case, officers of the American Independent Party, showed that their party would have been on the Ohio general election ballot except for the early deadline. After *Williams v. Rhodes*, courts were still not clear as to whether early petition deadlines for newly-qualifying parties and independent candidates were always unconstitutional, or only unconstitutional in conjunction with a very large number of signatures. However, the U.S. Supreme Court clarified this in 1983, in *Anderson v. Celebrezze*, 460 U.S. 780. In that case, Ohio's March 20 petition deadline for independent presidential candidates was held unconstitutional, even though the petition burden on plaintiff John B. Anderson was only 5,000 signatures, which was only about one-tenth of 1% of the number of registered voters in Ohio at the time (footnote one of the decision mentions the 5,000 signature requirement). Furthermore, the case involved the 1980 presidential election, and as the decision notes, five presidential candidates other than John

Anderson had successfully met the Ohio deadline that year, each using the independent candidate petition procedure (see footnote 12).

10. In considering the new petition deadline of September 4 or 5, 2019, which Arkansas has now put in place, for petitions seeking recognition of a new political party in Arkansas, it is interesting to compare Arkansas with the State of Utah. The reason for this is that Arkansas and Utah are the only States that require petitioning for new party recognition that set petition deadlines before January 1, 2020, for the November 3, 2020, general election. In every way, the comparison is not favorable to Arkansas. While Arkansas's petition deadline is September 4 or 5, 2019, Utah's deadline is November 30, 2019—almost three months later. While Arkansas, until very recently, use to have a petition signature requirement for new party formation of 10,000 valid petition signatures, the new requirement of 3% of the last gubernatorial vote in Arkansas is now 26,746 valid petition signatures—which dwarfs Utah's petition signature requirement of 2,000 valid petition signatures. As to the time period in which petition signatures are allowed to be gathered, Arkansas allows no more than 90 days while Utah currently allows one year, four days, and five hours. See Utah Code Ann., §§ 28A-4-306(1)(a)(i) and 28A-8-103(2). Finally, Arkansas and Utah are somewhat similar because they both have six electoral votes and four U.S. Representatives in Congress. However, Utah is slightly larger according to the 2018 census figures with a population of 3,161,105 compared to Arkansas's 2018 census figure of a population of 3,013,825.

11. In regard to the Secretary of State's Response to Plaintiffs' Motion for Preliminary Injunction filed on May 24, 2019, I would point out several mistakes and omissions that were made. First, Arkansas only has one method for an unqualified political party to appear on the

ballot for office (other than President) with the party label. Unlike Arkansas, New Hampshire has two methods for an unqualified political party to appear on the ballot with the party label next to the candidates of that party. The new political party and its supporters can do the 3% petition that the Secretary of State's Response mentioned, or it can also complete the independent candidate petitions for each of its nominees. Unlike Arkansas, in New Hampshire the independent procedure lets a candidate choose a party with label which goes on the ballot. The New Hampshire independent petitions, with party label, never exceed 3,000 signatures. Because New Hampshire has that relatively easy method, the New Hampshire Libertarian party has appeared on the New Hampshire ballot for federal or state office in every election from 1974 through 2018. I mention this because the Secretary of State's Response suggests that New Hampshire has a 3% petition as its only method to get on the ballot—which is not true. Furthermore, the case of *New Hampshire Libertarian Party v. Gardner,* 843 F.3d 20 (1st Cir. 2016) was not a challenge to the Constitutionality of the 3% petition requirement. The only issue in that case was whether the petitioning period was too restrictive. The petitioning period ran from January 1 to mid-August of any election year, a period which is 7 ½ months long. Secondly, the Secretary of State in his response is incorrect to state that the Secretary of State did not appeal the District Court's decision in *Citizens to Establish a Reform Party in Arkansas v. Priest*, 970 F.Supp. 690 (E.D. Ark. 1996) to the U.S. Court of Appeals for the Eighth Circuit. Not only did the Secretary of State appeal, but briefs were filed by both sides in the Eighth Circuit (8th Cir. Case No. 96-3238), the Eighth Circuit set a hearing date for oral argument of April 16, 1997, but then just before the oral argument the Secretary of State moved to dismiss the appeal. On June 19, 1997, the Eighth Circuit entered a judgment in favor of the appellees and

against the appellant secretary of state in a dismissal " . . . in accordance with Rule 42(b), Federal Rule of Appellate Procedure, subject to the following conditions: (1) Appellant agrees that Appellees are the prevailing parties in all respects concerning the appeal; (2) if the parties cannot agree on the amount of fees and costs appellees are entitled to appellant agrees to the reopening of the case in the district court for the limited purpose of determining the amounts [96-3238] [866820], Mandate shall issue forthwith." A copy of the docket for the Eighth Circuit Court of Appeals case of *Citizens to Establish a Reform Party in Arkansas, et al., Plaintiff-Appellee v. Sharon Priest, Secretary of State for the State of Arkansas, Defendant-Appellant*, Eighth Circuit Court of Appeals Docket No. 96-3238, is marked Exhibit "3", attached hereto, and made a part of this Affidavit as though fully set forth herein. The aforesaid docket was downloaded on May 24, 2019, by me using the Pacer service center.

12. Arkansas has had government-printed ballots since 1891. Before 1971, the year the first petition requirement was put into effect for the recognition of new political parties in Arkansas, there was no problem with overcrowding on the Arkansas ballot. The previous requirements of 7% and 3%, along with the newly enacted 3% requirement replacing the 10,000 petition signature requirement, were changes that were not made for any election-administration reason; they were made because legislators desired to reduce competition in elections.

13. In the preparation of this Affidavit, I have reviewed the decisions of the United States District Court for the Eastern District of Arkansas in the cases of *Citizens to Establish a Reform Party in Arkansas v. Priest*, and *Green Party of Arkansas v. Daniels*, and have reviewed and consulted the pleadings in this case, the election results, ballots, and laws of Arkansas and the other 49 states and the District of Columbus, the work of other election experts, and my

personal research. I understand that any false statements made herein will subject me to the penalties of perjury.

    Further Affiant sayeth not.

*Richard Winger* (signature)
Richard Winger

Subscribed and sworn to before me this 28 day of May, 2019.

                                            Notary Public

Commission (and Expiration):

(SEAL)

**Please see attached California Jurat**

11

**CALIFORNIA JURAT WITH AFFIANT STATEMENT**          GOVERNMENT CODE § 8202

☐ See Attached Document (Notary to cross out lines 1-6 below)
☐ See Statement Below (Lines 1-6 to be completed only by document signer[s], *not* Notary)

1. _____
2. _____
3. _____
4. _____
5. _____
6. _____

*Signature of Document Signer No. 1*      *Signature of Document Signer No. 2 (if any)*

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of San Francisco

Subscribed and sworn to (or affirmed) before me on this 28 day of May, 2019, by

(1) Richard Wenger

(and) (2) _____
            *Name(s) of Signer(s)*

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature _____
            *Signature of Notary Public*

M. GODOY
Notary Public - California
San Francisco County
Commission # 2241022
My Comm. Expires May 18, 2022

Seal
Place Notary Seal Above

———— OPTIONAL ————

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: Affidavit of Richard Wenger    Document Date: N/A
Number of Pages: 2    Signer(s) Other Than Named Above: N/A

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)    Item #5910