**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**LIBERTARIAN PARTY
OF ARKANSAS,** *et al.*                                                              **PLAINTIFFS**

**v.**                                            **Case No. 4:19-cv-00214-KGB**

**JOHN THURSTON, in his official capacity
as Secretary of State for the State of Arkansas**                   **DEFENDANT**

<u>**PRELIMINARY INJUNCTION ORDER**</u>

Before the Court is a motion for preliminary injunction filed by plaintiffs Libertarian Party

of Arkansas (the "LPAR"), Sandra Richter, Michael Pakko, Ricky Harrington, Jr., Christopher

Olson, and Michael Kalagias (Dkt. No. 12).  Defendant John Thurston, in his official capacity as

Secretary of State for the State of Arkansas, responded in opposition (Dkt. No. 17).  On June 4,

2019, the Court conducted an evidentiary hearing on the motion (Dkt. No. 28).

This action is brought under 42 U.S.C. § 1983 seeking a declaration that Arkansas Code

Annotated §§ 7-7-101, 7-7-203(c)(1), 7-7-205(a)(2), 7-7-205(a)(4)(B), 7-7-205(a)(6), and 7-7-

205(c)(3), as applied to plaintiffs for the 2019-2020 Arkansas general election cycle and for all

subsequent general election cycles in the State of Arkansas, violate plaintiffs' associational rights

under the First and Fourteenth Amendments, including the Equal Protection Clause of the

Fourteenth Amendment.  Plaintiffs claim a fundamental right to political association protected by

the First Amendment to the United States Constitution, which they contend includes both the right

of individuals to associate for the advancement of political beliefs and the right of individuals to

vote for the candidates or parties of their choice (Dkt. No. 1, ¶ 21).  Plaintiffs also claim that the

Arkansas statutory scheme's unnecessarily early petition deadline, coupled with the recently

increased high petition signature requirement, unequally and unfairly impacts in a discriminatory

manner the right of small, minor, unrecognized political parties in Arkansas who seek petition signatures for party formation in Arkansas (*Id.*, ¶ 28).  Plaintiffs seek an injunction prohibiting the State of Arkansas from enforcing Arkansas Code Annotated §§ 7-7-101, 7-7-203(c)(1), 7-7-205(a)(2), 7-7-205(a)(4)(B), 7-7-205(a)(6), and 7-7-205(c)(3) for the 2019-2020 Arkansas general election cycle and for all subsequent general election cycles in the State of Arkansas.  Plaintiffs bring a facial and as applied challenge (Dkt. No. 1, at 13, Prayer for Relief ¶ 1).  For the reasons discussed below, and to the extent set forth below, the Court grants plaintiffs' motion for preliminary injunction (Dkt. No. 12).

Also before the Court is a motion to exclude the affidavit of Richard Winger (Dkt. No. 21), to which plaintiffs responded in opposition (Dkt. No. 23).  For the reasons stated in this Order, the Court denies the motion (Dkt. No. 21).

## I.      Motion To Exclude Affidavit

As a preliminary matter, the Court will address the State of Arkansas' motion to exclude the affidavit of Richard Winger under Federal Rules of Evidence 104 and 702.  Mr. Winger states in his affidavit that he considers himself "an expert in the field of minor political parties, independent candidates, and election and ballot access laws in the United States . . . ."  (Dkt. No. 21-1, ¶ 2).  The State of Arkansas argues that the Court should evaluate the admissibility of Mr. Winger's opinions in terms of their reliability, relevance, and overall helpfulness to the trier of fact.  Fed. R. Evid. 104 and 702; *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  He asserts that the Court should exclude Mr. Winger's affidavit as unhelpful and inadmissible "because he offers no scientific, technical, or other specialized knowledge that will help the trier of fact to understand the evidence or to determine a fact in issue." (Dkt. No. 21, at 2-3).  Further, the State of Arkansas claims that the Court should exclude the affidavit because the

LPAR chose the date of the preliminary injunction hearing and that it should not be permitted to support its request for relief with a purported expert's hearsay affidavit that cannot be subjected to the test of cross-examination.  *See Wounded Knee Legal Defense/Offense Committee v. Federal Bureau of Investigation*, 507 F.2d 1281, 1287 (8th Cir. 1974).

In opposition to the motion, the LPAR explains certain circumstances that surrounded the submission of Mr. Winger's affidavit and his inability to attend the preliminary injunction hearing in this matter (Dkt. No. 23, at 1-3).  Further, the LPAR represents to the Court that Mr. Winger has previously been recognized as an expert witness and that his testimony was relied upon by the district court in *Citizens to Establish a Reform Party in Arkansas v. Priest*, 970 F. Supp. 690 (E.D. Ark. 1996), and *Green Party of Arkansas v. Daniels*, 445 F. Supp. 2d 1056 (E.D. Ark. 2006) ("*Green Party II*").

The Court denies the motion to exclude Mr. Winger's affidavit.  *Hoehne v. Kerns*, 47 Fed. App'x 796, 797 (8th Cir. 2002) (unpublished per curiam); *Wounded Knee*, 507 F.2d at 1286-87. The Court will admit the affidavit and, given that Mr. Winger was not available for cross examination at the hearing on the request for a preliminary injunction, give to it the weight the Court determines appropriate.

## II.     Findings Of Fact

The parties stipulated to certain facts (Dkt. No. 22) and then appeared before the Court for a hearing on the motion for preliminary injunction on June 4, 2019.  The facts below are taken from those stipulations and from the testimony and exhibits presented at that hearing, as well as the other exhibits in the record.

1.     The parties jointly stipulated to the following facts:

a.      Three percent of the total vote cast for Governor of Arkansas in the November 2018 general election is 26,746 votes (Dkt. No. 22, ¶ 2).

b.      The next preferential primary election and non-partisan general election in Arkansas will be held on March 3, 2020, and the next general primary election in Arkansas will be held on March 31, 2020 (*Id.*, ¶¶ 3-4).

c.      The next general election and non-partisan runoff election in Arkansas will be held on November 3, 2020 (*Id.*, ¶ 5).

d.      Pursuant to Arkansas Code Annotated § 7-7-205(a)(6), the current petition signature deadline for political party recognition in Arkansas is September 5, 2019, which is 60 days before the party filing period (*Id.*, ¶ 6).

2.      The laws governing the certification requirements for new political parties are found at Arkansas Code Annotated § 7-7-205, which was amended by Act 164, effective February 18, 2019.  Per Act 164, any group wishing to form a new political party must file a petition with the Arkansas Secretary of State containing "the signatures of registered voters in an amount that equals or exceeds three percent (3%) of the total votes cast for the Office of Governor in the immediately preceding general election for Governor."  2019 Ark. Acts 164, § 2; Ark. Code Ann. § 7-7-205(a)(2).  In this Order, the Court refers to this as the "three percent requirement."

3.      To be placed on the ballot with a party label, a political party must be certified by the Arkansas Secretary of State.  *See* Ark. Code Ann. §§ 7-7-101–102; 7-5-207(d)(1).

4.      Prior to the passage of Act 164, a petition for a new political party in Arkansas needed the signatures of "at least ten thousand (10,000) registered voters in the state."  Ark. Code Ann. § 7-7-205(a)(2) (amended February 18, 2019).

5.      The laws governing the timing of the filing of a new political party petition are found at Arkansas Code Annotated § 7-7-203, which was amended by Act 545 of 2019.  Prior to the passage of Act 545, the "party filing period" was a one-week period "ending at 12:00 noon on the first day in March and beginning at 12:00 noon one (1) week prior to the first day in March." Ark. Code Ann. § 7-7-203(c)(1).  Per Act 545, however, § 7-7-203(c)(1) was amended to state that "[f]or years in which the office of the United State[s] will appear on the ballot at the general election," the party filing period begins "at 12:00 noon on the first Monday in November preceding the general primary election and end[s] at 12:00 noon on the seventh day thereafter."  2019 Ark. Acts 545, § 2.

6.      A new party petition must be filed at least 60 days before the party filing period. Ark. Code Ann. § 7-7-205(a)(6).  Furthermore, the signatures on the filed petition must not be more than 90 days old at the time the petition is filed.  Ark. Code Ann. § 7-7-205(a)(4)(B). Throughout this Order, the Court refers to this as the "90-day window."

7.      A new political party that files a petition with the enough signatures and is certified must nominate its candidates "by convention" rather than by primary election for the first general election after certification of a sufficient petition.  Ark. Code Ann. § 7-7-205(c)(2)(A).

8.      Certificates of nomination for those nominated at a new party convention "shall be filed with the [Arkansas] Secretary of State or the county clerk no later than 12:00 noon on the date of the preferential primary election."  Ark. Code Ann. § 7-7-205(c)(2)(B)(ii).

9.      In the event a new political party is certified, placed on the ballot, and receives three percent of the total votes cast for the office of Governor or nominees for presidential electors at the first general election after the new political party is certified, then the new political party shall

nominate its candidates in a party primary as set forth in Arkansas Code Annotated § 7-7-101 *et seq.* Ark. Code Ann. § 7-7-205(c)(4).

10.     Candidates who wish to be placed upon the ballot as an independent with no political party affiliation in the county, township, or district in which the person is seeking office may do so by filing a petition "signed by not less than three percent (3%) of the qualified electors in the county, township, or district in which the person is seeking office, but in no event shall more than two thousand (2,000) signatures be required for a district, county, or township office." Ark. Code Ann. § 7-7-103(b)(1)(A). If the independent candidate is seeking a statewide office or any office for which a statewide race is required, that candidate's petition must either have 10,000 signatures or meet the three percent requirement, whichever is lesser. Ark. Code Ann. § 7-7-103(b)(1)(B).

11.     Additionally, any political group or independent candidate "desiring to have the names of its candidates [or candidate] for President and Vice President printed on the ballot shall file a petition with the [Arkansas] Secretary of State by noon on the first Monday of August of the year of the election," and the petition must contain the signatures of 1,000 registered voters of Arkansas. Ark. Code Ann. § 7-8-302(5)(B).

12.     Richard Winger, an individual who considers himself an expert in the field of minor political parties, independent candidates, and election and ballot access laws in the United States, has presented an affidavit in this case (Dkt. No. 21-1, ¶ 2). Mr. Winger has testified as an expert witness in two prior ballot access challenges in the Eastern District of Arkansas (*Id.*, ¶ 4).

13.     Mr. Winger asserts that, prior to 1971 in Arkansas, no petition was needed for a political party to be placed on the general election ballot for all offices (*Id.*, ¶ 6). He further asserts that, in 1971, the Arkansas General Assembly imposed a petition requirement on political parties

that had not polled as much as 7% of the vote in the last election.  He states that no new political party ever succeeded in satisfying the 7% requirement (*Id.*).

14.     Mr. Winger further asserts that, between 1977 and 2007, with the three percent requirement in force, no new political party successfully petitioned for ballot access without court intervention, even with 150 days in which to collect petition signatures (Dkt. No. 21-2, ¶ 6).

15.     Mr. Winger states that only three independent candidates have successfully gathered the 10,000 valid signatures necessary to run for statewide office as an independent (*Id.*).

16.     Mr. Winger maintains that, from 2007 through 2018, when Arkansas law allowed a new political party to be recognized with 10,000 valid signatures, only one new political party qualified by petition in 2008, 2010, 2016, and 2018 (*Id.*, ¶ 8).  In 2012 and 2014, only two new political parties qualified by petition (*Id.*).

17.     Mr. Winger further asserts that, in 2016, only 34 of Arkansas' 100 state House seats had a contested election (Dkt. No. 21-2, ¶ 8).  Additionally, Mr. Winger asserts that, in three out of the four United States congressional races held in 2016 in Arkansas, the only candidates on the ballot were nominees from the Republican Party and the LPAR (*Id.*).

18.     Michael Pakko, the present chair of the LPAR, testified that the LPAR is currently a nonprofit organization dedicated to putting the LPAR on the ballot again.  He testified that, prior to the law passed in late February 2019, the law was that 10,000 valid signatures of Arkansas voters were required to establish a new political party with a deadline of 60 days prior to the candidate filing period and a 90-day petitioning window of the party's choosing.  Mr. Pakko also testified that, prior to late February 2019, the LPAR had started fundraising and announced an intent to seek to become a new political party once again before 2020.

19.     Mr. Pakko also testified about the "retention requirement."  He testified that retention conditions depend on the year and that, when the presidential election is taking place, the requirement is to obtain three percent of the votes in the presidential election and, in other races, it is three percent of the vote in the gubernatorial election.

20.     Mr. Pakko testified that the LPAR was able to meet the 10,000-signature requirement in 2012, 2014, 2016, and 2018.  He also stated that the LPAR's 2018 gubernatorial candidate gained 2.9 percent of the vote, which was as close as the LPAR had ever come to meeting the three percent requirement.  Mr. Pakko testified that, if the gubernatorial candidate had met the three percent requirement, then the LPAR would have been declared a political party and granted the same status as the Republicans and the Democrats.  If the LPAR had met the three percent requirement, Mr. Pakko testified that it would have had to select its nominees for the next election in a preferential primary.

21.     Mr. Pakko testified that, in the alternative, if the LPAR did not meet the three percent requirement and had to petition for ballot access, the law requires it to nominate its candidates by convention.  He also testified that, in the event the LPAR is recognized for the 2020 election, it would nominate its candidates at a convention.  Mr. Pakko explained that, under current law, a nominating convention must be held prior to the preferential primary.

22.     Mr. Pakko testified that he became aware of Senate Bill 163—later passed as Act 164 of 2019—due to calls from reporters.  As a result, he began to lobby the General Assembly by attending hearings of both the Senate and House Government Affairs Committee, writing emails to state Senators, and organizing a letter-writing campaign for LPAR members to contact their state Representatives.  He further testified that he spoke to members of the General Assembly

and informed them that the proposed law seemed to conflict with precedent and appeared to be a targeted action against the LPAR.

23.     Mr. Pakko explained that there is some perception that the LPAR draws votes away from the Republican Party, though he noted that he has not seen documented evidence of this phenomenon.  According to Mr. Pakko, the Senate Bill 163 was passed in the state Senate almost exactly along partisan political lines, with all the Republicans Party senators voting for the bill and only one Democratic Party senator voting for it.  He noted that the situation in the state House was more complicated but that support was overwhelmingly Republican while the Democratic caucus overwhelmingly voted against Senate Bill 163.

24.     He also testified that the House version of Senate Bill 163 contained an emergency clause, but the emergency clause did not initially pass.  A second vote was required to pass the emergency clause.  Mr. Pakko explained that, if the emergency clause had not been passed, the LPAR likely would have been able to achieve ballot access before the law took effect.

25.     Mr. Pakko also testified about his experience in the past with petition drives.  He noted that he has personally collected signatures and that the 10,000-signature requirement is a challenging endeavor.  He testified that there are limited venues for canvassing for signatures and that significant manpower is required to collect 10,000 signatures in 90 days.  He admitted that this is difficult to accomplish with a volunteer effort alone, so some professional canvassers are paid for with donated money.

26.     Mr. Pakko testified that the Green Party of Arkansas ("GPA") was not able to comply with the 10,000-signature requirement that has now been eliminated.  Specifically, the GPA was unable to get the 10,000 signatures required to be on the ballot either in 2016 or in 2018.

27.     Mr. Pakko testified that, as of June 4, 2019, the LPAR's petition drive had received approximately 15,700 signatures.  He further testified that validity checks are suggesting that the LPAR has somewhere around 74 to 75 percent valid signatures, which indicates that they have approximately 10,880 valid signatures.  He noted that this number of signatures is barely sufficient under the old law.  He also noted that the Arkansas Secretary of State determines the validity of the signatures.

28.     Mr. Pakko stated that the LPAR began its petition drive in April 2019 because they wanted to get started early enough to avoid the hot summer months.  He further testified that they wanted to make sure that they started the petition drive in time to petition on college campuses. He also noted that the LPAR wanted to petition at times when people are in town and not on vacation during the summer months.

29.     Mr. Pakko further testified that inclement weather impedes the petition process. Specifically, he testified that, if it is raining or if there is other inclement weather, those are wasted days for the petition process.  He noted that the number of signatures goes up and down with the weather.

30.     Mr. Pakko explained that each of the LPAR's past petition drives has required at least $30,000.00 in cash plus a considerable volunteer effort.  He further explained that the LPAR is financed mostly from independent small donors across the state and across the nation.

31.     Mr. Pakko also testified that he has experience, as chair of the LPAR, with petition drives that are closer to the primary and general elections.  He stated that the interest in an election increases as you get closer to it.  As for petition drives that are farther from an election, Mr. Pakko testified that it is more difficult to get people to stop and take some time out of their day on

something that is not as imminent as it might be if the petitions were being collected closer to election time.  He did concede that people are still willing to sign a petition.

32.    Mr. Pakko testified that he did not see any reason why a small new party would need to participate in a primary election, and he noted that he did not know if the LPAR would have much participation in a primary election.  He also noted that, when a new party is recognized and a nominating convention is held, the first time a LPAR candidate appears on a ballot is in the first ballot of the general election.  He explained that potential LPAR candidates must file with the state during the candidate filing period and notify the LPAR that they are interested in seeking the nomination of the LPAR.

33.    Mr. Pakko testified about the process for an independent candidate to be placed on a ballot.  He testified that an independent candidate may do so by collecting 10,000 petition signatures.  He further testified that an independent candidate only appears on the general election ballot.  Mr. Pakko testified that independent candidates are listed as independent and cannot have party labels listed on the ballot.

34.    Mr. Pakko testified that he does not see any reason why the deadlines have been accelerated for new political parties that obtain ballot access by collecting signatures.  He explained that, because the LPAR does not participate in the primaries, there is no reason for the LPAR candidates to have to provide paperwork during the party filing period.  Rather, he testified that the only effective deadline or practical deadline for the LPAR is to have LPAR candidates selected in time that the candidates can be printed on the ballots, which occurs much later in the process.

35.    Mr. Pakko further testified about the process for a new political party to have a candidate placed on the ballot for President of the United States.  According to Mr. Pakko, any

11

group that seeks to have a candidate for President appear on the ballot must collect only 1,000 signatures.  He testified that the deadline for such signatures is sometime in the middle of the year of the election.  Mr. Pakko stated that he did not understand why this rule existed for the President but for no other public offices.

36.     Mr. Pakko also testified that the Arkansas Secretary of State will not accept petitions for ballot access that are not facially sufficient.  Mr. Pakko explained that he does not believe that the Arkansas Secretary of State will accept the LPAR's petition for ballot access if it contains less than 26,746 signatures.

37.     Mr. Pakko testified that he understood that population increase was one justification for the increased signature requirement, but he testified that he pointed out to a state House committee that, from 2007 to the present, the population of Arkansas has increased by six percent and that, to index properly for population growth, the signature requirement would need to be increased only to 10,600 signatures.

38.     Mr. Pakko also testified that in 2018, of the 100 members of the state House, 54 members were unopposed, even with the LPAR on the ballot.  He testified that, had it not been for the LPAR, 59 percent of the state House races would have been uncontested.  Mr. Pakko further stated that, in 2016, the LPAR was the only opposition in three out of four of Arkansas' federal congressional races.  Mr. Pakko explained that, if the LPAR is not able to gain ballot access as a new political party, the LPAR's only recourse would be to only place a presidential candidate on the ballot, but he noted that this would not allow the LPAR to run candidates in races for the General Assembly or county and township offices.

39.     Mr. Pakko further testified that the LPAR is collecting signatures as quickly as the LPAR can and that if the LPAR was to count every signature collected from April 1, 2019, then

June 28, 2019, would be the 90-day deadline to turn in those signatures to the Arkansas Secretary of State.  Mr. Pakko noted that it would not be feasible to attain valid 26,746 signatures given where the LPAR is after two months of working as hard as possible.  He elaborated that, in the time before June 28, 2019, the LPAR could probably collect another 6,000 to 7,000 signatures, which would give the LPAR a raw signature count of approximately 22,000 or 23,000.  He noted, however, that the more quickly the LPAR collects signatures, the higher the invalid numbers are going to be.

40.     Mr. Pakko stated that, to satisfy the three percent requirement, the LPAR would require an infusion of more resources in the form of more canvassers and financing.

41.     Mr. Pakko also discussed the difference between a new political party petitioning for ballot access and an initiative petition.  He noted that an initiative petition is due approximately 60 or 90 days before the election, so sometime during the summer of the year of the election.  He also testified that there is no limitation on how long signatures for an initiative petition may be collected.  Further, he testified that there is a cure period for initiative petition proponents to collect more signatures if there is an insufficient number of signatures on an initiative petition.  He noted that a handful of initiatives have been able to get on the ballot in each election.

42.     Mr. Pakko conceded that gathering signatures for a ballot access petition has different requirements than gathering signatures for an initiative petition.  Specifically, he conceded that the canvasser's signature and a notary are not required when gathering signatures for a ballot access petition.  He admitted that a canvasser for a ballot access petition does not have to be a registered voter.  He also admitted that signatures for a ballot access petition can come from anywhere in the state.

43.     Mr. Pakko explained that there is a form for gathering signatures for a ballot access petition.  Mr. Pakko stated that the form says that the undersigned seek to form a political party to appear on the general election ballot in 2020 and that there is a space for ten signatures per page on the form.  He also stated that the person signing the petition must identify the date on which the person is signing the form.  Mr. Pakko also testified that all the canvassers are Libertarians and that some of them are from out of state.  He noted that some of the canvassers are being compensated at the low end of the scale because they believe in the LPAR's cause.  Specifically, he noted that they have five paid canvassers.

44.     As for volunteer canvassers, Mr. Pakko testified that approximately 150 individuals are assisting with canvassing.  Mr. Pakko admitted that he has asked more than 150 individuals to assist with canvassing.  Mr. Pakko also described a form on the LPAR's website that anyone can use to sign the petition, though he noted that only half a dozen responses have come from this method.

45.     Mr. Pakko testified that the paid canvassers are not going door-to-door but instead are going to public places to obtain signatures.  He stated that the paid canvassers go to government buildings, public festivals, farmers' markets, and other gatherings on public property.  He noted that four of the paid canvassers are in Little Rock, though they travel to other parts of the state, and another is in Fort Smith.  Mr. Pakko did not know for certain if his canvassers would attend certain events in the future.  Mr. Pakko did admit that he and other canvassers gathered signatures at the Toad Suck Days festivals and that signatures were collected at the Bentonville Film Festival.  Mr. Pakko stated that he did not believe any canvassers had been sent to the Magnolia Blossom Festival.  Mr. Pakko explained that a common issue at large events is that there are many participants from out of state.  Mr. Pakko said that he believes the LPAR has canvassers at

Oaklawn in Hot Springs, Arkansas.  Mr. Pakko noted that his canvassers have had some problems collecting signatures at license offices, college campuses, public libraries, and post offices due to purported restrictions on access.

46.     Mr. Pakko also stated that the paid canvassers are not employees but are instead independent contractors who use their judgment as to where they can collect the most signatures. He noted that the paid canvassers look at event calendars and ask for input from local people regarding events.  The paid canvassers choose the most productive venue they can find.  Mr. Pakko admitted that he does consult with the paid canvassers.

47.     As for searching for volunteers, Mr. Pakko stated that the LPAR utilizes Facebook and Twitter, though it does not have a presence on Craigslist or Nextdoor.  Mr. Pakko also testified that the LPAR has a website where volunteers can sign up to canvass.

48.     The Court also heard testimony from Michael Kalagias, a registered voter in Arkansas and a past LPAR candidate.  Mr. Kalagias testified that he once received more than three percent of the vote in a race for the state House, though he failed to meet the three percent threshold in a race for a federal congressional seat.  Mr. Kalagias is the chair of the Benton County Libertarian Party and is an affiliate for the state party for Benton County, Arkansas.

49.     Mr. Kalagias testified that he has petitioned for signatures and that the Walmart shareholders meeting is a difficult place for him to gather signatures due to the number of non-Arkansas residents who attend the meeting.  Mr. Kalagias also testified that the weather has impacted the current petition drive; specifically, he noted that the Bentonville First Friday festival was cancelled due to weather.  He explained that his role as a firefighter had impacted his ability to petition in the 90-day window.

50.     Mr. Kalagias also testified about his experience canvassing far in advance of an election.  He testified that people are not as interested in canvassing until an election is near.  Specifically, he testified about an incident where he sought permission to canvass a farmer's market and was told that the market would prefer to wait to host political events like canvassers until closer to the political season.  Mr. Kalagias explained that this is not helpful for the LPAR's volunteers.

51.     Mr. Kalagias also testified that something unforeseen would have to occur for the LPAR to collect the signatures necessary to satisfy the three percent requirement.  He noted that the LPAR does not get many financial contributions, which makes it difficult for them to afford canvassers.  He further noted that most of the LPAR's time and resources are spent on ballot access and on petitioning rather than on being able to campaign for officers or finding candidates for office.

52.     Mr. Kalagias testified that he had turned in approximately 30 to 40 signatures.

53.     The Court also heard testimony from Mr. Christopher Olson, a registered voter in Arkansas and the vice chair of the LPAR.  Mr. Olson testified that he had only collected a handful of signatures.  Mr. Olson concurred that weather has a negative effect upon collecting signatures, though he conceded that he did not have a current plan to collect additional signatures.

54.     The Court heard testimony from Peyton Murphy, a staff attorney with the Arkansas Secretary of State's office, whose duties include advising about election laws related to party petitions and initiative petitions.  Mr. Murphy testified that the LPAR obtained access to general election ballots in Arkansas in 2012, 2014, 2016, and 2018.  He also testified that the GPA gained ballot access in 2012 and 2014 but not in 2016 or 2018.  He conceded that neither the LPAR nor the GPA had ever obtained at least three percent of the popular vote during a gubernatorial or

presidential election.  If the LPAR had met the three percent requirement, Mr. Murphy testified

that the LPAR would not need to petition to become a new party.  Mr. Murphy explained that, to

his knowledge, for each election cycle, the LPAR had to present 10,000 signatures for ballot

access.  He noted that any registered voter could sign a ballot access petition.

56.  Mr. Murphy explained that the current requirement for a new party to gain ballot

access is three percent of the number of voters in the last gubernatorial election.  For an initiated

act to be placed on the ballot, Mr. Murphy stated that a petition with signatures equaling at least

eight percent of the votes cast in the last gubernatorial election is required.  For a constitutional

amendment to be placed on the ballot, the threshold is 10 percent.  There are also geographical

limitations as to where the signatures for an initiative petition may come from; Mr. Murphy

explained that an initiative petition requires that half of the required signatures be collected in 15

different counties.  He also explained that canvassers for initiative petitions must pass a

background check, sign affidavits, and provide sample signatures to the Arkansas Secretary of

State's office.  He further explained that each sheet of collected signatures for an initiative petition

must be signed by the canvasser and notarized.  He also testified that there is a 30-day period after

the first time an initiative petition is submitted in which the submitter has an opportunity to cure

any defects.  None of these requirements apply to ballot access petitions or canvassers.

56.  Mr. Murphy also testified about the laws governing independent candidates who

seek ballot access.  He testified that, for a statewide independent candidate to obtain ballot access,

that candidate must submit signatures satisfying the three percent requirement or collecting up to

10,000 signatures.  Mr. Murphy also testified that independent candidates have a 90-day window

to collect signatures.

57.     Mr. Murphy offered testimony on how signatures on a ballot access petition might be invalidated.  He testified that a signature might be invalidated because the signor was not a registered voter.  A duplicate signature by someone who had already signed the petition would be invalidated.  After reviewing data from the Arkansas Secretary of State's office, Mr. Murphy testified that the LPAR had a validation rate of 76.3 percent in 2016.  He also testified that the LPAR had a validation rate of 84.4 percent in 2018.

58.     On the other hand, Mr. Murphy testified that the 2016 casino petition only had a 71 percent validity rate.  Similarly, he testified that the validity rate for the first 2018 casino petition was 73 percent and that the validity rate for the second 2018 casino petition was 68 percent.  Mr. Murphy testified that, for the two medical marijuana petitions in 2016, one had a validity rate of 65.9 percent and the other had a validity rate of 72.9 percent.  He also testified that the validity rate for the 2018 minimum wage petition was 75.7 for the initial submission and 73.1 for the second submission.  Finally, he testified that the validity rate for the 2018 term limits petition was 68.5 percent.

59.     Mr. Murphy further testified that initiative petitions have successfully been placed on the ballot in the 2014, 2016, and 2018 elections.  Mr. Murphy conceded that the deadline for initiative petitions is four months before the general election.  He conceded that it is possible that voter interest is higher the summer before an election compared to a year before the election.  He also noted that, in prior election cycles, initiative petitions could be circulated for any amount of time, so long as they had been approved by the Attorney General.  He acknowledged that there is no cure period for ballot access petitions that fail to include the required number of signatures.

60.     Mr. Murphy also explained the process the Arkansas Secretary of State's office uses to validate ballot access petitions.  First, the office checks each signature to see if the signor

is a registered voter.  This requires the Arkansas Secretary of State to verify that each signature is by a registered voter.  Next, the office tallies each page and generates a total number of valid signatures.

61.     Mr. Murphy testified that the new party filing period is now in November 2019 because the preferential primary was moved from May 2020 to March 2020.  He noted that the preferential primary was moved to March 2020 so that Arkansas could participate in Super Tuesday primaries.

62.     Mr. Murphy testified that any candidate who wants to run for office in November 2020 must fill out a political practices pledge and a candidate information form.

63.     Mr. Murphy testified that there are 1,750,077 registered voters in Arkansas.

64.     Mr. Murphy testified that, to his knowledge, the only independent candidate who has successfully petitioned for statewide office is Trevor Drown in 2010.  Mr. Winger's affidavit agrees that Mr. Drown qualified for the ballot as an independent candidate by satisfying the 10,000-signature requirement, but he also avers that two other independent candidates satisfied the 10,000-signature requirement between 1977 and 2006 (Dkt. No. 21-1, ¶ 6).

65.     The Court also heard testimony from Meghan Cox, who is co-founder of Lincoln Strategy Group and who specializes as a national political consultant in ballot access.  Ms. Cox testified that, through her work, she has certified candidates, ballot measures, and initiatives in 34 states, including Arkansas' 2016 tort reform measure.  Ms. Cox testified that, during the 2016 tort reform petition drive, it took 40 days to collect approximately 148,000 valid signatures.  Ms. Cox testified that this was possible because, in coordinating this effort through her employment, she used at least 80 canvassers brought in from out-of-state as well as local canvassers.

66.     Ms. Cox also testified about a ballot access measure she worked on in Nebraska where she oversaw the collection of 166,692 signatures in 82 days.  She noted that approximately 42,000 of those signatures were collected by volunteers.  The measure at issue there related to the death penalty, and Ms. Cox noted that there was a lot of controversy.  Ms. Cox explained that, in her opinion, people are less willing to sign a petition that is controversial.

67.     Ms. Cox opined that it is much easier for the LPAR to collect signatures for a ballot access petition than an initiative petition because of the lack of a geographic disbursement requirement and because there are very strict rules that govern initiative petitions in Arkansas.

68.     Ms. Cox explained how she collected signatures in Nebraska.  According to her, in coordinating this effort through her employment, she trained volunteers on verification and how to circulate petitions by using massive field trainings with town halls using screens to train remotely canvassers.  She noted that this effort required constantly calling and following up with the volunteers.  Furthermore, she agreed that a high degree of organization was necessary in the Nebraska petition drive.

69.     Ms. Cox further testified that most referendums take place in 90 days.  She also stated that it is not uncommon for there to be a 60-day period to collect signatures.  Ms. Cox also testified that, in one situation, her company through its efforts collected 66,000 signatures in a week.

70.     Ms. Cox also stated that she and her company have organized ballot access petitions for political candidates.  She stated that it is probably easier to get a signature for an unknown candidate than someone who is well known, in her experience.

71.     Ms. Cox opined that the laws governing new party ballot access in Arkansas are relatively easy to satisfy.  She also opined that she believed that the LPAR needs to collect between

35,000 to 37,000 signatures to satisfy the three percent requirement and that this is a very achievable requirement. She later stated that, at a 78 percent validity rating, the LPAR will need approximately 35,000 signatures to satisfy the three percent requirement.

72.     Ms. Cox testified that, if the LPAR were to hire her company, she would presume the validation rate to be between 75 and 78 percent. She also testified that, if she were running the LPAR's ballot access drive, she would first convene an entire master list of events and parades through September 4, 2019. She noted that, in the past, her company has been able to collect 9,000 to 10,000 signatures on a single day in a state like Arkansas by organizing all the volunteers. She further stated that 2019 might be a better time to collect petition signatures because the increased demand for canvassers in 2020 would increase the price of a petition drive in 2020. Ms. Cox also stated that she does not agree that registered voters are not interested in politics a year before an election.

73.     Ms. Cox explained that, if she was running the LPAR's ballot access drive, she would be very aggressive with the volunteer base. She hypothesized that, assuming each canvasser could collect 25 signatures per day, with 19 canvassers the LPAR's petition drive could be completed in 75 days. She conceded that such an effort would require diligence.

74.     As for hiring paid canvassers, Ms. Cox testified that she would use Facebook sites that are dedicated to ballot access drives. She stated that she would advertise on such sites and attract canvassers from out-of-state. She further stated that she would create a list of events and tell the paid canvassers to choose which events they wanted to cover. Additionally, if she realized that there was not enough coverage by the paid canvassers, Ms. Cox testified that she would use volunteers.

75.     Ms. Cox testified that she would never run a ballot access drive for a full 90 days due to weather challenges.  Therefore, she looked at 75-day and 60-day petition drive scenarios. She noted that paid canvassers collect approximately 50 signatures a day and that she generally pays canvassers per signature.

76.     Ms. Cox then testified about a series of projected budgets based upon various scenarios.  First, she assumed that, if every canvasser was part time and collected 25 signatures a day, then 16 canvassers would be needed to meet the 90-day requirement.  Alternatively, she testified that if those canvassers were full-time, the LPAR would only need eight canvassers.  For a 75-day project, Ms. Cox testified that the LPAR would need to collect 467 signatures per day. To accomplish this, she testified that the LPAR would need to hire seven canvassers to collect 70 signatures per day or nine canvassers to collect 50 signatures per day.  Alternatively, if the canvassers were part-time, then Ms. Cox testified that the LPAR would need to hire 19 canvassers. Finally, for a 60-day project, Ms. Cox testified that the LPAR would need to collect 583 signatures per day.  She testified that eight full-time canvassers would be needed to collect 70 signatures per day or 12 canvassers to collect 50 signatures per day.

77.     Ms. Cox testified that it would be feasible to hire canvassers for a statewide petition. She also testified that it was not burdensome to collect 26,740 valid signatures in 90 days.  She was not sure that the LPAR was doing all it could to recruit canvassers, based on her observations of the testimony.  She noted that the LPAR should seek out local canvassers as opposed to out-of-state ones since having local talent means that the LPAR will not have to pay extra lodging expenses for out-of-state canvassers.

78.     Ms. Cox also testified that her projected budgets assume that paid canvassers are paid $5.00 per signature.  She testified that if the LPAR only needed paid canvassers to collect

half of the required signatures, the cost would be approximately $98,000.00.  If the LPAR were able to rely entirely upon volunteers, Ms. Cox testified that the ballot access drive would cost approximately $3,000.00.

79.     Ms. Cox also presented a third scenario in which she speculated that the LPAR would use 40 percent paid canvassers and 60 percent volunteer canvassers.  She also assumed that the paid canvassers in this scenario would be paid $3.00 per signature.  She stated that this scenario would cost the LPAR approximately $55,000.00.

80.     Ms. Cox conceded that her calculations were based upon the LPAR's validity rates from 2016 and 2018, not from her own company's validity rates.  Ms. Cox also testified that, in some situations, paid staff follow up with volunteers on petition drives.

81.     Ms. Cox also testified that it is fairly reasonable to expect a volunteer to collect 25 signatures a day, though she did not testify as to how many hours a volunteer would need to work to collect 25 signature a day.  She notes that two of her recent petition drives involved an anti-dark money campaign and the death penalty and that the volunteer base was potentially energized because those issues are controversial.  She also testified that it is reasonable for a volunteer to collect 25 signatures a day for 90 days.  She noted that the average amount of signatures a volunteer collects a day is approximately 25.  She did clarify that she did not anticipate that volunteers would need to work 90 consecutive days to meet her projections.

82.     The Court heard testimony from M.V. Hood III, a professor of political science from the University of Georgia.  Mr. Hood testified that the laws challenged by the LPAR in this case do not prevent the LPAR from participating in the electoral process.  Mr. Hood noted that the LPAR was not able to achieve a three percent statewide vote share in 2012, 2014, 2016, or 2018.

He also noted that the party petition deadline was moved to September 2019 so that the preferential primary could be held in March 2020.

83.     Mr. Hood also explained his understanding of Arkansas' current election laws regarding political party ballot access.  He testified that a political party is a group that can achieve at least three percent of the statewide vote at either a gubernatorial election or a presidential election.  He also testified that, if a political party fails to garner at least three percent of the total votes cast, that group would have to go back to the petition process.  He noted that, if a political party does garner three percent of the electorate in a statewide election, then that political party is allowed to nominate candidates for positions up and down the ballot and that those nominees appear on the ballot with a party label.

84.     Mr. Hood explained that the LPAR is not a recognized political party in Arkansas because the LPAR failed to meet the three percent retention requirement in the 2018 gubernatorial election.  He further explained that, if the LPAR can collect 26,746 signatures in the LPAR's petition drive, then the LPAR will be able to nominate candidates for any open office that is on the ballot in 2020.  Mr. Hood also explained that a presidential candidate can get on the ballot with a party label with only a thousand signatures in Arkansas.  He also noted that, if the LPAR candidate for President were to garner three percent of the statewide vote, then the LPAR would be a recognized political party in the next election cycle.

85.     Mr. Hood stated that the LPAR's candidate for president received 1.52 percent of the total statewide vote in Arkansas in 2012, 2.03 percent in 2014, 2.64 percent in 2016, and 2.9 percent in 2018.

86.     Mr. Hood explained that anyone can run as an independent candidate in Arkansas by collecting 10,000 signatures for a statewide office.  He noted that, for a district, county, or

township election in Arkansas, the signature requirement for independent candidates is capped at 2,000 signatures.  He did concede that independent candidates do not have a party label on the ballot; instead, he testified that independent candidates appear on the ballot with an "I" by their name.  He also testified that it is possible that an independent candidate could be a member of a political party.  He noted that he has seen this in certain states.

87.    Mr. Hood also testified that his research from Tennessee and Alabama shows that, regardless of whether a non-major party candidate has a third-party label or is listed as an independent, there is no difference for non-major party candidates in terms of the share of the vote.

88.    Mr. Hood explained that, for the LPAR to gain the ballot access in Tennessee, the LPAR would have to gather signatures equaling two-and-a-half percent of the gubernatorial vote.

89.    Mr. Hood testified about the differences between political party petitions, referendums, and initiatives in Arkansas.  He explained that an initiative is a process where citizens can directly place either legislation or a constitutional amendment on the ballot.  As for a referendum, he testified that a referendum is a vote to reject or accept legislation recently passed by the General Assembly.  He noted that he was not able to find any instances in the last 20 years of a referendum getting on the ballot in Arkansas, but he did note that 14 initiatives have been placed on the Arkansas ballot through citizen petitions in the last 20 years.

90.    Mr. Hood also discussed the signatures required to place referenda or initiatives on the ballot in Arkansas.  He testified that, based upon the number of votes in the last gubernatorial election in Arkansas, an initiated legislative act would require 71,324 signatures.  As for an initiated constitutional amendment, he testified that 89,155 signatures would be required.  For a referendum, he testified that 53,493 signatures would be required.  Mr. Hood also noted that

referendum petitions must be completed within 90 days following the adjournment of the General Assembly.

91.     Mr. Hood explained that, in Alabama, the Libertarian Party has complied with a three percent requirement.  Regarding Tennessee, Mr. Hood stated that he believed it was correct that minor parties had to file their petitions for ballot access 90 days before the general election. He also conceded that the longer a group has to collect petition signatures, the more petition signatures that group may be able to collect.

92.     When asked if there was a necessary reason for new political party petitions to meet the three percent requirement in Arkansas, Mr. Hood testified that it does bring the signature requirement for new party petitions in line with the retention requirement.  When asked if the ballot access requirement and the retention requirement must be identical, Mr. Hood stated that they do not have to be identical.

93.     When asked if a ballot is overcrowded due to the presence of three or four political parties on the ballot, Mr. Hood answered that, no, it was not overcrowded.  He also testified that having a Libertarian, a Democrat, and a Republican on a ballot would not create an overcrowded ballot.

94.     While the Court has had this matter under advisement, the parties have informally apprised the Court of the status of this matter.  *See* Court's Exhibit 1.

**III.    Applicable Standard**

When determining whether to grant a motion for preliminary injunction, this Court considers:  (1) the threat of irreparable harm to the movant; (2) the movant's likelihood of success on the merits; (3) the balance between the harm to the movant and the injury that granting an injunction would cause other interested parties; and (4) the public interest.  *Kroupa v. Nielsen*, 731

F.3d 813, 818 (8th Cir. 2013) (quoting *Dataphase Sys. Inc. v. CL Sys.,* 640 F.2d 109, 114 (8th Cir.

1981)). Preliminary injunctive relief is an extraordinary remedy, and the party seeking such relief

bears the burden of establishing the four *Dataphase* factors. *Watkins Inc. v. Lewis,* 346 F.3d 841,

844 (8th Cir. 2003).

The Court examines the *Dataphase* factors as applied to plaintiffs' request for a preliminary

injunction. *See Dataphase*, 640 F.2d at 109. Under *Dataphase*, no one factor is determinative.

*Id.* at 113. The focus is on "whether the balance of the equities so favors the movant that justice

requires the court to intervene to preserve the *status quo* until the merits are determined." *Watkins*,

346 F.3d at 844.

The Eighth Circuit revised the *Dataphase* test when applied to challenges to laws passed

through the democratic process. Those laws are entitled to a "higher degree of deference."

*Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 725, 732 (8th Cir. 2008). In such

cases, it is never sufficient for the moving party to establish that there is a "fair chance" of success.

Instead, the appropriate standard, and threshold showing that must be made by the movant, is

"likely to prevail on the merits." *Id.* Only if the movant has demonstrated that it is likely to prevail

on the merits should the Court consider the remaining factors. *Id.*

## IV.   Likelihood Of Success On The Merits

Plaintiffs argue that the ballot access statutes governing new political parties in Arkansas

unconstitutionally deny them equal protection of the laws, the right to political association, the

right to petition for political party recognition, and the right to cast their vote effectively for all the

candidates of their choice in Arkansas' November 2020 general election (Dkt. No. 12, at 2).

Plaintiffs argue that three interrelated election laws are unconstitutional as applied to them: (1)

the three percent requirement found at Arkansas Code Annotated § 7-7-205(a)(2); (2) the 90-day

window for collecting the required number of signatures set forth at Arkansas Code Annotated § 7-7-205(a)(4)(B); and (3) the September 5, 2019, deadline for submitting the signatures.

Plaintiffs seek a preliminary injunction enjoining Mr. Thurston, in his official capacity as the Arkansas Secretary of State, and his agents from enforcing the provisions of Arkansas Code Annotated §§ 7-7-101, 7-7-203(c)(1), 7-7-205(a)(2), 7-7-205(a)(4)(B), 7-7-205(a)(6), and 7-7-205(c)(3) as they apply to plaintiffs for the November 2020 general election (Dkt. No. 12, at 1). For the reasons discussed below, the Court concludes that plaintiffs are likely to prevail on their argument that Arkansas Code Annotated §§ 7-7-101, 7-7-203(c)(1), 7-7-205(a)(2), 7-7-205(a)(4)(B), 7-7-205(a)(6), and 7-7-205(c)(3), as applied to plaintiffs for the 2019-2020 Arkansas general election cycle and for all subsequent general election cycles in the State of Arkansas, violate their associational rights under the First and Fourteenth Amendments.

### A.    Fundamental Rights Claims Under The First And Fourteenth Amendments

Plaintiffs first challenge the constitutionality of the ballot access statutes governing new political parties in Arkansas, arguing that those statutes unduly burden their First and Fourteenth Amendment fundamental rights.    State ballot access restrictions, though not always unconstitutional, burden two kinds of rights:  "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).  As the Supreme Court has explained, these rights "rank among our most precious freedoms." *Id*.  Indeed, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which . . . we must live." *Id*. (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964)).  The Supreme Court concluded that "[o]ther rights, even the most basic, are illusory if the right to vote is undermined." *Id*. (quoting *Wesberry*, 376 U.S. at 17).

To determine whether a state law ballot access restriction unconstitutionally violates those rights, the Court:

> must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff[s] seek[] to vindicate, and then the Court "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule, determining not only the legitimacy and strength of each of those interests but also the extent to which those interests make it necessary to burden the plaintiff[s'] rights.

*Moore v. Martin*, 854 F.3d 1021, 1025 (8th Cir. 2017) (internal quotations omitted).  The Court must "review the statute under a form of strict scrutiny referred to as the 'compelling state interest test' by first determining whether the challenged statute causes a burden of some substance on a plaintiff's rights, and if so, upholding the statute only if it is 'narrowly drawn to serve a compelling state interest.'"  *Moore*, 854 F.3d at 1026 (quoting *Libertarian Party of N.D. v. Jaeger*, 659 F.3d 687, 693 (8th Cir. 2011) (internal quotes omitted)).  "It has been recognized . . . that the entire election scheme must be analyzed to determine whether undue constraints on access to the ballot exist."  *Libertarian Party v. Bond*, 764 F.2d 538, 541 (8th Cir. 1985) (citations omitted). Furthermore, the State of Arkansas bears the burden of showing that the challenged statutes are narrowly drawn to serve the State's compelling interest.  *Moore*, 854 F.3d at 1026 (citing *Eu. v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 222 (1989)).

This is not the first challenge to Arkansas' ballot access statutes.  Based upon the Court's review of the previous challenges, other relevant precedent, and the record before it, the Court concludes that plaintiffs have met their burden of demonstrating that they are likely to prevail in proving that Arkansas Code Annotated §§ 7-7-101, 7-7-203(c)(1), 7-7-205(a)(2), 7-7-205(a)(4)(B), 7-7-205(a)(6), and 7-7-205(c)(3), as applied to plaintiffs for the 2019-2020 Arkansas general election cycle and for all subsequent general election cycles in the State of Arkansas, impose a severe burden on their rights under the First and Fourteenth Amendments and that the

State of Arkansas will be unable to demonstrate that the statutes are narrowly drawn to serve a compelling State interest.

        **1.**      **Prior Challenges To Arkansas' New Political Party Ballot Access Statutes**

The Court first notes that the Eighth Circuit Court of Appeals and district courts in this district have previously examined and ruled on proposed changes to Arkansas' new political party ballot access requirements.  In *Citizens To Establish a Reform Party in Arkansas*, the district court concluded that Arkansas' new political party ballot access requirements, individually and combined, violated the First and Fourteenth Amendment rights of the Reform Party, an association that sought recognition as a new political party in Arkansas.  At that time, Arkansas required a new political party to file a petition signed by at least three percent of the total vote cast in the last gubernatorial or presidential election and to file such a petition in the January before the general election.  970 F. Supp. at 692-93.  Furthermore, the court also noted that initiative and referendum petitions had a 30-day "cure" period and that independent candidate petitions required signatures equaling three-percent of the qualified electors of the state or 10,000 signatures of qualified electors, whichever amount was lesser.  *Id*. at 693-94.  The court concluded that "[e]arly filing deadlines such as the one herein at issue unduly hinder, if not bar, minor political parties from influencing the electoral process by ballot access."  *Id*. at 698.  The court also noted that filing deadlines in March or April in a general election year "would normally pass before any real political activity or interest therein could be expected."  *Id*. (quoting *Am. Party v. Jernigan*, 424 F. Supp. 943, 949 (E.D. Ark. 1977)).

The *Citizens To Establish a Reform Party in Arkansas* court concluded that the January deadline for filing a new political party petition required strict scrutiny and that the Arkansas Secretary of State failed to establish a compelling state interest for that deadline or demonstrate

how that deadline was the "least restrictive means available by which to satisfy that interest." *Id*. Additionally, the court concluded that, by allowing independent candidates to gain ballot access by presenting 10,000 signatures yet denying that same right to new political parties, the Arkansas legislature "arbitrarily" applied different standards without any compelling interest or rational basis for that decision.  970 F. Supp. at 699.  Accordingly, the court held that the signature requirements for independent candidates and new political parties "should be the same" and held that the Reform Party qualified as a new political party in view of that fact that it had submitted more than 10,000 valid signatures to the Arkansas Secretary of State.  *Id*.

Next, the GPA brought a challenge to Arkansas' deadline for the filing of petitions for new political parties, which at that time was the first Monday in May before the general election.  *Green Party of Arkansas v. Priest*, 159 F. Supp. 2d 1140, 1142 (E.D. Ark. 2001) ("*Green Party I*"). Specifically, the GPA asserted that this deadline made it impossible "for a new or emerging political party to gain recognition in 2011 and thereby to run a party candidate in the special election to be held November 20, 2001."  159 F. Supp. 2d at 1142.  The court in *Green Party I* held that the burdens imposed by preventing new political parties from gaining recognition in odd-numbered years was sufficiently severe to require strict scrutiny.  *Id*. at 1144.  The court also held that "[t]he State has no compelling interest in allowing unrecognized parties to participate in some elections but not others."  *Id*.

The GPA again successfully challenged Arkansas' new political party ballot access laws in 2006.  *Green Party II*, 445 F. Supp. 2d at 1063.  At that time, Arkansas required new political parties to present a petition meeting a three percent requirement yet allowed ballot access to independent candidates who presented only 10,000 signatures.  445 F. Supp. 2d at 1058.  Citing *Citizens To Establish a Reform Party in Arkansas* and *Green Party I*, the *Green Party II* court

concluded that Arkansas' three percent requirement for new political party recognition imposed "a severe burden under the First and Fourteenth Amendments on the association rights of the Green Party" and was "not narrowly drawn to serve a compelling state interest." *Id*. at 1063.

In 2010, the GPA once again challenged Arkansas' new political party ballot access laws. *Green Party of Arkansas v. Daniels*, 733 F. Supp. 2d 1055, 1057 (E.D. Ark. 2010) ("*Green Party III*"), *aff'd by Green Party of Arkansas v. Martin*, 649 F.3d 675 (8th Cir. 2011) ("*Green Party IV*"). Specifically, the GPA challenged Arkansas Code Annotated § 7-1-101(21)(C), which provided that "[w]hen any political party fails to obtain three percent (3%) of the total votes cast at an election for the office of Governor or nominees for presidential electors, it shall cease to be a political party . . . ." *Green Party III*, 733 F. Supp. 2d at 1057. The court in *Green Party III* held that the burdens imposed upon the GPA by Arkansas Code Annotated § 7-1-101(C)(21) were not severe enough to invoke strict scrutiny, in part because of the GPA's "track record of actually getting on the ballot," which included the GPA's successful petitions for ballot access in 2006, 2008, and 2010. *Id*. at 1061. The *Green Party III* court held that "[s]ecuring 10,000 signatures . . . within any ninety-day period of the Green Party's choosing . . . is simply not a severe burden for a political party" that had previously received approximately 200,000 votes in a statewide election. *Id*. In other words, the *Green Party III* court held that the existence of the 10,000-signature option for ballot access reduced any burden created by a three percent retention requirement.

The decision in *Green Party III* was affirmed by the Eighth Circuit in *Green Party IV*. There, the Eighth Circuit rejected the argument that Arkansas' three percent retention requirement posed a severe burden by reasoning that "[a]chieving ballot access is a task that can be, and has been accomplished with regularity" because "[t]he petition process permits the Green Party to secure ballot access by submitting 10,000 signatures from any registered Arkansas voters . . . ."

649 F.3d at 684.  On this score, the Eighth Circuit noted that the GPA's past success "diminish[ed] its own argument."  *Id.* (citation omitted).  The Eighth Circuit ultimately concluded that Arkansas' ballot access laws did not prevent the GPA from participating in the electoral process because, in spite of the three percent retention requirement, the GPA was able to "secure ballot access for their entire slate of candidates by filing a petition comprised of the signatures of 10,000 registered Arkansas voters . . . ."  *Id.* at 685.  The Eighth Circuit also noted that GPA candidates running for local offices could secure ballot access by filing a petition comprised of "at most 2000 signatures" and that the GPA's candidate for President could secure ballot access "by filing a petition comprised of a mere 1000 signatures."  *Id.*

### 2.     Prior Challenges To Arkansas' Independent Candidate Ballot Access Statutes

The Court also notes the series of federal challenges to Arkansas' ballet access requirements for independent candidates.  In *Lendall v. Bryant*, 387 F. Supp. 397, 400-03 (E.D. Ark. 1975) (per curiam) ("*Lendall I*"), a three-judge panel held unconstitutional the following requirements:  (1) a deadline of the first Tuesday in April in the election year for an independent candidate's petition and (2) a signature requirement of fifteen percent of the qualified electors as determined by the last gubernatorial vote.  Later, even after the signature requirements were reduced, a three-judge panel held that a filing deadline of the first Tuesday in April before the preferential primary election was unconstitutional.  *Lendall v. Jernigan*, No. LR-76-C-184 (E.D. Ark. Aug. 20, 1976), *aff'd mem.*, 433 U.S. 901 (1977) ("*Lendall II*").  A separate district court decision found that the petition requirement of ten percent of qualified electors, by itself, was unconstitutional.  *Lendall v. Jernigan*, 424 F. Supp. 951, 958 (E.D. Ark. 1977) ("*Lendall III*").  Additionally, another district court held that a one-time January 5 filing deadline accompanying a

one-time March 8 date for the preferential primary was unconstitutional.  *Lendall v. McCuen*, No.

LR-C-88-311 (E.D. Ark. Aug. 16, 1988) ("*Lendall IV*").

In 1994, the Eighth Circuit Court of Appeals did uphold the following ballot access

restrictions for independent candidates:  (1) a filing deadline thirty days before the primary

election; (2) a signature requirement of the lesser of three percent of qualified electors or ten

thousand signatures; and (3) a 60-day period in which to gather signatures.  *Langguth v. McCuen*,

30 F.3d 138 (8th Cir. 1994) (unpublished per curiam table decision).  Notably, however, the ballot

access restrictions in that case included deadlines for collecting signatures that ended "30 days

before the primary and 186 days before the general election."  *Id*. at *2

The Eighth Circuit has had an opportunity to review Arkansas' ballot access statutes for

independent candidates in the recent past.  *Moore v. Martin*, Case No. 4:14-cv-00065 JM, 2015

WL 13343585 (E.D. Ark. Aug. 25, 2015), *aff'd in part, reversed in part Moore*, 854 F.3d at 1023.

At the trial level, plaintiffs—independent candidates for Lieutenant Governor and the state

House—argued that "the petition deadline coupled with the signature requirement, lowered public

interest, and inconvenient petitioning time [are] unconstitutional."  2015 WL 13343585, at *5.  At

that time, the party filing period began one week prior to the first day in March and ended the first

day of March.  2015 WL 13343585, at *1.  Furthermore, prospective independent candidates for

statewide office had to file a political practices pledge, an affidavit of eligibility, a petition signed

by three percent of qualified electors or 10,000 qualified electors, whichever was less, and a notice

of candidacy.  *Id*.  Additionally, as is true now, petitions for independent candidates had to "be

circulated not earlier than ninety (90) calendar days before the deadline for filing petitions . . . ."

*Id*.  While the district court found that the March 1 deadline was a "burden of some substance,"

the district court also found that the "increased number of initiative petitions" and "ever increasing

litigation over petitions" constituted a compelling state interest. *Id*. at *6. Furthermore, the district court concluded that the regulations governing independent candidate petitions—including the signature requirements and petition deadlines—were "narrowly tailored to advance the State's interest in timely certifying independent candidates who wish to be placed on the ballot . . . ." 2015 WL 13343585, at *6. Accordingly, the district court denied plaintiffs' motion for summary judgment and granted the Arkansas Secretary of State's motion for summary judgment. *Id*. at *7.

The Eighth Circuit affirmed in part and reversed in part the district court's decision in *Moore*. First, the Eighth Circuit held that "[t]he district court correctly noted that the March 1 filing deadline for independent candidates imposes a burden of some substance on Moore's First and Fourteenth Amendment rights and that Arkansas has a compelling interest in timely certifying independent candidates for inclusion on the general election ballot." 854 F.3d at 1027. The Eighth Circuit disagreed, however, with the district court's conclusion that there was no genuine issue of material fact regarding whether the March 1 deadline was narrowly drawn to serve that compelling interest. *Id*. Specifically, the Eighth Circuit noted that the record evidence did not show that the burden of verifying petitions for nonpartisan candidates made it necessary to move the independent candidate petition deadline to March 1. *Id*. Furthermore, while the Eighth Circuit noted that "[s]tronger evidence exists to suggest that the processing of initiative petition signatures might conflict with the processing of independent candidate petition signatures," the Eighth Circuit noted that "a number of other relevant facts are unclear," including when independent candidate petitions were processed or "the amount of time required to process independent candidate petitions and the

feasibility of temporarily hiring additional election workers." *Id.* at 1028.  Accordingly, the Eighth

Circuit remanded the matter back to the district court for further proceedings.  *Id.*[1]

The Court is mindful of these prior cases, and the holdings in these cases, as it turns to

examine the facts of this matter in the light of controlling law.

### 3.   Burdens Imposed On Plaintiffs

Plaintiffs argue that "[t]he Arkansas election scheme for the recognition of new political

parties results in a deadline which is fourteen months . . . before the general election" and that "the

unnecessarily early petition signature deadline, limitation of petitioning time to ninety days, and

3% petition signature requirement" create unconstitutional burdens (Dkt. No. 12, at 10-11).  The

State of Arkansas retorts that "binding precedent precludes ruling the modicum-of-support

requirement unconstitutional," arguing that the Eighth Circuit has previously ruled that a three-

percent signature requirement is not unconstitutional (Dkt. No. 17, at 18-19).

Below, the Court first analyzes the record evidence to determine the scope of the burdens,

if any, imposed upon plaintiffs, as well as the evidence and precedents from other jurisdictions.

Based upon this review, the Court concludes that plaintiffs have demonstrated that they are likely

to prevail in demonstrating that the burdens imposed upon them by Arkansas Code Annotated §§

7-7-101, 7-7-203(c)(1), 7-7-205(a)(2), 7-7-205(a)(4)(B), 7-7-205(a)(6), and 7-7-205(c)(3), as

applied to plaintiffs for the 2019-2020 Arkansas general election cycle and for all subsequent

general election cycles in the State of Arkansas, are a severe burden upon their First and Fourteenth

Amendment rights.

---

[1]  Notably, the dissent in *Moore* would not have affirmed the district court's decision, but instead, based upon the State's failure to show that the ballot access laws were narrowly drawn to serve a compelling interest, would have granted judgment as a matter of law for the plaintiffs. 854 F.3d at 1030 (Smith, J., dissenting)

### a.  LPAR's History In Arkansas

"Past experience will be a helpful, if not always an unerring, guide:  it will be one thing if [the Libertarian Party has] qualified with some regularity, and quite a different matter if [it has] not."  *Storer v. Brown*, 415 U.S. 724, 742 (1974).  The record evidence shows that the LPAR has never been able to gather enough signatures to meet the three percent requirement; rather, its past successes in 2012, 2014, 2016, and 2018 gaining ballot access have been through the 10,000-signature requirement.  Indeed, the LPAR has never been able to garner three percent of the *vote* in a statewide election.  Another court in this district noted that, since 1977, only "one party has obtained ballot access by submitting" a petition that met the three percent signature requirement:  the Reform Party in 1996.  *Green Party II*, 445 F. Supp. 2d at 1058.  Additionally, the record evidence is that the GPA was unable to satisfy even the 10,000-signature requirement in 2016 or 2018.

### b.  The Signature Requirement And The 90-Day Window

This experience is buttressed by the record evidence before the Court related to LPAR's present petition drive.  The record evidence is that the LPAR had, as of the date of the hearing, been able to collect approximately 15,700 signatures from its start on April 1, 2019.  Further, the record evidence is that, even with additional petitioning efforts, the LPAR will be unable to meet the three percent requirement by June 28, 2019, which is 90 days past April 1, 2019, when the LPAR began collecting signatures.  Indeed, Mr. Pakko testified that the LPAR would require an infusion of resources in the form of money and canvassers to meet the three percent requirement.  Mr. Pakko also noted that each of the LPAR's past petition drives for ballot access had consumed approximately $30,000.00 and required a considerable volunteer effort.

Mr. Pakko affirmed that the LPAR was collecting signatures as quickly as it could and that if the LPAR were to count every signature collected from April 1, 2019, then June 28, 2019, would be the 90-day deadline to turn in those signatures to the Arkansas Secretary of State.  Mr. Pakko noted that it would not be feasible to attain 26,746 signatures given where the LPAR was after two months of working as hard as its members had to collect signatures.  He elaborated that, in the time from the hearing to June 28, 2019, the LPAR could probably collect another 6,000 or 7,000 signatures, which would give the LPAR a raw signature count of around 22,000 or 23,000.

Having studied her testimony and projections, the Court is skeptical of Ms. Cox's projections about the LPAR's ability to collect 26,746 valid signatures.  Ms. Cox estimated that LPAR would need to collect 35,000 raw signatures to produce 26,746 valid signatures.  Ms. Cox presented several budgets to the Court which explained the cost to the LPAR to collect the 26,746 valid signatures.  The budgets contained different time frames and were based upon different estimates regarding the use of paid and volunteer canvassers.  Ms. Cox conceded that she would not use her 90-day projection, given the possibility of inclement weather.  Instead, she opted to utilize a 75-day projection and a 60-day projection to estimate the work required to meet the goal.

For her 75-day projection, Ms. Cox testified that the LPAR would need to hire seven canvassers to collect 70 signatures per day or nine canvassers to collect 50 signatures per day. Alternatively, if the canvassers were part-time, then Ms. Cox testified that the LPAR would need to hire 19 canvassers.  Finally, for a 60-day project, Ms. Cox testified that the LPAR would need to collect 583 signatures per day.  She testified that eight full-time canvassers would be needed to collect 70 signatures per day or 12 canvassers to collect 50 signatures per day.  Ms. Cox testified that it would be feasible to hire canvassers for a statewide petition.  She also testified that, in her opinion, it was not burdensome to collect 26,746 valid signatures in 90 days.

She said that she was not sure that the LPAR was doing all it could to recruit canvassers. She also noted that the LPAR should seek out local canvassers, as opposed to out-of-state ones, since having local talent means does not require paying extra lodging expenses that would be associated with out-of-state circulators.

Ms. Cox also testified that, if volunteers could be recruited to collect half of the signatures, the LPAR would need to pay approximately $98,000.00 for paid canvassers. She also hypothesized that, if the LPAR could collect 60% of the signatures with volunteers and pay a reduced rate to collect the remaining signatures, then the LPAR would need to pay approximately $55,000.00 for paid canvassers. She also noted that, if the LPAR was able to find enough volunteers, collecting all the signatures would only cost them approximately $3,000.00.

There is no record evidence that the LPAR has the financial resources or volunteer base necessary to achieve Ms. Cox's projections. The record evidence is that the LPAR currently has approximately 150 volunteer canvassers and five paid canvassers. For her 75-day petition drive projection, Ms. Cox testified that the LPAR would need to collect 467 signatures per day; for her 60-day projection, she testified that the LPAR would need to collect 583 signatures per day. Each of Ms. Cox's projections assume that at least half of the necessary signatures will be collected by volunteers; if half of the signatures need to be collected by volunteers, then—according to the Court's calculation—those volunteers would need to collect approximately 233 or 291 signatures per day.[2] Since Ms. Cox testified that it was not unreasonable for a volunteer to collect 25 signatures a day, the Court infers that the LPAR would require approximately nine volunteers working per day to collect 233.5 signatures a day for 75 days or 11 volunteers working per day to

---

[2] 467/2=233.5 and 583/2=291.5.

collect 291.5 signatures a day for 60 days.[3]  Given that the LPAR has only been able to collect approximately 15,700 signatures utilizing its 150 volunteers and 5 paid canvassers, the Court is not persuaded that the LPAR could find enough additional volunteers to collect the number of signatures required to satisfy Ms. Cox's projections.

Put another way, the volunteer labor hours demanded by Ms. Cox's projects are unrealistic and illustrate the burden the three percent requirement and 90-day window places upon the plaintiffs.  Assuming that at least half of the 35,000 required raw signatures must be collected by volunteers, and that each volunteer can reasonably collect 25 signatures a day, the LPAR must find volunteers who can provide 700 days of volunteer work.[4]  If a volunteer must work an eight-hour day to collect 25 signatures, the Court further infers that Ms. Cox's projections would require approximately 5,600 hours of volunteer time in order to collect half of the raw signatures.[5]  Even if each volunteer must only work a four-hour day to collect 25 signatures, the Court infers that Ms. Cox's projections would require 2,800 hours of volunteer time in order to collect half of the raw signatures.[6]

There is no record evidence before the Court that the LPAR has access to volunteers who can provide approximately 5,600 or 2,800 hours of volunteer time.  If each of the LPAR's 150 volunteers were to commit an equal amount of volunteer time, Ms. Cox's projections would require each of them to volunteer approximately 37 manhours under the eight-hour work-day

---

[3] $233.5/25=9.34$ and $291.5/25=11.66$.

[4] $35000/2=17,500$ and $17,500/25=700$.

[5] $700*8=5,600$.

[6] $700*4=2,800$.

projection.[7]   Alternatively, the same projections would require each volunteer to volunteer approximately 18 manhours under the four-hour work day projection.[8]   In the Court's view, requiring the LPAR to find 150 volunteers who can, on average, each give up anywhere from 18 to 37 hours of work to canvass for signatures during a set period is a severe burden on the LPAR.

Even if the LPAR were able to find the requisite number of volunteers who could collect half of the signatures required to meet the three percent requirement, the Court concludes that the financial burden of collecting the remaining half of the necessary signatures would place a burden of some substance upon the LPAR.  Ms. Cox testified that it would cost the LPAR $98,000.00 to pay canvassers to collect half of the required signatures.  Ms. Cox also testified that, if paid canvassers were required to collect only 40% of the required signatures—an assumption that would increase the required number of volunteer manhours—and if those canvassers were paid at a lower rate, then the cost to the LPAR would be approximately $55,000.00.

The record evidence before the Court is that the LPAR's past petition drives have cost approximately $30,000.00.  There is no record evidence that the LPAR has additional financial resources that would allow it to pay to collect even 40% of the signatures required to meet the three percent requirement.  Mr. Kalagias testified that the LPAR does not get many financial contributions, which makes it difficult for them to afford canvassers.  Further, Mr. Pakko testified that the LPAR would require more resources to meet the three percent requirement within 90 days, which the Court understands to mean the LPAR does not presently have those resources.  Ms. Cox's projections do not include slightly more money being required by the LPAR; they include significantly more money being required by the LPAR.

---

[7]  5,600/150=37.3.

[8]  2,800/150=18.7.

For all of these reasons, the Court concludes that plaintiffs have demonstrated that they are likely to prevail in proving that the Arkansas ballot access statutes being challenged impose a severe burden on their constitutional rights.

### c.       September 2019 Petition Deadline

The three percent requirement within a 90-day petitioning window, however, does not stand alone in this case.  Instead, the Arkansas statutes challenged by plaintiffs set the petition deadline in September 2019, and the Court has been asked to examine the combined effects of the challenged Arkansas statutes.

The Court notes that the petition filing deadline in September 2019, more than a year prior to the general election—which is the first time a new political party candidate is placed on a ballot—very likely severely burdens plaintiffs' fundamental rights under the Court's understanding of controlling law.  In *Williams*, the Supreme Court struck down a 15% signature requirement in conjunction with a deadline to file signatures the February before the general election.  393 U.S. at 33.  The Supreme Court later upheld Georgia's June filing deadline for new political party petitions, noting that, unlike in *Williams*, "Georgia does not fix an unreasonably early filing deadline for candidates not endorsed by established parties." *Jenness*, 403 U.S. at 438. While the Court is cognizant that "[c]onstitutional challenges to specific provisions of a State's election laws . . . cannot be solved by any 'litmus-paper-test' that will separate valid from invalid restrictions," the Court notes that the filing deadline here—nearly a year prior to the general election—is far earlier than other filing deadlines for candidates not endorsed by established parties struck down by the Supreme Court.

This determination is supported by record evidence.  There is evidence in the record that the LPAR has had some difficultly canvassing in certain public places like a farmer's market

because those venues asked that political activity be restricted or limited until closer to the political season.   There also is some record evidence that certain people are not interested in signing petitions this far in advance, outside of the political season.  This evidence tends to support LPAR's claim that the early dates the LPAR is required to gather signatures also impacts its ability to meet the newly imposed statutory requirements.

Accordingly, in conjunction with the burdens created by the three percent requirement and the 90-day petitioning window, the Court concludes that plaintiffs are likely to prevail in demonstrating that the September 2019 filing deadline creates a severe burden on plaintiff's constitutional rights.

### d.        Initiative And Referendum Petitions In Arkansas

The record evidence regarding other petition drives in Arkansas does not convince the Court that the burdens facing plaintiffs are trivial or otherwise not severe.

First, as to the record evidence regarding initiative petition drives in Arkansas, while such petitions have successfully garnered far more than 26,746 signatures, the circumstances surrounding the gathering of those signatures are far different than those facing the LPAR. Notably, there is no limitation on how long signatures for an initiative petition may be collected, and the record evidence shows that such signatures may be collected well into the summer of an election year.  Additionally, initiative petitions, if insufficient, have the benefit of a 30-day cure period.  Similarly, to the extent the record evidence shows that it is possible to obtain 26,746 valid signatures in Arkansas in a 90-day petitioning window more than a year prior to a general election, the Court notes that there is no evidence before the Court regarding the cost of such an endeavor.

As to referendum petitions, Mr. Hood testified that he was unaware of any instance of a successful referendum petition in Arkansas in the last 20 years, and the Court notes that referendum

petitions, unlike initiative petitions, require that signatures be collected in a 90-day petitioning window following the adjournment of the General Assembly.  Ark. Const. Art. 5, § 1 ("Such petition shall be filed with the Arkansas Secretary of State not later than ninety days after the final adjournment of the session at which such Act was passed . . . .").

In other words, the record evidence relating to initiative and referendum petitions in Arkansas tends to show that successful petitions are those that have more than 90 days to collect signatures.  Accordingly, to the extent the State of Arkansas argues that plaintiffs are not facing a severe burden because initiative petitions have successfully garnered more than 26,746 valid signatures, the Court rejects that argument.

### e.      Petition Drives In Other Jurisdictions

Furthermore, the record evidence regarding petition drives in other states does not convince the Court that plaintiffs are not likely to prevail in demonstrating that Arkansas' ballot access statutes impose a severe burden on their First and Fourteenth Amendment rights.  Ms. Cox testified that she, through her work, organized an effort to collect over 166,000 signatures in 82 days in Nebraska, but she also noted that this was in relation to a controversial topic and did not testify as to how far in advance of an election those signatures were collected.  Ms. Cox explained that a high degree of organization was needed in the Nebraska effort and that her company had to organize trainings for canvassers in that effort.  Additionally, there is no record evidence regarding the amount of money necessary to finance those efforts in Nebraska.  Since both the cost and the full extent of the restrictions, or lack thereof, placed on petition efforts in Nebraska are unknown, the Court is not persuaded that the evidence regarding Ms. Cox's efforts in Nebraska undermines plaintiffs' argument that they are likely to prevail on the issue of whether the challenged Arkansas statutes impose a severe burden on their First and Fourteenth Amendment rights.

Similarly, the case law cited by the State of Arkansas does not convince the Court that Arkansas' new political party ballot access laws do not impose a severe burden on plaintiffs. The State of Arkansas argues that the Supreme Court's decision in *Jenness v. Fortson*, 403 U.S. 431, 433-34 (1971), upheld a five-percent cutoff, but this Court notes that the ballot access scheme under review in *Jenness* allowed 180 days to collect signatures and set the deadline for filing a petition on the second Wednesday in the June before the general election. The State of Arkansas notes that the Eighth Circuit upheld a ballot access statute for new political parties in *Libertarian Party of North Dakota*, but the Court notes that the challenged statute in that case required a petitioner to present "signatures equal to the *lesser* of 1% of the legislative district's population or 300 people." 659 F.3d at 691. Likewise, while the First Circuit Court of Appeals did uphold a five-percent requirement for new political parties in *Libertarian Party of New Hampshire v. Gardner*, 843 F.3d 20, 22 (1st Cir. 2016), petitioners in that state had "a bit more than seven months" to collect the signatures, and the time to collect the signatures was from January to August before the general election. The Eleventh Circuit Court of Appeals issued a similar ruling in *Libertarian Party of Florida v. State of Florida*, 710 F.2d 790, 794 (11th Cir. 1983), upholding a three percent requirement where petitioners had 188 days from January until September in the year of the general election to collect signatures.

The State of Arkansas cites many other instances where federal courts upheld signature requirement ballot access laws. *See Tripp v. Scholz*, 872 F.3d 857, 860 (7th Cir. 2017) (holding that a five percent requirement for political parties did not create an unconstitutional burden); *Swanson v. Worley*, 490 F.3d 894, 896-97 (11th Cir. 2007) (upholding three percent requirement and June filing date did not create an impermissible burden); *Libertarian Party of Me. v. Diamond*, 992 F.2d 365, 367 (1st Cir. 1993) (upholding a five percent signature requirement); *Rainbow*

*Coalition of Oklahoma v. Oklahoma State Election Bd.*, 844 F.2d 740, 741 (10th Cir. 1988) (upholding five percent signature requirement for new political parties); *Arutunoff v. Oklahoma State Election Bd.*, 687 F.2d 1375, 1379 (10th Cir. 1982) (holding that a 10% retention requirement was not unconstitutional); *Beller v. Kirk*, 328 F. Supp. 485 (S.D. Fla. 1970), *aff'd*, 403 U.S. 925 (1971) (upholding a three percent requirement for minor political parties); *Green Party of Alaska v. State Division of Elections*, 147 P.3d 728, 730 (Alaska 2006) (upholding a three percent retention requirement for new political parties); *Libertarian Party N.H. v. State*, 910 A.2d 1276, 1279 (N.H. 2006) (holding that a three percent requirement for minor political parties did not create a severe burden); *Libertarian Party of Oregon v. Roberts*, 750 P.2d 1147, 1149 (Ore. 1998) (upholding five percent signature requirement for minor political parties).

Each of these cases, however, is distinguishable from the present case before the Court. *See Tripp*, 872 F.3d at 861 (noting that the five percent requirement required plaintiff to obtain only 2,399 signatures in order to appear on the ballot); *Swanson*, 490 F.3d at 905-06 (noting that signatures were due on the date of the first primary held the June before the general election); *Libertarian Party of Me.*, 992 F.2d at 375 (omitting any discussion of how long signatures could be required and noting a petition deadline the April before a general election); *Rainbow Coalition of Oklahoma*, 844 F.2d at 741 (holding that a May 31st deadline the year of the general election did not create severe burden, thought it was "troublesomely early"); *Arutunoff*, 687 F.2d at 1377 (omitting any discussion of how long signatures could be collected or the deadline for filing); *Beller*, 328 F. Supp. at 486 (omitting any discussion of how long or when signatures were to be collected to satisfy three percent requirement); *Green Party of Alaska*, 147 P.3d at 734 n.28 (noting that a minor party could regain ballot access by presenting a petition signed by at least one percent of the number of voters who cast ballots in the last general election); *Libertarian Party N.H.*, 910

A.2d at 1279 (omitting any discussion of how long or when signatures were to be collected); *Libertarian Party of Oregon*, 750 P.2d at 1148-49 (same).

### f.   Alternative Means For Ballot Access In Arkansas

The Court also rejects the State of Arkansas' argument that the alternative means of gaining ballot access—independent candidacy or a party label for a presidential candidate—somehow reduce any burden upon plaintiffs' constitutional rights.  Arkansas law allows any individual to run statewide as an independent candidate by satisfying the three percent requirement or by presenting 10,000 valid signatures.  Ark. Code Ann. § 7-7-103(b)(1)(A).  Additionally, any candidate may run as an independent for a county, township, or district race if they present at least 2,000 valid signatures.  *Id*.  The Court concedes that it appears that the LPAR's candidates could appear on the ballot as independent candidates for statewide races by presenting 10,000 signatures and on local races by presenting 2,000 signatures each.  But this solution does not reduce the burden on the LPAR's associational rights to advance their political beliefs by identifying themselves as members of the LPAR on the ballot, as this option specifically denies minor party candidates the right to a party label on the ballot.  *Moore*, 854 F.3d at 1025 ("Ballot access restrictions implicate not only the rights of potential candidates for political office, but also the First and Fourteenth Amendment rights of voters to cast their ballots for a candidate of their choice and to associate for the purpose of advancing their political beliefs.") (citation omitted).  Furthermore, this argument would essentially force LPAR candidates to run as independents, which would burden the right of qualified voters "to cast their votes effectively" by identifying the party affiliation of the individuals running for office.  *Williams*, 393 U.S. at 30; *see Storer*, 415 U.S. at 745 ("[T]he political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other.").  For these reasons, the

Court concludes that the option to run as an independent candidate by collecting 10,000 signatures does demonstrate that plaintiffs are unlikely to succeed on the merits of their claim that the challenged Arkansas statutes severely burden their First and Fourteenth Amendment rights.

The Court reaches the same conclusion as to the option for the LPAR to gain ballot access for presidential and vice-presidential candidates by filing a petition with only 1,000 signatures. *See* Ark. Code Ann. § 7-8-302(5)(B). While this option undoubtedly allows for the LPAR to place two candidates on the ballot with party labels, this opportunity only arises once every four years. This option does not allow the LPAR to field candidates for other offices with a party label. In effect, this option denies the LPAR the right to present its candidates to the voters in the majority of electoral races in Arkansas. The Court therefore concludes that the option to run a candidate with a party label for only the offices of President and Vice-President by filing a petition with 2,000 signatures does not demonstrate that plaintiffs are unlikely to succeed on the merits of their claims.

For all the reasons discussed above, and based upon the record evidence before the Court, the Court concludes that plaintiffs have demonstrated that they are likely to prove that Arkansas Code Annotated §§ 7-7-101, 7-7-203(c)(1), 7-7-205(a)(2), 7-7-205(a)(4)(B), 7-7-205(a)(6), and 7-7-205(c)(3), as applied to plaintiffs for the 2019-2020 Arkansas general election cycle and for all subsequent general election cycles in the State of Arkansas, impose a severe burden upon plaintiffs' associational rights under the First and Fourteenth Amendments. Accordingly, the Court will apply strict scrutiny to the challenged ballot access statutes.

### 4.      Compelling State Interest And Arkansas' Protection of Such Interests

Since the burdens placed upon plaintiffs by the challenged Arkansas ballot access statutes are "severe," the laws "must be 'narrowly drawn to advance a state interest of compelling

importance.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).

The State repeatedly invokes the phrase "compelling state interest" in its filings, but based on this Court's review, the State fails to articulate clearly a compelling state interest to be examined, leaving this Court to speculate as to what the State's interests may be.  Like other courts, this Court acknowledges that the State of Arkansas does have "an interest in limiting the size of the ballot, avoiding voter confusion, and protecting the integrity of the elections process" and that those interests are "protected by requiring a certain number of signatures on a petition to demonstrate a modicum of public support." *Citizens To Establish a Reform Party in Arkansas*, 970 F. Supp. at 699 (citing *Lubin v. Panish*, 415 U.S. 709, 714 (1974); *Jenness*, 403 U.S. at 442).  However, the measures adopted by the State "must be justified by reference to a compelling state interest[] and may not go beyond what the state's compelling interests actually require . . . because the fundamental right to vote is inseparable from the right to place the candidate of one's choice on the ballot . . . ." *McLain v. Meier*, 637 F.2d 1159, 1163 (8th Cir. 1980) (citation omitted).

There is no record evidence before the Court that explains the State's interest—let alone a compelling one—in requiring new political parties to meet the three percent requirement, file a petition more than a year in advance of the general election, and collect signatures in a 90-day window.  The only evidence offered by the State of Arkansas is Mr. Murphy's testimony that setting the preferential primary in the March before a general election would allow Arkansas to participate in "Super Tuesday."  However, under Arkansas law governing the certification of new political parties, "[a] new political party formed by the petition process shall nominate candidates by convention for the first general election after certification."  Ark. Code Ann. § 7-7-205(c)(2)(A).  Additionally, "[i]f the new party maintains party status by obtaining three percent (3%) of the total

votes cast for the office of Governor or nominees for presidential electors at the first general election after certification, the new political party shall nominate candidates in the party primary as set forth in § 7-7-101 et seq." *Id.* § 7-7-205(c)(4).  Accordingly, this explanation is *a non sequitur* since new political parties that qualify for the ballot by collecting signatures nominate their candidates by convention, rather than by participation in the preferential primary election. According to Arkansas law, the first time candidates from the LPAR would appear on a primary ballot would be *after* a general election in which the LPAR satisfied the three percent retention requirement.  Thus, it is not clear to the Court why a change in the primary calendar should affect new political parties that qualify for the ballot by collecting signatures and that do not participate in primaries.

While the State of Arkansas did not raise the issue, Arkansas law does provide that a nominating convention for a party formed by the petition process "shall be held no later than 12:00 noon on the date of the preferential primary election."  Ark. Code Ann. § 7-7-205(c)(2)(B)(i). Furthermore, Arkansas law provides that "[c]ertificates of nomination [for candidates seeking the nomination of a new political party] shall be filed with the Secretary of State or the county clerk no later than 12:00 noon on the date of the preferential primary election."  *Id.* § 7-7-205(c)(2)(B)(ii).  Additionally, "[a] candidate to be nominated by convention shall file a political practices pledge . . . during the party filing period." *Id.* at § 7-7-205(c)(3).  It is possible, therefore, that the State of Arkansas could have argued that the State has an interest in setting the deadline for filing new political party petitions 60 days in advance of the party filing period so that a newly certified political party would have time to prepare political practices pledges and to hold a nominating convention.  This argument, however, would beg the question as to why new political

party political practices pledges or nominating conventions must be held before a primary election in which the new political party would not appear on the ballot.

Additionally, there is no record evidence of ballot overcrowding.  In fact, Mr. Hood, the State of Arkansas' own expert, conceded that a ballot with only a Democrat, a Republican, and a Libertarian would not be an overcrowded ballot.

Even assuming that the State of Arkansas has demonstrated a State interest and that such an interest is compelling, the Court finds that plaintiffs are likely to prevail on their argument that Arkansas' ballot access statutes, as applied to plaintiffs, are not narrowly drawn to protect those interests.  Act 164 states that "[i]t is found and determined by the General Assembly . . . that the current laws concerning signature requirements for certain petitions are insufficient to reflect the will of the voters of Arkansas . . . ."  2019 Ark. Acts 164, § 2.  The record evidence also shows that Act 164 more than doubled the number of signatures required for a new political party to gain ballot access, and the record evidence does not provide any basis for this increase.  There is no record evidence that explains what facts made it necessary or even advisable to more than double the signatures required for a new political party to gain ballot access.  In fact, the record evidence shows that the GPA was unable to meet even the 10,000-signature requirement in 2016 and 2018. Since strict scrutiny applies, the Court must apply a "more exacting judicial scrutiny" to Arkansas' ballot access laws.  *See U.S. v. Carolene Products Co.*, 304 U.S. 144, 152 n. 4 (1938). Accordingly, as in *Green Party II*, the Court concludes that the record evidence shows that "[t]he 10,000 signature threshold is a sufficient modicum of support to serve the state's interest in avoiding cluttered ballots . . . ."  445 F. Supp. 2d at 1062.  The Court therefore concludes that plaintiffs have shown that they are likely to prevail on the issue of whether Act 164 is narrowly drawn to protect a compelling state interest.

Additionally, the timeframe for the collection of signatures for a new party petition is not narrowly drawn to protect a compelling state interest.  As discussed above, per Arkansas Code Annotated §§ 7-7-205(c)(2)(A) and 7-7-205(c)(4), candidates affiliated with new political parties who gain ballot access by collecting signatures are not placed on the ballots for preferential or general primary elections; instead, they are nominated by convention.  Therefore, as discussed, candidates affiliated with new political parties who qualify for the ballot by collecting signatures in Arkansas do not appear on primary ballots; rather, they first appear on general election ballots. There is no record evidence before the Court that explains why the State of Arkansas must certify new political parties at the same time as pre-existing political parties.  Similarly, as discussed, there is no record evidence that explains why other requirements for new political parties and their candidates—such as the deadline for the filing of political practices pledges or the holding of nominating conventions—are tied to the dates for the party filing period or primary elections. Accordingly, as the State of Arkansas has failed to meet its burden of showing that the challenged statutes are narrowly drawn to serve the State's compelling interest, *Moore*, 854 F.3d at 1026, the Court concludes that plaintiffs have shown that they are likely to prevail on the issue of whether the deadlines for submitting new political party petitions are narrowly drawn to protect a compelling state interest.

For the reasons discussed above, the Court concludes that plaintiffs have demonstrated that they are likely to prove that Arkansas Code Annotated §§ 7-7-101, 7-7-203(c)(1), 7-7-205(a)(2), 7-7-205(a)(4)(B), 7-7-205(a)(6), and 7-7-205(c)(3), as applied to plaintiffs for the 2019-2020 Arkansas general election cycle and for all subsequent general election cycles in the State of Arkansas, are not narrowly drawn to serve a compelling state interest and, therefore, fail the strict scrutiny test and cannot stand.

### B.      Equal Protection Claim

The Court next turns to plaintiffs' claim that Arkansas' ballot access statutes, as applied to plaintiffs, unequally discriminate against plaintiffs in violation of the Equal Protection Clause of the Fourteenth Amendment (Dkt. No. 1, ¶ 26). "To determine whether or not a statute violates the Equal Protection Clause, [the court] must consider 'the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.'" *Libertarian Party of N.D.*, 659 F.3d at 701 (quoting *Williams*, 393 U.S. at 30). The court must "first look at the state's interests," which include "protecting the integrity of the political process from frivolous or fraudulent candidacies, ensuring the election process is efficient, avoiding voter confusion caused by an overcrowded ballot, and avoiding the expense and burden of run-off elections." *Libertarian Party of N.D.*, 659 F.3d at 701. Further, the Court must consider "whether the law disadvantages one group over another so as to result in unequal treatment and whether this unequal treatment is justified by a compelling interest." *Id.* (citing *Williams*, 393 U.S. at 30).

> Although "reasonable election regulations may, in practice, favor the traditional two-party system," . . . , they may not serve the purpose of allowing the same two parties "to retain a permanent monopoly on the right to have people vote for or against them." *Williams*, 393 U.S. at 32. "Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms. New parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past." *Id.*

*Libertarian Party of S.D. v. Krebs*, 290 F. Supp. 3d 902, 915 (D.S.D. 2018).

Based on the parties' filings and the record before the Court, the Court concludes that plaintiffs have not demonstrated that they are likely to prevail on their Equal Protection Clause claims. This claim is not well developed in the record before the Court. The Eighth Circuit held that an independent candidate's Equal Protection claims were properly dismissed because "[t]he

Equal Protection Clause does not mandate that [an independent candidate] be treated the same as new political parties or initiated acts." *Langguth*, 30 F.3d at *2. In a more recent decision, a district court determined that certain ballot access laws in South Dakota discriminated against new party candidates in seeking certain state office, resulting in unequal treatment that was not justified by a compelling state interest in violation of the Equal Protection Clause. *Krebs*, 290 at 915. While the record evidence does appear to show that plaintiffs are disparately treated *vis-a-vis* independent candidates under the challenged Arkansas statutes, at this stage of the proceeding, the Court concludes that plaintiffs have not sufficiently articulated or developed their Equal Protection claims so as to permit the Court to determine that plaintiffs are likely to prevail on their claims that Arkansas' ballot access statutes have an unconstitutionally disparate impact as applied to plaintiffs, at least at this stage of the proceeding.

## V.      Irreparable Harm, Balance of Equities, and Public Interest

The State of Arkansas argues that plaintiffs have failed to show a threat of irreparable harm (Dkt. No. 30, at 17). The State of Arkansas asserts that plaintiffs have offered only "hypothetical difficulties that [they] might face in gathering the required number of signatures." (*Id*.). Plaintiffs argue, on the other hand, that they will suffer immediate and irreparable injury if Arkansas' ballot access statutes prevent them from casting votes for their candidates of choice in the 2020 general election (Dkt. No. 12, at 2).

A threat of irreparable harm exists when a party demonstrates a harm that may not be compensated by money damages in an action at law. *See Kroupa*, 731 F.3d at 820; *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371-72 (8th Cir. 1991). Here, the record evidence demonstrates that plaintiffs face an irreparable harm: the inability to gain ballot access for the LPAR due Arkansas' ballot access requirements. As Mr. Pakko testified, the LPAR is not

likely to collect enough signatures in a 90-day period to satisfy the three percent requirement.  The record evidence also demonstrates that, except for one instance in 1996, no new political party has been able to meet the three percent requirement.  Further, as discussed at length above, the record evidence also tends to show that the LPAR does not have the financial resources or volunteer base to satisfy the three percent requirement in a 90-day period.  The Court therefore concludes that the record evidence before it demonstrates a threat of irreparable harm to plaintiffs.

The Court also concludes that, based upon the record evidence at this stage of the proceedings, the threat of irreparable harm to plaintiffs and the public interest outweigh the immediate interests of the State of Arkansas and any potential harm to the State of Arkansas caused by the entry of a preliminary injunction that is narrowly tailored to afford plaintiffs relief.  The Court must examine the record evidence in the context of the relative injuries to the parties and to the public.  *Dataphase*, 640 F.2d at 114.  The record evidence indicates that the LPAR will not be able to run candidates down the ballot unless a preliminary injunction is entered.  Additionally, there is no record evidence that requiring the State of Arkansas to certify the LPAR as a new political party under Arkansas Code Annotated § 7-7-205 if the LPAR presents a petition with at least 10,000 signatures of registered voters would do any harm to either Mr. Thurston, the State of Arkansas, or the public.  Accordingly, as the preliminary injunction set forth below does not affect any timelines and instead only enjoins the State of Arkansas from enforcing the three percent requirement, the Court concludes that the harm to the State of Arkansas and the public is *de minimus*.  The Court therefore finds that the balance of equities and the public interest weigh in favor of a preliminary injunction.

Finally, under Federal Rule of Civil Procedure 65(c), a district court may grant a preliminary injunction "only if the movant gives security in an amount that the court considers

proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  While plaintiffs submit that they are ready to execute a bond to provide such security, the State of Arkansas has not requested security nor is there any evidence before the Court that the State of Arkansas will be financially harmed if it is wrongfully enjoined. The Court therefore declines to require security from plaintiffs.

### VI.    Scope Of Injunction

As discussed above, the Court concludes that plaintiffs have met their burden to obtain a preliminary injunction against the State of Arkansas.  Plaintiffs ask the Court to enter a preliminary injunction that allows them "to conduct a petition drive pursuant to the petition signature requirement that existed before the election laws were changed in February of 2019." (Dkt. No. 13, at 11).  The State of Arkansas , on the other hand, argues that, if a preliminary injunction is to issue, then "it 'must be narrowly tailored to remedy only' harms related to [the] 90-day window." (Dkt. No. 17, at 31 (quoting *Lytle v. U.S. Dep't of Health and Human Servs.*, 612 Fed. App'x 861, 862 (8th Cir. 2015)).

Plaintiffs bring a facial and as applied challenge (Dkt. No. 1, at 13, Prayer for Relief ¶ 1). "[T]he 'label is not what matters.'"  *Iowa Right to Life Committee, Inc. v. Tooker*, 717 F.3d 576, 587 (8th Cir. 2013) (quoting *Doe v. Reed*, 561 U.S. 186, 194 (2010), and citing *Citizens United v. Federal Election Commission*, 558 U.S. 310, 331 (2010) ("[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge.")). "Instead, the 'important' inquiry is whether the 'claim and the relief that would follow. . . reach beyond the particular circumstances of the [] plaintiffs." *Doe v. Reed*, 561 U.S. at 194.

A plaintiff brings a facial challenge "to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question." *City of Chicago v. Morales*, 527 U.S. 41, 55 n. 22 (1999).  By contrast, "[a]n as-applied challenge consists of a challenge to the statute's application only as-applied to the party before the court." *Phelps-Roper v. Ricketts*, 867 F.3d 883, 896 (8th Cir. 2017) (quoting *Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 790 (8th Cir. 2004)).  A successful as-applied challenge, then, means "the statute may not be applied to the challenger, but is otherwise enforceable." *Id.* (quoting *Klobuchar*, 381 F.3d 785, 790 (8th Cir. 2004).  Plaintiffs' claims have "'characteristics of both' challenges." *Tooker*, 717 F.3d at 587 (concluding that the court could "consider each challenged . . . requirement in isolation, and, if necessary, apply the 'normal rule that partial, rather than facial, invalidation is the required course.'").

"In crafting an appropriate remedy, the Court seeks to go no further than necessary to address the constitutional wrong supported by this record." *Gerlich v. Leath*, 152 F. Supp. 3d 1152, 1180 (S.D. Iowa 2016) (citing *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982); *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 790 (8th Cir. 2004)).

> Facial challenges are disfavored for several reasons.  Claims of facial invalidity often rest on speculation.  As a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually barebones records."  Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither "anticipate a question of constitutional law in advance of the necessity of deciding it" nor "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied."  Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution.  We must keep in mind that "[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people."

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51 (2008).

With these principles in mind, "the Court fashions a remedy that addresses the specific conduct of

the Defendants that adversely impacted these Plaintiffs," *Gerlich*, 152 F. Supp. 3d at 1180-81, and construes this to be an as-applied challenge, as plaintiffs seem to suggest in their motion for preliminary injunction (Dkt. No. 12, at 1).  *See Green Party of Penn. v. Aichele*, 89 F. Supp. 3d 723, 737-38 (E.D. Pa. 2015) ("[T]he 'usual judicial practice' is to address an as-applied challenge before a facial challenge.").

The Court notes that plaintiffs have demonstrated that they are likely to show that the following three elements severely burden their constitutional rights:   (1) the three percent requirement; (2) the 90-day signature gathering window; and (3) the fact that the signatures must be collected and turned in more than a year before the general election is to occur.  The enjoinment of any *one* of these elements would somewhat reduce the burdens placed upon plaintiffs' constitutional rights.

The record evidence, however, is that plaintiffs likely would be able to qualify for certification as a new political party but for Act 164's elimination of the 10,000-signature petition option, even if plaintiffs had only a 90-day petition gathering window and even if the signatures had to be collected and turned in more than a year before the general election is to occur.  The Court concludes that reinstating the 10,000-signature requirement is the narrowest form of relief that would grant relief to the irreparable harm facing plaintiffs.  The Court declines at this stage of the proceeding to alter the deadlines for submitting new party petitions or the party filing deadline, as such changes might unintentionally affect the complex primary calendar in the State of Arkansas.  However, plaintiffs are not foreclosed from petitioning the Court for further injunctive relief.

Accordingly, Mr. Thurston, in his official capacity as Arkansas Secretary of State, together with his agents, servants, and employees, and all persons in active concert or participation with

him, are preliminarily enjoined from enforcing Arkansas Code Annotated §§ 7-7-101, 7-7-203(c)(1), 7-7-205(a)(2), 7-7-205(a)(4)(B), 7-7-205(a)(6), and 7-7-205(c)(3) to the extent that these statutes impose the three percent requirement as to the LPAR.  Specifically, the same parties are enjoined from failing to recognize the LPAR as a new political party and are enjoined from restricting ballot access to the LPAR as a new political party if the LPAR petitions for the certification of a new political party containing, at the time of filing, the signatures of at least 10,000 registered voters in Arkansas and otherwise complies with the remaining requirements of Arkansas law, save and except for the enjoined three percent requirement.

### VII.    Conclusion

For the foregoing reasons, the Court determines that plaintiffs have met their initial burden for the issuance of a preliminary injunction.  Therefore, the Court grants plaintiffs' motion for preliminary injunction (Dkt. No. 12).  Accordingly, Mr. Thurston, in his official capacity as Arkansas Secretary of State, together with his agents, servants, and employees, and all persons in active concert or participation with him, are preliminarily enjoined from enforcing Arkansas Code Annotated §§ 7-7-101, 7-7-203(c)(1), 7-7-205(a)(2), 7-7-205(a)(4)(B), 7-7-205(a)(6), and 7-7-205(c)(3) to the extent that these statutes impose the three percent requirement as to the LPAR. Specifically, the same parties are enjoined from failing to recognize the LPAR as a new political party and are enjoined from restricting ballot access to the LPAR as a new political party if the LPAR petitions for the certification of a new political party containing, at the time of filing, the signatures of at least 10,000 registered voters in Arkansas and otherwise complies with the remaining requirements of Arkansas law, save and except for the enjoined three percent requirement.  The Court declines at this stage of the proceeding to alter the deadlines for submitting

new party petitions or the party filing deadline, as such changes might unintentionally affect the complex primary calendar in the State of Arkansas.

So ordered this 3rd day of July 2019, at 4:45 p.m.

Kristine G. Baker
United States District Judge

Court's Exhibit 1



**4:19-cv-00214-KGB Libertarian Party of Arkansas et al v . Thurston**

Christine.cryer, bostonbarristers, dylan.jacobs,
Jacob White   to:  jennifer.merritt, nicholas.bronni, vincent.wagner,       07/02/2019 04:46 PM
william.hyman

Cc:  Tracy Washington

Dear Counsel,

Thank you for the update. The Court has plaintiffs' motion for preliminary injunction under advisement.

Best,

Jacob White
Law Clerk to U.S. District Judge Kristine G. Baker
500 W. Capitol Avenue
Little Rock, Arkansas 72201
501-604-5420
jacob_white@ared.uscourts.gov



**RE: LPAR et al v. Thurston (continuance of previous email )**

Nicholas Bronni    to:   'Law Office',                               07/02/2019 01:39 PM
                          Jacob_White@ared.uscourts.gov
          Cc:   Dylan Jacobs, Vincent Wagner   , 'Whitfield Hyman', Jennifer Merritt

History:                  This message has been forwarded.

Mr. White and Counsel--

We appreciate Mr. Linger reaching out to us and including us on this correspondence.

While we would obviously defer to the Court's preference, we would suggest that Plaintiffs file
something with the Court on the official record.  We would also appreciate the opportunity to respond
to that filing on the record.

Nicholas Bronni

**Nicholas J. Bronni**
Solicitor General
Office of Arkansas Attorney General Leslie Rutledge

323 Center Street, Suite 200
Little Rock, Arkansas 72201
501.682.6302 | 501.682.2000
Nicholas.bronni@arkansasag.gov | ArkansasAG.gov

**From:** Law Office [mailto:bostonbarristers@tulsacoxmail.com]
**Sent:** Tuesday, July 2, 2019 1:23 PM
**To:** Jacob_White@ared.uscourts.gov
**Cc:** Dylan Jacobs; Nicholas Bronni; Vincent Wagner; 'Whitfield Hyman'; Christine Cryer; Jennifer Merritt
**Subject:** LPAR et al v. Thurston (continuance of previous email)


Jacob White, Esq.,

Dear Mr. White:
After discussing this matter on the phone this morning with Dylan Jacobs,
Assistant Solicitor General for the State of Arkansas, and not being sure if I should
file a status report or simply send notice to you as Judge Baker's law clerk, I have
decided to send this notice to you by email with copies to the other attorneys
involved in the case pursuant to Local Rule 7.3(a).  The representatives of the
Libertarian Party of Arkansas turned in 18,667 petition signatures on Friday, June
28, 2019, to the Arkansas Secretary of State's office.  These signatures have been
received but not yet determined for sufficiency by the Secretary of State's office.
Of course, the current law states that the Secretary of State shall not accept for

Court's Exhibit 1

filing any new party petition that is not prima facie sufficient at the time of filing. Ark. Code Ann., Sec. 7-7-205(a)(3).  Since the LPAR began its petition drive on April 1, 2019, and is limited under current law to 90 days, and the court had not yet reached a decision on the motion for preliminary injunction, it was thought best to turn in the signatures last Friday.

James C. Linger


James C. Linger, Attorney
1710 South Boston Avenue
Tulsa, Oklahoma 74119-4810
918-585-2797 Telephone
918-583-8283 Facsimile