## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

LIBERTARIAN PARTY OF ARKANSAS, *et al.*                                      PLAINTIFFS

v.                                        Case No. 4:19-cv-00214-KGB

JOHN THURSTON, in his official capacity as
Secretary of State for the State of Arkansas                                      DEFENDANT

### BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR STAY PENDING APPEAL
### AND TO SHORTEN PLAINTIFFS' TIME TO RESPOND

Because the Secretary's appeal presents "serious" legal issues and "the balance of

equities favors" Arkansas, this Court should stay its preliminary injunction pending appeal.

*James River Flood Control Ass'n v. Watt*, 680 F.2d 543, 545 (8th Cir. 1982); *see* Fed. R. Civ. P.

62(c) (discussing procedures for seeking stays pending appeal); Fed. R. App. P. 8(a) (same).  The

normal four-factor stay analysis makes this clear.  *See Hilton v. Braunskill*, 481 U.S. 770, 776

(1987).  Of these four factors, "[t]he most important factor is the appellant's likelihood of

success on the merits."  *Brady v. Nat'l Football League*, 640 F.3d 785, 789 (8th Cir. 2011); *see*

*S&M Constructors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir. 1992) (referring to "likelihood of

success on the merits" as the "most significant" stay factor).  This Court erroneously concluded

that the Libertarian Party's purported inability to comply with certain of Arkansas's ballot-access

laws made the entire regime severely burdensome.  Beyond that, this Court improperly

discounted Arkansas's interests in the laws enacted in the 2019 General Assembly.  These errors

mean that the Secretary is likely to succeed on appeal.

The other three stay factors—which require the Court to weigh the harm caused to

Arkansas absent a stay against any harms to the Libertarian Party from a stay, along with the

public interest—also support the Secretary's request.  *See Hilton*, 481 U.S. at 776.  Any potential

harm caused to the Libertarian Party is self-inflicted by its choice to submit to the Secretary, over

two months before the September 5 deadline, a facially insufficient number of signatures.  That choice cannot justify preliminary injunctive relief.  And that self-inflicted harm certainly does not outweigh the harm that the preliminary injunction of Arkansas's duly enacted modicum-of-support requirement causes to the State and the public.  For these reasons, this Court should stay its preliminary injunction pending the Secretary's appeal.

Because the deadlines for the 2020 election cycle will soon begin to pass, the Secretary seeks expedited treatment of this motion.  He respectfully requests that the Court shorten the Libertarian Party's response time to 7 days, making any opposition to this motion due by 5:00 PM on Friday, July 19, 2019.

## I.      The Secretary is likely to succeed on the merits of his appeal.

The Libertarian Party has failed to meet both prongs of the Eighth Circuit's test for reviewing ballot-access regimes.  First, because the Libertarian Party has not "establish[ed] that [Arkansas] law imposes a substantial burden" on it, none of the challenged Arkansas laws can be found unconstitutional.  *Libertarian Party of N.D. v. Jaeger*, 659 F.3d 687, 694 (8th Cir. 2011).  Second, regardless of whether Arkansas's ballot-access laws impose a substantial burden on the Libertarian Party, they are "necessary to achieve a compelling state interest."  *Id.* at 697.  They are, therefore, constitutional, and the Secretary is likely to succeed on appeal.

### A.      The Court erroneously declared that Arkansas's ballot-access regime imposes a severe burden.

On the issue of the burden that Arkansas law purportedly places on the Libertarian Party, this Court improperly focused on the Libertarian Party's claim that it would need to expend additional resources to comply with the 3% modicum-of-support requirement.  (*See, e.g.*, PI Order, DE 31 at 39, 41.)  But Arkansas can require the Libertarian Party to "incur some cost in completing a petition drive without rendering the effects of [the modicum-of-support

requirement] severely burdensome." *Green Party of Arkansas v. Martin*, 649 F.3d 675, 683 (8th Cir. 2011). That the 2019 changes to Arkansas's ballot-access regime would impose new costs on the Libertarian Party does not render any particular Arkansas law severely burdensome.

At least one clearly erroneous factual finding led the Court to its conclusion on this point. The Court found that "approximately 150 individuals are assisting with canvassing." (PI Order at 14 ¶ 44; *see id.* at 40.) But Dr. Pakko's testimony does not support that finding. In fact, he testified that the Libertarian Party was using just five paid canvassers, and that only about a dozen volunteers had actually tried to collect signatures other than from "their spouse and neighbors." (Tr. of June 4 Hr'g on Mot. for Prelim. Inj. (Tr.) 47:12-21.) The Court's finding that the Libertarian Party was unable to meet the modicum-of-support requirement despite "utilizing its 150 volunteers," therefore, vastly overstates the Party's efforts to canvass for signatures. (PI Order at 40.) This vast overstatement led the Court, in turn, to miscalculate the marginal burden on the Libertarian Party of "find[ing] enough additional volunteers to collect the number of signatures required." (*Id.*) As a factual matter, therefore, the Court clearly erred when assessing the burden imposed on the Libertarian Party by the modicum-of-support requirement.

More fundamentally, the Court misunderstood the nature of the burden relevant to the constitutionality of the modicum-of-support requirement. The Court seems to have concluded that because the Libertarian Party did not comply with Arkansas's ballot-access requirements, those requirements are *ipso facto* a severe burden. The Court ruled that the modicum-of-support requirement imposed a severe burden on the Libertarian Party because of a lack of "record evidence that the [Party] has the financial resources or volunteer base necessary" to comply with that requirement. (*Id.* at 39; *see id.* at 13 ¶ 40.) That is true. But it is equally true that there is

*also* no evidence in the record that the Libertarian Party *does not* have sufficient resources.  The only evidence in the record is that some of the Libertarian Party's past ballot-access campaigns have cost around $30,000.  (Tr. 36:1-10; *see* PI Order at 10 ¶ 30.)

There is no evidence about how much the Party spent on its 2019 ballot-access campaign, nor is there any evidence about the Party's finances.  That lack of evidence cannot carry the Libertarian Party's burden to make a "clear showing" that it is likely to succeed on the merits. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quotation marks omitted).  And a lack of evidence certainly does not satisfy the Eighth Circuit's requirement that the Libertarian Party "make a more rigorous showing that it is likely to prevail on the merits" of its challenge to the modicum-of-support requirement.  *PPAEO v. Jegley*, 864 F.3d 953, 957-58 (8th Cir. 2017).  To put it another way, the Court preliminarily enjoined the modicum-of-support requirement on the basis of the Libertarian Party's supposed lack of resources to comply with that requirement.  But there is no evidence in the record about the extent of the Libertarian Party's resources.  Taken on its own terms, the Court's reasoning lacks evidentiary support.

Besides this evidentiary failing, the Court's focus on the Libertarian Party's resources in this particular election cycle misses the point of the severe-burden analysis.  The question is not whether the burdens of Arkansas's ballot-access regime will prevent any one organization in a given election cycle from qualifying as a political party.  Instead, the question is whether Arkansas's ballot-access regime requires new parties to "spend" such "significant funds to secure ballot access" that it effectively freezes them out of the electoral process. *Green Party of Ark.*, 649 F.3d at 681.  The record shows that is not true in this case.

There was unrebutted testimony that the Libertarian Party would only need 9 full-time canvassers out each day for 75 days to collect enough signatures to satisfy the modicum-of-

support requirement.  (PI Order at 22 ¶ 76.)  And the Libertarian Party in fact used 5 paid canvassers.  (*Id.* at 14 ¶ 43.)  Therefore, it is undisputed that the Libertarian Party needed, in addition to those 5 paid canvassers, only 4 full-time volunteers each day for 75 days to satisfy the modicum-of-support requirement.  The only testimony in the record is that a campaign similar to such a hypothetical campaign would cost around $55,000.  (*Id.* at 23 ¶ 79.)  Despite the lack of any evidence in the record to contradict these numbers, the Court devised its own models for volunteer ballot-access drives based on its own unsupported assumptions about how many hours each canvasser would need to work each day.  (*See id.* at 40-41.)  The Libertarian Party offered no evidence that $55,000 imposes a severe burden on a group seeking the ability to run a candidate in every election across Arkansas.  The Court should not have manufactured its own models to compensate for the Libertarian Party's failure to introduce evidence that Arkansas law rises to the level of a severe burden.

The Court also should not have ignored the multitude of cases that the Secretary cited upholding against constitutional attack ballot-access requirements at least as burdensome as the 3% modicum-of-support requirement.  The Court cursorily discussed all those cases.  (*See id.* at 44-47.)  But the only distinguishing factor between this case and those cases that the Court identified is that the parties in those cases had longer time periods to comply with those ballot-access requirements.  In some of those cases, the number of signatures required was actually higher in percentage terms than Arkansas's modicum-of-support requirement.  The implication of this, therefore, is that to the extent Arkansas law is severely burdensome, it is the *timeline* that imposes the severe burden *and not* the modicum-of-support requirement.

That is not to concede that the timeline is severely burdensome.  The Court also should not have found a severe burden based on the Libertarian Party's failure to satisfy the modicum-

of-support requirement by an arbitrary June 28 cutoff date.  (*Id.* at 37.)  That failure arose from the Libertarian Party's own lack of diligence, not the burdens of Arkansas law.  Presumably, the individual plaintiffs in this case are among the most active and dedicated members of the Libertarian Party.  As of the June 4 hearing, however, even two of the three testifying plaintiffs had not begun collecting signatures in earnest.  (*See id.* at 16 ¶¶ 52-53.)  The Libertarian Party should not be allowed to handicap its own chances of a successful ballot-access campaign and then obtain a preliminary injunction based on its inability to meet a deadline that it—and not Arkansas law—has imposed.

Finally, the Court misunderstood the importance of the Libertarian Party's ability to access the race for U.S. President and Vice President with only 1,000 signatures.  According to the Court, "this option denies the LPAR the right to present its candidates to the voters in the majority of electoral races in Arkansas."  (*Id.* at 48.)  But the point is not that the Libertarian Party's ability to field a presidential candidate makes up for those other electoral races.  The presidential race is itself a ballot-access mechanism.  If the Libertarian Party's candidate for U.S. President obtains 3% of the vote, then the Party will have across-the-board ballot access in the next election cycle.  Arkansas law does not violate the Libertarian Party's First Amendment rights merely "by encouraging successful participation in . . . presidential elections."  *Green Party of Ark.*, 649 F.3d at 683.

**B.**     **Regardless of the severity of the burden—and contrary to this Court's ruling otherwise—Arkansas's ballot-access regime is narrowly tailored to serve a compelling governmental interest.**

Second, independently of the Court's improper severe-burden analysis, the Court also improperly discounted Arkansas's interest in the modicum-of-support requirement.  According to the Court, Arkansas articulated no interest whatsoever in that requirement.  (*See* PI Order at 49 (claiming that Arkansas left it to the Court's "speculat[ion]" to ascertain a compelling interest).)

To the contrary, Arkansas cited a number of interests that justify the modicum-of-support requirement:  "Arkansas's interests in avoiding confus[ion], deception, and frustration of the democratic process; in the stability of its political system; and in ensuring that only potentially viable candidates appear on the ballot—these interests justify the three-percent, modicum of support requirement."  (Opp'n to Mot. for Prelim. Inj., DE 17 at 24; *see id.* at 23-24 (discussing in support of this idea, *inter alia*, *Storer v. Brown*, 415 U.S. 724, 736 (1974); and *Jenness v. Fortson*, 403 U.S. 431, 442 (1971)).)

In particular, the Court completely ignored the Libertarian Party's electoral history in Arkansas, which implicates the State's interest in ensuring that only viable candidates appear on the ballot.  *See Burdick v. Takushi*, 504 U.S. 428, 438 (1992) (describing as "the function of the election process . . . 'to winnow out and finally reject all but the chosen candidates'" (quoting *Storer*, 415 U.S. at 735)).  In past election cycles, the Libertarian Party has repeatedly attained political-party status through the former 10,000-signature requirement.  Yet it has proved time and again that its candidates are not viable.  Each election, the Libertarian Party has failed to maintain its political-party status by obtaining even a mere 3% of the vote for governor or president.  Arkansas's interest in allowing only potentially viable candidates on the ballot permitted it to raise its modicum-of-support requirement so that the Libertarian Party would have to work harder to cultivate broader electoral support before being granted across-the-board ballot access in the future.  Instead of confronting this history of electoral failure, the Court refuted a straw man by focusing only on the question whether Arkansas has an overcrowded ballot.  (PI Order at 51.)  Because the Court ignored the arguments that the Secretary actually made, he is likely to win on the merits of his appeal.

II.     **Absent a stay pending appeal, the harm to Arkansas and the public would outweigh the harm to the Libertarian Party.**

When considering whether to issue a preliminary injunction, the Court concluded that neither the State nor the public would suffer any harm at all.  (*See* PI Order at 55 (asserting that "there is no record evidence" that the requested preliminary injunction "would do any harm to either Mr. Thurston, the State of Arkansas, or the public").)  But the Supreme Court has been clear that "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *see Maryland v. King*, 567 U.S. 1301, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quotation marks omitted)), *cited by Perez*, 138 S. Ct. at 2324 n.17; *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[I]t is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined."). The Court completely ignored this well-established kind of irreparable harm to the State.

When considering the supposed harm to the Libertarian Party, however, the Court treated as irreparable an illusory, entirely self-inflicted harm.  *See Stilley v. Outlaw*, No. 2:12-CV-00140-KGB/BD, 2012 WL 3596548, at *1 (E.D. Ark. July 26, 2012) (recommending that the Court deny a preliminary injunction because "the only possible harm that [plaintiff] possibly faces is self-inflicted"), *recommendation adopted*, 2012 WL 3612625 (Aug. 20).  The Libertarian Party started collecting signatures on April 1, 2019.  (PI Order at 10, 12-13 ¶¶ 28, 39.)  Then it submitted its signatures to the Secretary 90 days later on June 28.  (*Id.*, Court's Ex. 1.)  Although it may have been true that "even with additional petitioning efforts," the Libertarian Party would have been "unable to meet the three percent requirement by June 28," that is irrelevant.  (*Id.* at 37.)  June 28 was not the Libertarian Party's true deadline.  The Libertarian Party could have

continued attempting to collect enough signatures to comply with the modicum-of-support requirement until September 5.  *See* Ark. Code 7-7-205(a)(6).

True, because of the 90-day window, this would have required the Libertarian Party to give up some of the signatures it had already collected.  But the individual Plaintiffs testified that the Libertarian Party's ballot-access campaign did not begin in earnest until at least mid-April. (*See* Tr. 24:5-7 (testifying that although they "kicked it off [at the] beginning of April," the campaign did not really begin then because they "did not get all of [their] canvassers in town on the job really until about mid-April").)  Indeed, it is not clear when the Libertarian Party began to truly attempt to hit the modicum-of-support requirement's target.  At the June 4 hearing, two of the individual Plaintiffs admitted that they were not working diligently to collect signatures even at that time.  (*See* PI Order at 16 ¶¶ 52-53.)

This testimony demonstrates that the Libertarian Party knew as early as June 4 that it would not satisfy the modicum-of-support requirement by June 28.  (*See id.* at 12-13 ¶ 39.)  With that knowledge, the Libertarian Party's irrational decision to end its ballot-access campaign on June 28—over two months before the statutory deadline on September 5—caused their inability to comply with Arkansas's ballot-access laws.  The Court should not have entered a preliminary injunction to remedy such a self-inflicted harm.

Worse, the Court's decision to enjoin the modicum-of-support requirement does not address even that self-inflicted harm.  As the Court notes, the Supreme Court and other courts have upheld more stringent modicum-of-support requirements than Arkansas's.  (*See, e.g.*, *id.* at 45 (discussing *Jenness*, which allowed a 5% modicum-of-support requirement).)  This Court refused to rely on those decisions, however, because the laws in those cases created a larger window for collecting signatures and a later deadline for turning them in.  (*Jenness*, for example,

involved a 180-day window and a deadline in June before the election.  *See* 403 U.S. at 433-34.) But if a 5% requirement was permissible on a longer timeline in *Jenness*, then that suggests that the problem with Arkansas's ballot-access regime—assuming there is in fact a problem—relates to the *timeline alone* and *not* the size of its smaller modicum-of-support requirement.

If the Libertarian Party has suffered any harm, that harm relates only to timing: the 90-day window, the September 5 deadline, or both.  So the Court should not have preliminarily enjoined the modicum-of-support requirement.  Such an injunction does nothing to remedy the identified harms (self-inflicted though they may be).  *See Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982) ("An injunction must be tailored to remedy specific harm shown.").  As a result, the Court should stay its injunction pending the Secretary's appeal.

CONCLUSION

For these reasons, the Secretary respectfully requests that the Court stay its order granting the Libertarian Party's motion for a preliminary injunction while the Secretary's appeal of that order is pending.  The Secretary also respectfully requests that the Court shorten the Libertarian Party's response time to 7 days, making any opposition to this motion due by 5:00 PM on Friday, July 19, 2019.

Dated:  July 12, 2019                                    Respectfully submitted,

                                                         LESLIE RUTLEDGE
                                                         Attorney General

                                                         Nicholas J. Bronni (2016097)
                                                           Solicitor General
                                                         Vincent M. Wagner (2019071)
                                                           Deputy Solicitor General
                                                         Dylan L. Jacobs (2016167)
                                                           Assistant Solicitor General
                                                         OFFICE OF THE ARKANSAS
                                                           ATTORNEY GENERAL
                                                         323 Center Street, Suite 200
                                                         Little Rock, Arkansas  72201
                                                         (501) 682-2007
                                                         (501) 682-2591 (fax)
                                                         nicholas.bronni@arkansasag.gov

                                                         *Counsel for Defendant*