IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

LIBERTARIAN PARTY OF ARKANSAS, *et al.*,

                                                                                                                      PLAINTIFFS,

v.                        Case No. 4:19-cv-00214-KGB

JOHN THURSTON, in his official capacity as
Secretary of State for the State of Arkansas,

                                                                                                                          DEFENDANT.

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

      Plaintiffs' most recent summary-judgment brief leaves one thing clear: Converting the preliminary injunction into a permanent injunction (or an analogous declaratory judgment) would be, on this record, an inappropriate remedy. The preliminary injunction and the Eighth Circuit's decision affirming it were based on review of evidence relating only to Arkansas's ballot-access laws in presidential election cycles. Those laws are materially different in midterm election cycles, with primaries and related deadlines falling months closer to the general election. Although Plaintiffs' evidence remains focused entirely on presidential election cycles, they seek prospective relief—whether an injunction or a declaratory judgment—that would apply to every future election in Arkansas. Because the undisputed facts establish, as a matter of law, that they are not entitled to such relief, the Court should deny their motion for summary judgment and instead grant the Secretary's.

**I.    Because Plaintiffs have not proved a severe burden, they have not proved that strict scrutiny applies.**

      Plaintiffs do not argue that they will prevail under any standard other than strict scrutiny. But they incorrectly jump to the conclusion that strict scrutiny applies to Arkansas's modicum-of-support requirement and its related compliance deadlines. (Plaintiffs' Combined Reply Brief,

Doc. 76 ("Reply") at 4-8.) The Eighth Circuit said in this case that their evidence of the burdensomeness of these laws was weak. *See Libertarian Party of Ark. v. Thurston*, 962 F.3d 390, 404 (8th Cir. 2020) (*LPAR*) ("Plaintiffs did not make an overwhelming showing as to the actual burdensomeness of the current regime or their own particular ability or inability to comply."). And at this more developed stage of this case, Plaintiffs' evidence of burden is weaker still, because they have not offered evidence of the burdensomeness of Arkansas's midterm election calendar, which has deadlines that fall closer to the relevant elections than in presidential election cycles. Because "[e]lection laws will invariably impose some burden upon individual voters," *Burdick v. Takushi*, 504 U.S. 428, 433 (1992), the applicable level of scrutiny "depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights," *id.* at 434. Plaintiffs have not proved that they will face a severe burden in all future elections. Therefore, they have not established that the ballot-access laws they challenge trigger strict scrutiny.

As an initial matter, the Eighth Circuit considered only the propriety of a preliminary injunction based on Plaintiffs' evidence regarding the 2020 presidential election cycle. So Plaintiffs cannot use the law-of-the-case doctrine to dodge their evidentiary burden regarding future elections. (*See* Reply 5 (citing *United States v. Bartsh*, 69 F.3d 864 (8th Cir. 1995)).) All that "doctrine prevents [is] the relitigation of a settled issue in a case." *Bartsh*, 69 F.3d at 866. Cases like *Bartsh* do not "involve remand after the interlocutory appeal of a preliminary injunction," which this Court has said presents unique circumstances arising from the nature of courts' equitable powers. *Hopkins v. Jegley*, 510 F. Supp. 3d 638, 652 (E.D. Ark. 2021) (citing, among other cases, *Bartsh*); *see Bartsh*, 69 F.3d at 866 (referring to law-of-the-case doctrine and mandate rule as "close relation[s]"). Nothing in the Eighth Circuit's decision requires this Court to conclude that Arkansas's ballot-access laws—particularly in midterm election cycles—impose a severe

burden. (*Cf.* Reply 8 (quoting Eighth Circuit's decision with insertion in brackets regarding "gubernatorial election cycles in Arkansas" in attempt to extend that decision's holding).)

Make no mistake: Plaintiffs' evidence of "the actual burdensomeness of the current regime or their own particular ability or inability to comply" remains less than "overwhelming." *LPAR*, 962 F.3d at 404. For one thing, they remain unable to dispute Ms. Cox's testimony—based on her extensive experience running a variety of petitioning drives in Arkansas and around the country—about the ease of complying with Arkansas's ballot-access laws. (*See* Def. SUMF, Doc. 72 ¶ 88.) Instead, they attempt to manufacture a factual dispute by citing Dr. Pakko's last-minute supplemental affidavit. (*See* Pls. Resp. to Def. SUMF, Doc. 75 at 18-19.) But this latest affidavit from Dr. Pakko, rather than respond meaningfully to Ms. Cox's testimony, simply dismisses it as "her opinion." (Doc. 76-1 ¶ 26; *accord id.* ¶ 27.) That does not justify discarding her testimony.

Additionally, Ms. Cox's testimony is consistent with Plaintiffs' own concessions about the slight burden imposed by Arkansas's ballot-access laws. Plaintiffs concede that, to obtain across-the-board ballot access, they must obtain signatures from just 1.5% of the pool of voters eligible to sign their petitions. (*See* Pls. Resp. to Def. SUMF, Doc. 75 at 4-5.) The Eighth Circuit agreed. *See LPAR*, 962 F.3d at 404 ("Here, the 3% requirement from the last election translates into about 1.5% of registered voters, numbers clearly below the figures at issue in the State's cases."). And the Eighth Circuit also noted that the Supreme Court's decision in *Jenness v. Fortson*, 403 U.S. 431 (1971), along with "several cases from other circuits and states," had "refused to strike petitioning regimes with similar or higher signature requirements" than Arkansas. *LPAR*, 962 F.3d at 403; *see Libertarian Party of N.H. v. Gardner*, 843 F.3d 20, 26 (1st Cir. 2016) (noting that "[n]either the Supreme Court nor any circuit court has struck down a

statewide ballot-access regime on the grounds that a signature requirement of five percent (or less) is too much").

Thus, decades of precedent supports Ms. Cox's testimony that Arkansas's ballot-access laws do not impose a severe burden. Plaintiffs' primary response on this point has been to repeat the claim—made throughout this litigation—that "no political party was successful in complying with Arkansas's 3% petition signature requirement" in prior decades. (Reply 11.) But they have never offered any evidence about how many political groups over the years *tried and failed* to satisfy Arkansas's modicum-of-support requirement. Without evidence of that, the absence of minor parties on the ballot is as likely due to a lack of desire among Arkansans to form minor parties as it might be to any specific feature of Arkansas's ballot-access laws.

Unsurprisingly, therefore, Plaintiffs' reply (at 9) makes clear that they do not truly claim to face any burden caused by the modicum-of-support requirement itself but only by "the new deadlines in December or September of the year before the general elections." But the problem with this claim is that Plaintiffs' evidence only relates to presidential election cycles. They have not offered evidence about the alleged burdensomeness of Arkansas's deadlines for midterm elections. Indeed, they do not claim that Arkansas's midterm deadlines are particularly early when compared to other States. They claim only that Arkansas's deadlines are somehow made more burdensome by the fact that "neither independent candidates or new political party candidates participate in the preferential primary election or general primary election required of established political parties in Arkansas." (Reply 8; *see id.* at 15 ("[M]any of the states with earlier deadlines require all political parties to participate in a primary election to nominate their candidates for the general election ballot."); *accord id.* at 16 (contrasting, again, Arkansas's require-

ment that new parties nominate candidates by convention with other States that require participation in primary elections); *id.* at 17 (same).) Plaintiffs never explain exactly how this burdens them. If Arkansas's deadlines are not burdensome in and of themselves, then they do not become burdensome by dint of the requirement that Plaintiffs hold a nomination convention rather than a primary election.

Finally, Plaintiffs continue to ignore alternative avenues for them to achieve across-the-board ballot access. Arkansas allows them to satisfy the modicum-of-support requirement through presidential candidates. By collecting 5,000 signatures, they may have a candidate placed on the ballot for the offices of President and Vice President of the United States. Ark. Code Ann. 7-8-302(5)(B). Those candidates would be officially labeled on the ballot as the Libertarian Party's candidates. *See id.* 7-8-302(4)(A). And if such candidates received "at least three percent (3%) of the entire vote cast for the office," then they would qualify as a "political party" with across-the-board ballot access in the following election. *Id.* 7-1-101(27)(A). Plaintiffs do not argue that these procedures are severely burdensome.[1] Instead, they simply dismiss this process as a ballot-access path. (*See* Suppl. Pakko Aff., Doc. 76-1 ¶ 6 (characterizing this incorrectly as only a vehicle for presidential candidates).) But a group that runs a sufficiently successful presidential campaigns in Arkansas will obtain (and *retain*) across-the-board ballot access for every partisan election in the State.

---

[1] Plaintiffs correctly note that Arkansas recently increased the number of signatures required for such candidates from 1,000 to 5,000. (*See* Pls. Resp. to Def. SUMF, ECF 75 at 1-2.) *See also* Act 273, sec. 1, 93d Ark. Gen. Assemb., Reg. Sess. (Mar. 8, 2021) (amending Ark. Code Ann. 7-8-302(5)(B)). This change took effect shortly before the Secretary's prior summary-judgment filings, which referred to the superseded 1,000-signature threshold. (*See* Def. MSJ Br., Doc. 71 at 2 (citing superseded 1,000-signature requirement); Def. SUMF, Doc. 72 ¶ 60 (same).) Plaintiffs do not argue that this change had the effect of increasing the burdensomeness of the modicum-of-support requirement for presidential candidates.

Because the undisputed facts establish, as a matter of law, that Arkansas's ballot-access laws' "burden is slight," the Secretary "need not establish a compelling interest to tip the constitutional scales in [Arkansas's] direction." *Burdick*, 504 U.S. at 439. And Plaintiffs do not argue that the challenged laws would fail to pass anything less than strict scrutiny. As a result, the undisputed facts demonstrate that the Secretary is entitled to judgment as a matter of law.

## II.   In any event, Arkansas's ballot-access laws are narrowly tailored to the State's compelling interests.

Because Arkansas's ballot-access laws impose "only modest burdens," the Secretary must show only that they are "reasonable" and "politically neutral." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 452 (2008) (quotation marks omitted). The Secretary has already made that showing. (*See* Def. MSJ Br., Doc. 71 at 8-22.) Even if this Court finds that Arkansas's ballot-access regime "impose[s] a severe burden," the challenged provisions "are narrowly tailored to serve a compelling state interest." *Wash. State Grange*, 552 U.S. at 451 (quotation marks omitted).

To argue otherwise, Plaintiffs do not claim that Arkansas lacks compelling interests. Instead, they pose three questions about whether Arkansas's ballot-access laws are sufficiently tailored to the State's admittedly compelling interests. (*See* Reply 24-25.) But these questions demonstrate a misunderstanding of the relevant standard. Plaintiffs argue that the challenged laws fail strict scrutiny, because they are not "necessary"—*i.e.*, *perfectly* tailored—to serving the State's compelling interests. (*Id.* at 24.) But that is not the correct standard. Even a law that, unlike the laws challenged here, "restricts [someone's] speech on the basis of its content" does not need to be "perfectly tailored" to the State's compelling interests to be constitutional. *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 442, 454 (2015) (quotation marks omitted). Were strict

6

scrutiny applied, it would require only that Arkansas's ballot-access regime "be *narrowly* tailored" to the State's compelling interests, "not that it be *perfectly* tailored." *Id.* at 454 (quotation marks omitted). Applying this standard, instead of Plaintiffs' incorrect proposed standard, the challenged laws are constitutional

Regarding the 90-day window for collecting signatures, Plaintiffs do not dispute that Arkansas has a compelling interest in preventing fraud in the election process. *See Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (noting "the State's compelling interest in preventing voter fraud"). And Arkansas need not point to past instances of fraud to justify the 90-day window. *Cf. Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 194 (2008) (op. of Stevens, J.) (finding Indiana's interest in preventing in-person voter fraud compelling even though "[t]he record contain[ed] no evidence of any such fraud actually occurring in Indiana at any time in its history"). Plaintiffs' claim is that the 90-day window is not tailored to Arkansas's compelling interest, because "a longer petitioning period would give a greater time to catch petitioning fraud." (Reply 22.) This misunderstands the nature of Arkansas's interest. By concentrating petitioning activity into a defined period, Arkansas is better able to police the process.

Contrary to Plaintiffs' argument (*id.* at 24), it does not undermine this interest to point out that Arkansas has chosen not to police fraud with the same tools in signature gathering for presidential candidates and initiative petitions. Regarding presidential elections, the Supreme Court has made clear that the State has less interest in controlling ballot access. *See Anderson v. Celebrezze*, 460 U.S. 780, 804 (1983) (holding that "State's interest in regulating a nationwide Presidential election is not nearly as strong" as "in the context of elections wholly within the boundaries of" that State). This distinction explains Arkansas's differential treatment of signature gathering in presidential and other partisan elections. Regarding initiative petitioning, Arkansas has

7

many other rules to keep fraud out of the process—rules that do not apply to groups seeking to obtain across-the-board ballot access. Chief among these are the qualifications for paid canvassers. *See* Ark. Code Ann. 7-9-601(a)(1) ("A person shall not provide money or anything of value to another person for obtaining signatures on a statewide initiative petition or statewide referendum petition unless the person receiving the money or item of value meets the requirements of this section."). As Ms. Cox testified, the absence of any qualifications on who may circulate Plaintiffs' petitions greatly reduces the alleged burden of Arkansas's ballot-access laws. (*See* Def. SUMF, Doc. 72 ¶ 88.)

Regarding the deadlines for turning in petition signatures, States may permissibly set deadlines to serve their interest in orderly election administration. Plaintiffs suggest that the Secretary must justify the precise date selected by Arkansas for its various deadlines. (*See* Reply 24-25.) But Plaintiffs do not discuss the Eighth Circuit's longstanding acknowledgment that any given deadline will be "to some extent 'necessarily arbitrary.'" *McLain v. Meier*, 851 F.2d 1045, 1050 (8th Cir. 1988) (quoting *Am. Party of Tex. v. White*, 415 U.S. 767, 783 (1974)). They "could always point to a day slightly later that would not significantly alter [Arkansas's] interests until the point at which" its compliance deadlines would cease to exist. *Id.* To overcome Arkansas's compelling interest in maintaining the current deadlines, Plaintiffs must have "presented evidence that would enable to a court to prescribe a shorter period." *Nader v. Keith*, 385 F.3d 729, 735 (7th Cir. 2004). They have offered no evidence whatsoever of what a permissible compliance deadline would be, according to their theory. Thus, they have not shown that Arkansas's chosen deadlines fail at narrow tailoring.

Finally, regarding the modicum-of-support requirement, Plaintiffs downplay Arkansas's interest in preventing frivolous candidacies. For starters, Plaintiffs again fail to mention that the

Supreme Court has not required evidence of specific instances of frivolous candidacies to justify ballot-access laws. *See Munro v. Socialist Workers Party*, 479 U.S. 189, 194-95 (1986) ("We have never required a State to make a particularized showing of . . . the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access."). Regardless, as Plaintiffs admit, the Secretary detailed evidence that the Libertarian Party of Arkansas had itself put forward frivolous candidates in the past. Plaintiffs try to deflect this fact with nonspecific whataboutism, alleging generically that the two major parties "have occasionally had frivolous candidates." (Reply 22.) But they identify no candidate similar to the Secretary's example, whom—contrary to Plaintiffs' implication—the Eighth Circuit agreed was a frivolous candidate. It "note[d] . . . that Arkansas describes a particular instance of frivolity in a prior election involving the Libertarian Party that Arkansas characterizes as harming the general integrity of, and respect for, the election process." *LPAR*, 962 F.3d at 403 n.5. "Namely, the Libertarian Party placed an Elvis Presley impersonator on the ballot for an office and listed the candidate as Elvis Presley." *Id.*

Each of the laws that Plaintiffs challenge is narrowly tailored to Arkansas's compelling interests.

### III. Converting the preliminary injunction into a permanent injunction would not be an appropriate remedy.

Plaintiffs close by suggesting that this Court provide them some alternative relief to simply converting the preliminary injunction into a permanent injunction. (*See* Reply 25-27.) Plaintiffs are correct to make this suggestion. The entire record in this case revolves around the alleged burdens faced by Plaintiffs based on Arkansas's election calendar in presidential election cycles. Therefore, aside from the reasons already discussed that Plaintiffs are not entitled to any relief whatsoever, it would be an abuse of discretion to simply convert the preliminary injunction

into a permanent one. Plaintiffs have not put forward evidence that the more forgiving electoral calendar in midterm election cycles imposes a severe burden.

Additionally, as Plaintiffs' summary-judgment arguments continue to demonstrate, the only harm they have even alleged is a result of the compliance deadlines in Arkansas's ballot-access laws, not the modicum-of-support requirement. To permanently enjoin that requirement, therefore, would not "directly address and relate to the constitutional violation itself." *Missouri v. Jenkins*, 515 U.S. 70, 88 (1995) (quoting *Milliken v. Bradley*, 433 U.S. 267, 281-82 (1977)). If this Court were to rule for Plaintiffs, it would instead need to "tailor injunctive relief to the scope of the violation found." *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 604 (7th Cir. 2007) (quotation marks omitted). Any injunction issued by this Court "must be narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs." *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022-23 (8th Cir. 2015) (quotation marks omitted) (ellipsis in original). And those specific harms all allegedly derive from Arkansas's compliance deadlines—not its modicum-of-support requirement.

## CONCLUSION

For these reasons, the Secretary respectfully requests that the Court deny Plaintiffs' motion for summary judgment and grant his motion for summary judgment.

Dated:  October 14, 2021               Respectfully submitted,

                                       LESLIE RUTLEDGE
                                         Attorney General

                                       VINCENT M. WAGNER (2019071)
                                         Deputy Solicitor General
                                       DYLAN L. JACOBS (2016167)
                                         Assistant Solicitor General
                                       OFFICE OF THE ARKANSAS
                                         ATTORNEY GENERAL
                                       323 Center Street, Suite 200
                                       Little Rock, Arkansas  72201
                                       (501) 682-8090
                                       vincent.wagner@arkansasag.gov

                                       *Counsel for Defendant*