IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

LIBERTARIAN PARTY
OF ARKANSAS, *et al.*                                                      PLAINTIFFS

v.                                    Case No. 4:19–cv–00214–KGB

JOHN THURSTON, in his official capacity
as Secretary of State for the State of Arkansas                           DEFENDANT

<u>OPINION AND ORDER</u>

Before the Court is a motion for summary judgment filed by plaintiffs Libertarian Party of Arkansas (the "LPAR"), Sandra Chaney Richter, Michael Pakko, Ricky Harrington, Jr., Christopher Olson, and Michael Kalagias (Dkt. No. 62). Also before the Court is a motion for summary judgment filed by defendant John Thurston, in his official capacity as Secretary of State for the State of Arkansas (Dkt. No. 70). Plaintiffs responded to Secretary Thurston's motion (Dkt. No. 76), and Secretary Thurston responded to plaintiffs' motion (Dkt. No. 77). For the following reasons, the Court grants plaintiffs' motion (Dkt. No. 62) and denies Secretary Thurston's motion (Dkt. No. 70). The Court declares unconstitutional Arkansas Code Annotated §§ 7–7–101, 7–7–203(c)(1), 7–7–205(a)(2), 7–7–205(a)(4)(B), 7–7–205(a)(6), and 7–7–205(c)(3) both facially and as applied to plaintiffs for the 2019–2020 general election cycle and all subsequent Arkansas general election cycles.

## I.     Overview Of Parties And Claims

Plaintiffs are the LPAR, which describes itself as "a formerly recognized political party" in Arkansas that has "previously conducted successful petition drives for political party recognition in Arkansas, . . . has previously held its Nominating Conventions, . . . and intends to conduct a petition drive for political party recognition in the State of Arkansas for the election

cycle. . . ." (Dkt. No. 1, ¶ 1).  Dr. Pakko is a resident of and registered voter in Arkansas and a member and current chair of LPAR (*Id.*, ¶ 3).  Mr. Olson is a resident of and registered voter in Arkansas and a member and current vice chair of LPAR (*Id.*, ¶ 5).  Ms. Richter, Mr. Harrington, and Mr. Kalagias each describe themselves as residents of and registered voters in Arkansas, members of the LPAR, and individuals considering running as Libertarian candidates for elective office in Arkansas (*Id.*, ¶¶ 2, 4, 6).  Secretary Thurston, in his official capacity, is responsible for among other matters certification of election results, maintaining State election records, and administering the election and voter registration laws of the State of Arkansas (*Id.*, ¶ 8).

Plaintiffs bring this action under 42 U.S.C. § 1983 seeking a declaration that Arkansas Code Annotated §§ 7–7–101, 7–7–203(c)(1), 7–7–205(a)(2), 7–7–205(a)(4)(B), 7–7–205(a)(6), and 7–7–205(c)(3), as applied to plaintiffs for the 2019–2020 Arkansas general election cycle and for all subsequent general election cycles in the State of Arkansas, violate plaintiffs' associational rights under the First and Fourteenth Amendments, including the Equal Protection Clause of the Fourteenth Amendment.  Plaintiffs claim a fundamental right to political association protected by the First Amendment to the United States Constitution, which they contend includes both the right of individuals to associate for the advancement of political beliefs and the right of individuals to vote for the candidates or parties of their choice (Dkt. No. 1, ¶ 21).  Plaintiffs also claim that the Arkansas statutory scheme's unnecessarily early petition deadline, coupled with the recently increased high petition signature requirement, unequally and unfairly impacts in a discriminatory manner the right of small, minor, unrecognized political parties in Arkansas who seek petition signatures for party formation in Arkansas (*Id.*, ¶ 28).  Plaintiffs seek an injunction prohibiting the State of Arkansas from enforcing Arkansas Code Annotated §§ 7–7–101, 7–7–203(c)(1), 7–7–205(a)(2), 7–7–205(a)(4)(B), 7–7–205(a)(6), and 7–7–205(c)(3) for the 2019–2020 Arkansas

general election cycle and for all subsequent general election cycles in the State of Arkansas. Plaintiffs bring a facial and as applied challenge (Dkt. No. 1, at 13, Prayer for Relief ¶ 1).

## II.    Procedural Background

Plaintiffs filed a motion for preliminary injunction on May 3, 2019, which defendant opposed (Dkt. Nos. 12, 13, 17).  The Court conducted a hearing on the motion for preliminary injunction on June 4, 2019 (Dkt. No. 28).  The Court entered an Order granting preliminary injunctive relief on July 3, 2019 (Dkt. No. 31).  Defendant appealed this Court's Order (Dkt. No. 33).  The Court denied defendant's request to stay the Order pending appeal (Dkt. No. 48).  The Eighth Circuit Court of Appeals affirmed this Court's preliminary injunction Order on June 18, 2020 (Dkt. Nos. 54, 55).  *See Libertarian Party of Ark. v. Thurston*, 394 F. Supp. 3d 882, 922 (E.D. Ark. 2019), *aff'd*, 962 F.3d 390 (8th Cir. 2020).

The parties entered into a joint stipulation as to the continuing effect of this Court's preliminary injunction Order of July 3, 2019, and joint stipulations of fact (Dkt. No. 60).  The Court conducted a status conference with counsel and the parties in the case, recognized certain agreements reached by the parties in the case, and set a briefing schedule for summary judgment briefing (Dkt. No. 61).  According to plaintiffs, "[u]nder the new laws challenged herein, the next petition signature deadline will be September 7, 2023, for political party formation and recognition for the 2023–2024 election cycle." (Dkt. No. 76, at 10).

Plaintiffs filed a motion for summary judgment (Dkt. No. 62).  Defendant filed a motion for summary judgment (Dkt. No. 70).  Plaintiffs filed a combined reply brief in support of their motion for summary judgment and response and brief in opposition to defendant's motion for summary judgment (Dkt. No. 76).  Defendant filed a reply in support of defendant's motion for summary judgment (Dkt. No. 77).

### III.    Factual Background[1]

1.      The LPAR is a formerly recognized political party under the laws of Arkansas pursuant to Ark. Code Ann. § 7–3–101 and § 7–7–20 (Dkt. No. 72, ¶ 1)

2.      Sandra Chaney Richter, Michal Pakko, Ricky Harrington, Jr., Christopher Olson, and Michael Kalagias are residents of the State of Arkansas, registered voters in the State of Arkansas, and citizens of the State of Arkansas and the United States of America (*Id.*, ¶ 2).

3.      Secretary Thurston is charged by statute with the certification of candidates and political parties.  Secretary Thurston was at all times herein relevant acting, both personally and through the conduct of agents and/or employees of the State of Arkansas, under the color of state law and the authority of his office as a state official.  Secretary Thurston is sued in his official capacity only (*Id.*, ¶ 3; Dkt. No. 60, ¶ 5).

4.      Pursuant to Ark. Code Ann. § 7–7–205(c)(4), to remain a political party in the State of Arkansas after the 2020 Arkansas general election, the LPAR needed to receive three percent of the total votes cast for the nominees for presidential electors in Arkansas (Dkt. No. 72, ¶ 4; Dkt. No. 60, ¶ 6).

5.      In the 2020 general election in Arkansas, the Libertarian candidate for U.S. Senate, Mr. Harrington received 399,390 votes for 33.5 percent of the total votes cast for U.S. Senator in Arkansas (Dkt. No. 72, ¶ 5; Dkt. No. 60, ¶ 7).

---

[1] The following facts in paragraphs 1 through 92 of this section of the Opinion and Order are taken from plaintiffs' statement of undisputed facts, defendant's combined response to plaintiffs' statement of undisputed material facts and statement of undisputed material facts, and plaintiffs' concise statement of the material facts as to which plaintiffs contend a genuine dispute exists (Dkt. Nos. 63, 72, 75).  The facts in paragraphs 93 through 185 of the Opinion and Order are taken from this Court's preliminary injunction Order.  The parties stipulated:  "The transcript of the preliminary injunction hearing held on June 4, 2019, and all exhibits and affidavits received therein may be considered by the District Court in deciding and reaching a final decision of any motions for summary judgment filed by the Plaintiffs or Defendants." (Dkt. No. 60, at 6, ¶ 29).

6.      In the 2020 general election in Arkansas, the Libertarian candidates for President and Vice President of the United States received 13,133 votes for 1.1 percent of the total votes cast for the 13 pairs of candidates for President and Vice President in Arkansas (Dkt. No. 72, ¶ 6; Dkt. No. 60, ¶ 8).

7.      The LPAR failed to receive three percent of the total votes cast for the nominees for presidential electors in Arkansas in the 2020 general election and, therefore, ceased to be recognized as a political party in Arkansas (Dkt. No. 72, ¶ 7; Dkt. No. 60, ¶ 9).

8.      The LPAR has previously conducted successful petition drives for political party recognition in Arkansas, pursuant to Ark. Code Ann. § 7–7–205(a), for the elections which were held in 2012, 2014, 2016, and 2018, when the number of required valid petition signatures of registered voters was 10,000 valid petition signatures (Dkt. No. 72, ¶ 8; Dkt. No. 60, ¶ 10).

9.      The LPAR, its supporters, and the individual plaintiffs named in this lawsuit, were, as of February 4, 2021, preparing to conduct a petition drive for political party recognition in Arkansas in 2021, for the general election to be held in Arkansas on November 8, 2022 (Dkt. No. 72, ¶ 9; Dkt. No. 60, ¶ 11).

10.     Ark. Code Ann. § 7–7–205(a) sets forth the procedure by which an unrecognized party can obtain official recognition by the Arkansas Secretary of State (Dkt. No. 72, ¶ 10; Dkt. No. 60, ¶ 12).

11.     Official recognition not only gives a political party's candidates access to the ballot but is also the only way for a political party to be listed on the ballot alongside its candidate (Dkt. No. 72, ¶ 11; Dkt. No. 60, ¶ 13).

12.     Pursuant to Ark. Code Ann. §§ 7–7–205(a)(2), 7–7–205(a)(4)(B), 7–7–203(c)(1)(A), and 7–7–205(a)(6), a new political party in order to be recognized in the State of

Arkansas for the election cycle of 2021–2022 must turn in 26,746 valid petition signatures of registered Arkansas voters collected over no more than a 90–day period and filed with the Arkansas Secretary of State no later than December 24, 2021 (Dkt. No. 72, ¶ 12; Dkt. No. 60, ¶ 14).

13.     Pursuant to Arkansas Code Ann. § 7–7–103(b)(1)(B), if a person wishes to be an independent candidate for State office or for United States Senator in which a statewide race is required, the person shall file petitions signed by not less than three percent of the qualified electors of the State or which contain 10,000 signatures of qualified electors, whichever is the lesser (Dkt. No. 72, ¶ 13; Dkt. No. 60, ¶ 15).

14.     Three percent of the total vote cast for Governor of Arkansas in the November 2018 general election is 26,746 votes (Dkt. No. 72, ¶ 14; Dkt. No. 60, ¶ 16).

15.     The parties are in agreement that the text of the preliminary injunction entered by this Court on July 3, 2019, does not limit its application to the 2020 election cycle.  Specifically:

> [Defendant John] Thurston, in his official capacity as Arkansas Secretary of State, together with his agents, servants, and employees, and all persons in active concert or participation with him, are preliminarily enjoined from enforcing Arkansas Code Annotated §§ 7–7–101, 7–7–203(c)(1), 7–7–205(a)(2), 7–7–205(a)(4)(B), 7–7–205(a)(6), and 7–7–205(c)(3) to the extent that these statutes impose the three percent requirement as to the LPAR.  Specifically, the same parties are enjoined from failing to recognize the LPAR as a new political party and are enjoined from restricting ballot access to the LPAR as a new political party if the LPAR petitions for the certification of a new political party containing, at the time of filing, the signatures of at least 10,000 registered voters in Arkansas and otherwise complies with the remaining requirements of Arkansas law, save and except for the enjoined three percent requirement.

*Libertarian Party of Ark. v. Thurston*, 394 F. Supp. 3d 882, 922 (E.D. Ark. 2019), *aff'd*, 962 F.3d 390 (8th Cir. 2020).  Secretary Thurston continues to disagree that the preliminary injunction Order is correct (Dkt. No. 72, ¶ 15; Dkt. No. 60, ¶ 1).

16.     For the elections that were conducted in Arkansas in 2020, all political party candidates were required to file a Political Practices Pledge, Party Certificate of Candidacy, and Candidate Information Form during the party filing period:  12:00 noon, November 4, 2019, to 12:00 noon, November 11, 2019 (Dkt. No. 72, ¶ 16; Dkt. No. 60, ¶ 28).

17.     The party filing period for the 2021–2022 election cycle is a one–week period beginning at noon on February 22, 2022, and ending at noon on March 1, 2022 (Dkt. No. 72, ¶ 17; Dkt. No. 60, ¶ 26).

18.     Pursuant to Ark. Code Ann. § 7–7–203(c)(1)(A), Libertarian candidates will have to submit their Political Practices Pledges, Candidate Information Form, and Party Certificate of Candidacy during the party filing period for the 2021–2022 election cycle of 12:00 noon, February 22, 2022, to 12:00 noon March 1, 2022 (Dkt. No. 72, ¶ 18; Dkt. No. 60, ¶ 17).

19.     Pursuant to Ark. Code Ann. § 7–7–203(b)(1), at the time the parties filed summary judgment papers, the next preferential primary election and nonpartisan general election in Arkansas was to be held on May 24, 2022 (Dkt. No. 72, ¶ 19; Dkt. No. 60, ¶ 18).

20.     Pursuant to Ark. Code Ann. § 7–7–203(a)(1), at the time the parties filed summary judgment papers, the next general primary election in Arkansas was to be held on June 21, 2022 (Dkt. No. 72, ¶ 20; Dkt. No. 60, ¶ 19).

21.     Arkansas only holds general elections in even numbered years, Ark. Code Ann. § 7–5–102, and at the time the parties filed summary judgment papers, the next general election and non–partisan runoff election in Arkansas was to be held on November 8, 2022 (Dkt. No. 72, ¶ 21; Dkt. No. 60, ¶ 20).

22.     For elections to be conducted in Arkansas for 2022, at the time the parties filed summary judgment papers, the ballots for the general election on November 8, 2022, had not yet been printed (Dkt. No. 72, ¶ 22; Dkt. No. 60, ¶ 21).

23.     An independent candidate for statewide office in Arkansas may achieve ballot status by filing a petition signed by at least 10,000 valid Arkansas voters (Dkt. No. 72, ¶ 23; Dkt. No. 60, ¶ 22).[2]

24.     Plaintiff Ricky Harrington, Jr., received 399,390 votes as the Libertarian candidate for U.S. Senator in Arkansas in the 2020 general election (Dkt. No. 72, ¶ 24; Dkt. No. 60, ¶ 7). Plaintiffs maintain, but defendant does not concede, that Mr. Harrington plans to be the Libertarian candidate for governor of Arkansas in the 2022 general election (Dkt. No. 72, ¶ 24).

25.     Prior to the three percent of the last total vote cast for Governor of Arkansas petitioning requirement being held unconstitutional in two separate published decisions by the United States District Court for the Eastern District of Arkansas, *Citizens To Establish A Reform Party In Arkansas v. Priest*, 970 F. Supp. 690 (E.D. Ark. 1996), and *Green Party of Arkansas v. Daniels*, 445 F. Supp. 2d 1056 (E.D. Ark. 2006), no new political parties successfully petitioned and were recognized in Arkansas from 1977 (when a petitioning requirement was first put in place)

---

[2] Dr. Pakko submitted a supplemental affidavit in support of plaintiffs' reply in which he avers, in pertinent part:

> I would note Independent candidates can petition independently, but in order to run multiple candidates, the LPAR would need to run multiple petition campaigns over various geographic districts, with additional costs and complications.  Moreover, a candidate with a party label on the ballot is distinctly different than an Independent candidate, even if that candidate is endorsed by a nonexistent political party.  The political party label gives the potential voter more information about the candidate and is not deceptive in labeling a political party candidate as an Independent.

(Dkt. No. 76–1, ¶ 7).  Defendant filed a reply in support of defendant's motion for summary judgment but did not address the allegations in Dr. Pakko's supplemental affidavit (Dkt. No. 77).

through 2007 (when the 10,000 petition signature requirement was put into the law).  Therefore, no new political party had ever successfully petitioned in Arkansas for political party status prior to the establishment of a 10,000 petition signature requirement (Dkt. No. 72, ¶ 25).[3]

26.     Before 2019, and since 2007, when the requirement for new political party formation in Arkansas became 10,000 valid petition signatures or three percent of the last gubernatorial vote, only two minor political parties have ever successfully petitioned for new party recognition in Arkansas (viz.:  the Green Party in 2008, 2010, 2012, and 2014; and the Libertarian Party in 2012, 2014, 2016, and 2018) (Dkt. No. 72, ¶ 26; Dkt. No. 60, ¶ 23).[4]

27.     The Libertarian Party of Arkansas was the only minor political party to obtain political party recognition and ballot status in Arkansas by petitioning for the general elections which were held in Arkansas in November 2016 and November 2018 (Dkt. No. 72, ¶ 27; Dkt. No. 60, ¶ 24).

---

[3]  Although defendants admit this allegation, defendants claim the allegation is immaterial (Dkt. No. 72, ¶ 25).

[4]  Dr. Pakko submitted a supplemental affidavit in support of plaintiffs' reply in which he avers, in pertinent part:

> Further, prior to the 3% requirement being held unconstitutional on two occasions by this Court, no new political parties successfully petitioned and were recognized in Arkansas from 1977 (when a petitioning requirement was first put in place) through 2007 (when the 10,000 petition signature requirement was put into the law).  In other words, no new political party had ever successfully petitioned in Arkansas for political party status prior to the establishment of a 10,000 petition signature requirement.

(Dkt. No. 76–1, ¶ 5).  Defendant filed a reply in support of defendant's motion for summary judgment but did not address the allegations in Dr. Pakko's supplemental affidavit (Dkt. No. 77).

28.     The Libertarian Party of Arkansas was the only minor political party to obtain recognition for ballot status in Arkansas by petitioning for the election cycle for 2019–2020 (Dkt. No. 72, ¶ 28).[5]

29.     Pursuant to Ark. Code Ann. § 7–7–205(c)(2), any new political party which achieves recognition in Arkansas by successfully petitioning does not nominate its candidates for the general election at a preferential primary election, but rather that party nominates its candidates at a party convention (Dkt. No. 72, ¶ 29; Dkt. No. 60, ¶ 25).

30.     Pursuant to Ark. Code Ann. § 7–7–205(a)(6), the current petition signature deadline for political party recognition in Arkansas is December 24, 2021, which is 60 days before the party filing period (Dkt. No. 72, ¶ 30; Dkt. No. 60, ¶ 27).

31.     The current petition signature deadline for recognition of new political parties in Arkansas is December 24, 2021 – which is 60 days before the party filing period, 319 days before

_____

[5] Dr. Pakko submitted a supplemental affidavit in support of plaintiffs' reply in which he avers, in pertinent part:

> The Libertarian Party of Arkansas is a formerly recognized political party under the laws of Arkansas, pursuant to Ark. Code Ann. §§ 7–3–101 and 7–7–205, and has previously conducted successful petition drives for political party recognition in Arkansas, pursuant to Ark. Code Ann. §§ 7–7–205(a), in 2012, 2014, 2016, and 2018, when the number of valid petition signatures requirement was 10,000 valid petition signatures by law for 2012 through 2018, and also 2020 and 2022 because of the granting of a preliminary injunction by the U.S. District Court for the Eastern District of Arkansas in 2019 for the 2019–2020 election cycle and the 2021–2022 election cycle in Arkansas. As Chair of the Libertarian Party of Arkansas I know from my personal knowledge and past election experience as well as in petitioning personally and managing petition drives that the Libertarian Party of Arkansas, its supporters, and the individual Plaintiffs herein, anticipate they will probably have to conduct petition drives for political party recognition in Arkansas in the future after the 2022 Arkansas general election and after the 2024 Arkansas general election.

(Dkt. No. 76–1, ¶ 4).  Defendant filed a reply in support of defendant's motion for summary judgment but did not address the allegations in Dr. Pakko's supplemental affidavit (Dkt. No. 77).

the date of the General Election in Arkansas, on November 8, 2022, approximately five months before the Republicans and Democrats will hold their preferential primary election to select their candidates on May 24, 2022, and approximately six months before the Republicans and Democrats will hold their general primary election—to decide any runoffs from the preferential primary elections—on June 21, 2022, for the November 8, 2022, General Election (Dkt. No. 72, ¶ 31).

32.     The parties dispute whether severe weather and pandemic outbreaks can have a negative effect on approaching people to sign petitions for the recognition of new political parties. Plaintiffs maintain that it is rare in any 90–day period from the experience of Dr. Pakko not to lose a certain number of days because of bad weather or pandemic outbreaks (Dkt. No. 72, ¶ 32).

33.     For the 2023–2024 election cycle in Arkansas, the party filing period is set for the one–week period beginning at 12:00 noon, November 6, 2023, and ending at 12:00 noon on the seventh day thereafter on November 13, 2023 (Dkt. No. 72, ¶ 33).

34.     Pursuant to Ark. Code Ann. § 7–7–203(b)(2), the preferential primary election and non–partisan General Election in Arkansas for the 2023–2024 election cycle will be held on March 5, 2024 (Dkt. No. 72, ¶ 34).

35.     Pursuant to Ark. Code Ann. § 7–7–203(a)(2), the general primary election in Arkansas for the 2023–2024 election cycle will be held on April 2, 2024 (Dkt. No. 72, ¶ 35).

36.     Arkansas only holds elections in even numbered years, Ark. Code Ann. § 7–5–102, and the General Election and non–partisan runoff elections in Arkansas for the years 2023–2024 election cycle will be held on November 5, 2024 (Dkt. No. 72, ¶ 36).

37.     Pursuant to Ark. Code Ann. § 7–7–205(a)(6), the petition signature deadline for political party recognition in Arkansas for the 2023–2024 election cycle is September 7, 2023, which is 60 days before the party filing period and 425 days before the date of the General Election

in Arkansas on November 5, 2024, and approximately six to seven months before the Republicans and Democrats would hold their preferential primary election to select their candidates on March 4, 2024, and their general primary election on April 2, 2024 (Dkt. No. 72, ¶ 37).

38.    The parties dispute the timetable during which the LPAR, its supporters, and the individual plaintiffs conducted a petition drive for political party recognition in Arkansas in 2021 for the General Election to be held in Arkansas on November 8, 2022 (Dkt. No. 72, ¶ 38).

39.    The parties dispute whether the three percent requirement has previously been declared unconstitutional twice by this Court in *Citizens To Establish A Reform Party in Arkansas v. Priest*, 970 F. Supp. 690 (E.D. Ark. 1996), and *Green Party of Arkansas v. Daniels*, 445 F. Supp. 2d 1056 (E.D. Ark. 2006) (Dkt. No 72, ¶ 39).

40.    The Reform Party unsuccessfully petitioned for political party recognition in Arkansas in 1996 because it failed to obtain the needed petition signatures by the petition signature deadline of January 2, 1996, but was ordered to be recognized as a political party and placed on the Arkansas ballot by this Court when the law was declared unconstitutional in the case of *Citizens To Establish A Reform Party in Arkansas v. Priest*.  While the American Party was recognized as a political party in Arkansas in 1968 and 1970, that was because at that time Arkansas did not require any petition signatures to be submitted for political party recognition.  The current petition deadlines for the last and current election cycles are earlier than the petition deadline of January 2 of the 1996 General Election year because the deadline for the 2020 General Election year was September 5, 2019, while the deadline for the 2022 General Election year was December 24, 2021, and the deadline for the 2024 General Election year is September 7, 2023 (Dkt. No. 72, ¶ 40).

41.    There has been no showing that the general election ballot in Arkansas has been cluttered in recent elections by new party and independent candidates.  In fact, in the 2020 General

Election in Arkansas, only 43 of the 100 seats up for election on November 3, 2020, in the State House races were contested on the General Election ballot. The Arkansas elections in 2012 and 2014 were the only election years in which two minor political parties (LPAR and Green Party) achieved political party recognition by petitioning and were placed on the Arkansas ballot (*Id.*, 41).[6]

43.  Because the LPAR would be a new political party in Arkansas if it were successful in its petition drive this year, it would not nominate its candidates for the General Election at a preferential primary election (with a runoff election being conducted about a month later, if necessary, and a primary election, as do the Republican and Democratic Parties) but would nominate its candidates by convention (Dkt. No. 72, ¶ 42).

43.  The party filing period (*i.e.*, for the Republican and Democratic parties) is set for the 2021–2022 election cycle for a one–week period beginning at 12:00 noon, February 22, 2022, and ending at 12:00 noon on the seventh day thereafter (viz.:  March 1, 2022). Therefore, the current petition signature deadline for political party recognition in Arkansas of December 24, 2021—which is 60 days before the party filing period pursuant to Ark. Code Ann. § 7–7–205(a)(6)—is 319 days before the date of the General Election in Arkansas on November 8, 2022, and approximately five to six months before the Republicans and Democrats would hold their preferential primary elections to select their candidates on May 24, 2022, and their general primary election on June 21, 2022, for the same November 8, 2022, General Election (Dkt. No. 72, ¶ 43).

44.  The parties do not dispute that, on June 28, 2019, the LPAR turned in 18,702 petition signatures for political party recognition to the Arkansas Secretary of State, of which the

---

[6] Although defendants admit this allegation, defendants claim the allegation is immaterial (Dkt. No. 72, ¶ 41).

Secretary of State originally claimed 12,749 petition signatures were found to be valid.  The parties do not dispute that, several months thereafter in a letter dated December 10, 2019, and shortly before oral argument in the appeal of this case before the U.S. Court of Appeals for the Eighth Circuit, the Secretary of State informed Dr. Pakko that the correct number of valid signatures was 14,779 petition signatures.  The parties dispute whether there was any explanation as to why the mistake had occurred—although Dr. Pakko noticed that the previous incorrect figure of 12,749 matched a previous valid petition signature figure from a previous petition drive the LPAR had conducted in Arkansas.  Plaintiffs maintain that this mistake by the Arkansas Secretary of State's Office causes concern to the LPAR about possible future carelessness and inattention to detail by the Secretary of State's Office (Dkt. No. 72, ¶ 44).

45.     The parties do not dispute that the movement of the petition signature deadline for new party petitions in Arkansas requires the 90–day petitioning time to be conducted at least 14 to 17 months before the Arkansas General Election for presidential election years and at least 10½ to 13½ months before the Arkansas General Election for gubernatorial election years.  Plaintiffs maintain that those deadlines fall at a time far removed from Arkansas elections and at a time when voter interest is less, election issues are not yet as well defined as they will be later, and before many voters have become disillusioned with the choices available to them for candidates from the Republican and Democratic parties, while Secretary Thurston disputes this (Dkt. No. 72, ¶ 45).

46.     The LPAR maintains that, because the LPAR usually expects a validity rate of around 74 to 75 percent of signatures gathered, they try in their petition drives to be cautious and anticipate that it will be necessary to submit approximately 14,000 petition signatures in order to have at least 10,000 valid petition signatures (Dkt. No 72, ¶ 46).  Secretary Thurston disputes this

and asserts that "Meghan Cox testified as to a 'conservative validity rate' of 'between 75 and 78%' for LPAR based on the validity rates provided by" the Secretary of State's Office (*Id.*).

47.     Plaintiffs maintain that, at the time the parties filed summary judgment papers, the LPAR started a new petition drive to regain political party recognition for the 2021–2022 election cycle.  While the LPAR expects to collect a sufficient number of valid signatures to comply with the 10,000 petition signature requirement allowed by this Court's preliminary injunction Order filed on July 3, 2019, and the joint stipulation as to the continuing effect of the District Court's preliminary injunction Order filed in this case on February 4, 2021, the LPAR anticipates in the future that the party may not always be successful in receiving three percent of the vote for Governor or three percent of the vote for President in Arkansas so as to meet Arkansas's retention requirement and, thus, expects it will probably have to petition in the future to regain political party recognition in Arkansas (Dkt. No. 72, ¶ 47).  Secretary Thurston sent a letter on July 20, 2021, to plaintiffs notifying them that "the new political party petition submitted to our office on June 28, 2021 is sufficient" and stating that "[t]he total number of signatures submitted was 14,593. After checking each submitted signature, 11,886 were determined to be valid." (*Id.*).  Secretary Thurston also agrees that, if the LPAR does not meet the three percent of the vote retention requirement, the LPAR will have to petition in the future to regain political party recognition (*Id.*).

48.     In any gubernatorial or presidential election in which LPAR's candidate for Governor or President does not obtain at least three percent of the vote cast will require them to petition again for party recognition.  The party filing period (*i.e.*, for the Republican and Democratic parties) is set for the 2023–2024 election cycle for a one–week period beginning at 12:00 noon, November 6, 2023, and ending at 12:00 noon on the seventh day thereafter (viz.: November 13, 2023).  Therefore, the petition signature deadline for political party recognition in

Arkansas for the 2023–2024 election cycle will be September 7, 2023—which is 60 days before the party filing period pursuant to Ark. Code Ann. § 7–7–205(a)(6), is 425 days before the date of the General Election in Arkansas on November 5, 2024, and approximately six to seven months before the Republicans and Democrats would hold their preferential primary elections to select their candidates on March 5, 2024, and their general primary election on April 2, 2024, for the same November 5, 2024, General Election (Dkt. No. 72, ¶ 48).

49.    The parties dispute the nature of the burden imposed by the challenged laws in this case (Dkt. No. 72, ¶ 49).

50.    The parties dispute the effects of severe weather on acquiring the requisite number of petition signatures (Dkt. No. 72, ¶ 50).

51.    The parties dispute the nature of the burden imposed by the 90–day signature–collection window (Dkt. No. 72, ¶ 51).

52.    The parties dispute whether there is a particular time when interest of the voting public is high at a time when the election is far in the future and whether there is any particular good time to petition in the year before an election (Dkt. No. 72, ¶ 52).

53.    The parties dispute the impact of the 90–day petitioning period with a deadline of December 24, 2021 (Dkt. No. 72, ¶ 53).

54.    As Chair of LPAR, Dr. Pakko has kept track of recent developments in the Arkansas General Assembly as to ballot access and election bills.  Dr. Pakko contacted a number of Arkansas legislators in regard to this case before the Court and the decision of the U.S. Court of Appeals for the Eighth Circuit affirming this Court's decision granting plaintiffs a preliminary injunction.  Dr. Pakko made specific suggestions to correct the laws at issue in this case, but none of the legislators he contacted responded to his legislative proposal, although Dr. Pakko found

them clearly to be aware of the situation.  Therefore, the Arkansas General Assembly at this time has not addressed the issues raised in the instant case (Dkt. No. 72, ¶ 54).[7]

55.     Because a political party in Arkansas which is successful in petitioning for ballot status does not nominate its candidates at the preferential primary or general primary elections for the current election cycle for 2022, Dr. Pakko sees no reason that the petition signature deadline for the new political party and the submission date for the candidates of the new political party for Political Pledges, Candidate Information Forms, and Party Certificate of Candidacy should be submitted from February 22, 2022, to March 1, 2022, well before the preferential primary election on May 24, 2022, and the general primary election on June 21, 2022, since the political party does not have its candidates chosen at the elections in May and June of the General Election year, but rather at the new political party's nominating convention which must be held no later than the date of the preferential primary election (Dkt. No. 72, ¶ 55).[8]

56.     The LPAR can only select its candidates at the nominating convention if they have filed the Political Practices Pledge, Party Certificate of Candidacy, and Candidate Information Form during the party filing period at noon on February 22 through noon on March 1, 2022 (Dkt. No. 72, ¶ 56).

57.     Prior to 2013, the dates for a new political party to submit petitions, nominate candidates, and have those candidates file a Political Practices Pledge were tied to the preferential primary election.  Act 1356 of 2013 changed those dates to connect them with the party filing period (Dkt. No. 72, ¶ 57).

---

[7]   Although defendants admit the allegations in this paragraph, defendants claim the allegations are immaterial (Dkt. No. 72, ¶ 54).

[8]   Although defendants admit the allegations in this paragraph, defendants claim the allegations are immaterial (Dkt. No. 72, ¶ 55).

58.     In Dr. Pakko's proposed legislative fix this year, he specified the general primary election (as opposed to the preferential election) as a more appropriate date of reference because the general primary election is a runoff election, if necessary, for the major political party candidates for each elective office if no one receives a majority of the vote in the preferential primary election the month before (*Id.*, ¶ 58).[9]

59.     The parties agree that the transcript of the preliminary injunction hearing held on June 4, 2019, and all exhibits and affidavits received therein may be considered by the District Court in deciding and reaching a final decision of any motions for summary judgment filed by the plaintiffs or defendants (Dkt. No. 72, ¶ 59; Dkt. No. 60, ¶ 29).

60.     LPAR has "a number of paths" for ballot access, beyond meeting the modicum–of–support requirement.  Any group may nominate presidential and vice presidential candidates by collecting what Secretary Thurston in certain filings in this case maintains is 1,000 signatures, and what plaintiffs assert was raised to 5,000 signatures, from registered voters.[10]  *See* Ark. Code Ann. § 7–8–302(5)(B).  Those nominees appear on the ballot along with the group's name, and if a group's nominees win three percent of the vote, it will become a political party entitled to across–the–board ballot access.  Ark. Code Ann. § 7–1–101(27)(A).  Individuals may likewise qualify for the presidential ballot by collecting signatures.  Ark. Code Ann. § 7–8–302(6)(A).  Those requirements reflect the Supreme Court's conclusion that States have "a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the

---

[9]  Although defendants admit the allegations in this paragraph, defendants claim the allegations are immaterial (Dkt. No. 72, ¶ 58).

[10]  At the time this Court entered its preliminary injunction Order, the number of signatures required was 1,000; the statute has been amended since that time to now require 5,000 signatures. Ark. Code Ann. § 7–8–302(5)(B).

former will largely be determined by voters beyond the State's boundaries." *Anderson v. Celebrezze*, 460 U.S. 780, 795 (1983).  (Dkt. No. 75, ¶ 60).[11]

61.    Individual candidates may also qualify for down–ballot contests by collecting a specified number of signatures.  Ark. Code Ann. § 7–7–103(b)(1).  Candidates meeting those requirements will be listed on the ballot as independents, but groups and parties are free to endorse particular candidates.  Ark. Code Ann. § 7–7–103(a).  Indeed, nothing prevents groups from endorsing individuals as the official candidates of the Green, Libertarian, Reform, Socialist, or any other political party (Dkt. No. 75, ¶ 61).

62.    Alternatively, a group may become a "political party" and secure the ability to nominate candidates for every partisan office on the ballot.  Ark. Code Ann. § 7–7–102.  A group may do that by winning at least three percent of the votes cast in the previous gubernatorial or presidential election.  Ark. Code Ann. § 7–1–101(27)(A) (Dkt. No. 75, ¶ 62).

63.    The parties agree that, if a group's gubernatorial and presidential candidates continue to win at least three percent of the vote, that group will retain the ability to nominate candidates for every partisan office.  Ark. Code Ann. § 7–1–101(27)(C).  The parties disagree on whether this indicates that both major parties retain across–the–board access based on that retention requirement, given the challenged statute, and disagree on whether this allegation is immaterial (Dkt. No. 75, ¶ 63).

---

[11]  Plaintiffs do not dispute this statement, except to the extent defendant relies on a 1,000 signature requirement that is now outdated and was raised to 5,000 (Dkt. No. 75, ¶ 60).  Plaintiffs assert this is immaterial.  Further, Dr. Pakko in his supplemental affidavit asserts that "the LPAR seeks to be a political party running candidates on all federal, state, and local levels, whereas this method essentially aids the LPAR only in being "a vehicle for the National Presidential candidate to be on the ballot in Arkansas" (Dkt. No. 76–1, ¶ 6).  Defendant filed a reply in support of defendant's motion for summary judgment but did not address the allegations in Dr. Pakko's supplemental affidavit (Dkt. No. 77).

64.    Groups that fail to win three percent of the vote (or that are seeking ballot access for the first time) may also obtain across–the–board access by meeting the "petition requirements for new political parties."  Ark. Code Ann. § 7–7–205.  To do so, groups must demonstrate a modicum of support by collecting "signatures of registered voters in an amount that equals or exceeds three percent (3%) of the total votes cast for the Office of Governor."  Ark. Code Ann. § 7–7–205(a)(2).  Having satisfied that modicum–of–support requirement, a group may nominate candidates for every partisan office.  Ark. Code Ann. § 7–7–102(b).  So long as that group's gubernatorial and presidential and vice presidential nominees win at least three percent of the vote, the group will retain across–the–board ballot access.  Ark. Code Ann. § 7–1–101(27)(C). (Dkt. No. 75, ¶ 64).[12]

65.    Unlike in many states, "[a]ny [Arkansas] registered voter" can sign a petition regardless of whether he or she voted in the last election, and there is no limit to the number of petitions that a voter can sign.  As of June 2019, there were 1,750,077 registered voters in Arkansas.  Thus, compared to the eligible pool of potential signatories, Arkansas's modicum–of–support requirement only requires groups to collect signatures from slightly more than 1.5 percent of that pool (26,746 signatures ÷ 1,750,077 registered voters = 0.0153) (Dkt. No. 75, ¶ 65).

66.    The parties agree that, from 2008 to 2018 Arkansas elections, Arkansas allowed groups to obtain across–the–board access with just 10,000 signatures—or, approximately half–a–percent of eligible voters (10,000 signatures ÷ 1,750,077 registered voters = 0.0057).

---

[12]    Plaintiffs do not dispute this statement, except plaintiffs contend it is immaterial "because no unrecognized political party has ever been able to meet the 3% petitioning requirement in Arkansas" (Dkt. Nos. 75, ¶ 64; 76–1, ¶ 8).

Unsurprisingly, groups regularly met that half–a–percent requirement and then failed to satisfy the three percent ballot–retention requirement (Dkt. No. 75, ¶ 66).[13]

67.    The parties disagree on the result of that experience and its impact on the challenged statute (Dkt. Nos. 75, ¶ 67).

68.    The parties disagree on the impact of both Arkansas's modicum–of–support requirement and retention requirement involving the three percent threshold (Dkt. No. 75, ¶ 68).

69.    The parties disagree on the reasoning for and impact of the 90–day rolling window for signature collection (Dkt. No. 75, ¶ 69).

70.    Since 2013, groups seeking across–the–board ballot access have been required to submit signatures to the Secretary of State no later than 60 days before the "party filing period." (Dkt. No. 75, ¶ 70).[14]

71.    The Arkansas General Assembly moved the entire election calendar forward in presidential election cycles so that—starting with the 2020 election—Arkansas's preferential primary election will take place in presidential cycles on Super Tuesday (Dkt. No. 75, ¶ 71).

---

[13]    Dr. Pakko, in his supplemental affidavit submitted in support of plaintiffs' reply, states:

> In regard to Defendant's Statement of Undisputed Material Facts, numbered paragraph 66 (Dkt. No. 72, p. 26), I would note that it is an opinion that "Unsurprisingly, groups regularly met that half–a–percent requirement. . . ." since in recent election years only the Green and Libertarian parties were able to meet the 10,000 petition signature requirement and only the Libertarian Party of Arkansas has done so in the last seven years.

(Dkt. No. 76–1, ¶ 9).  Defendant filed a reply in support of defendant's motion for summary judgment but did not address the allegations in Dr. Pakko's supplemental affidavit (Dkt. No. 77).

[14]    Plaintiffs do not dispute this but assert that it is immaterial because the "candidate filing period" during which candidates of the established parties filed to participate in primary elections should not be relevant to the deadlines governing the formation of new political parties which do not participate in the preferential primary election or the general primary election and nominate their candidates for the general election ballot at a nominating convention (Dkt. No. 75, ¶ 70).

72.     In the 2020 election cycle, the signature submission deadline moved forward to September 5, 2019 (Dkt. No. 75, ¶ 72).

73.     In the midterm election cycles, the primary will remain in the second half of May prior to the General Election (Dkt. No. 75, ¶ 73).

74.     As a result, in non–presidential years, the party filing period falls on the last week of February—about three months before the late–May primary (Dkt. No. 75, ¶ 74).

75.     The parties disagree as to the specific election laws in other states and those laws' impact, if any, on this dispute (Dkt. No. 75, ¶ 75).

76.     The parties disagree as to the specific election laws in other states and those laws' impact, if any, on this dispute (Dkt. No. 75, ¶ 76).

77.     The parties disagree as to the specific election laws in other states and those laws' impact, if any, on this dispute (Dkt. No. 75, ¶ 77).

78.     LPAR has never won three percent of the gubernatorial or presidential and vice presidential vote.  Instead, between 2012 and 2018, it obtained across–the–board ballot access by satisfying the old 10,000–signature requirement (Dkt. No. 75, ¶ 78).  Although the parties do not dispute these facts, the parties do not agree on inferences to be drawn from these facts (*Id.*).

79.     In fact, the closest LPAR ever came to meeting the ballot–retention requirement was in the 2018 gubernatorial election (Dkt. No. 75, ¶ 79).  Although the parties do not dispute this fact, the parties do not agree on inferences to be drawn from this fact (*Id.*).

80.     At the June 4, 2019, preliminary injunction hearing, Dr. Pakko, the LPAR Chairman, testified as to LPAR's efforts to obtain signatures (Dkt. No. 75, ¶ 80).

81.     In part, Dr. Pakko testified that he believed the previous 10,000–signature requirement was "challenging" and "expensive."  He based that claim on LAPR's past petition

drives, which "required at least $30,000 in cash to accomplish plus a considerable volunteer effort." (Dkt. No. 75, ¶ 81). Dr. Pakko also testified that, as a result of the earlier presidential year compliance deadlines, "the market for petition canvassers [wa]s a little bit easier to work with." (*Id.*).

82. At the June 4, 2019, preliminary injunction hearing, Dr. Pakko testified as to compliance deadlines (Dkt. No. 75, ¶ 82). The parties disagree on the characterizations of this testimony (*Id.*).

83. Mr. Kalagias, a past candidate for office and chair of the Benton County, Arkansas, Libertarian Party, also testified at the preliminary injunction hearing (Dkt. No. 75, ¶ 83). The parties disagree on the characterizations of this testimony (*Id.*).

84. Mr. Olson, LPAR's vice chair and chair of its elections committee, testified at the preliminary injunction hearing (Dkt. No. 75, ¶ 84). The parties disagree on the characterizations of this testimony (*Id.*).

85. Peyton Murphy, the former assistant director of the elections division of the Arkansas Secretary of State's Office, testified about the lack of restrictions on who can sign group ballot–access petitions. Mr. Murphy explained that "[a]ny registered voter in the state of Arkansas could sign" LPAR's petition. He further explained that, with ballot–access petitions, there is no limit to the number of petitions that a voter can sign, there are no restrictions on who can collect signatures, and there are no special geographic requirements (Dkt. No. 75, ¶ 85). The parties disagree on the characterizations of this testimony (*Id.*).

86. Dr. Trey Hood, a political scientist at the University of Georgia, offered expert testimony at the preliminary injunction hearing (Dkt. No. 75, ¶ 86). The parties disagree on the characterizations of this testimony (*Id.*).

87.     The parties disagree on the characterizations of Dr. Hood's testimony and research (Dkt. No. 75, ¶ 87).

88.     Political consultant and ballot–access expert Meghan Cox testified at the preliminary injunction hearing (Dkt. No. 75, ¶ 88).

89.     The parties agree that Ms. Cox agreed with Dr. Pakkos' testimony that it is cheaper to hire canvassers earlier in an election cycle—*i.e.*, before September 5—than later (Dkt. No. 75, ¶ 89).  The parties disagree on the characterizations of Ms. Cox's testimony (*Id.*).

90.     The parties agree that three and a half weeks after the preliminary injunction hearing, on June 28, 2019, LPAR ended its signature collection effort and turned in 18,667 signatures.  That submission was more than two months before the September 5, 2019, deadline and less than 90 days after LPAR began its collection drive (Dkt. No. 75, ¶ 90).  Dr. Pakko notes that the LPAR submitted signatures on June 29, 2019, exactly 90 days after beginning the petition campaign, not "less than 90 days after the LPAR claimed to have begun its signature drive." (Dkt. No. 76–1, ¶ 28).

91.     The parties disagree on the characterization of LPAR's June 28, 2019, actions (Dkt. No. 75, ¶ 91).

92.     The parties agree that, on July 20, 2021, the Arkansas Secretary of State sent plaintiffs a letter notifying them that "the new political party petition submitted to our office on June 28, 2021 is sufficient" and that "[t]he total number of signatures submitted was 14,593.  After checking each submitted signature, 11,886 were determined to be valid." (Dkt. No. 75, ¶ 92).

93.     Prior to the preliminary injunction hearing,[15] the parties jointly stipulated to the following facts:

a.     Three percent of the total vote cast for Governor of Arkansas in the November 2018 General Election is 26,746 votes (Dkt. No. 22, ¶ 2).

b.     The next preferential primary election and non–partisan General Election in Arkansas will be held on March 3, 2020, and the next general primary election in Arkansas will be held on March 31, 2020 (Dkt. No. 22, ¶¶ 3–4).

c.     The next General Election and non–partisan runoff election in Arkansas will be held on November 3, 2020 (Dkt. No. 22, ¶ 5).

d.     Pursuant to Arkansas Code Annotated § 7–7–205(a)(6), the current petition signature deadline for political party recognition in Arkansas is September 5, 2019, which is 60 days before the party filing period (Dkt. No. 22, ¶ 6).

94.     The laws governing the certification requirements for new political parties are found at Arkansas Code Annotated § 7–7–205, which was amended by Act 164, effective February 18, 2019.  Per Act 164, any group wishing to form a new political party must file a petition with the Arkansas Secretary of State containing "the signatures of registered voters in an amount that equals or exceeds three percent (3%) of the total votes cast for the Office of Governor in the immediately preceding general election for Governor."  2019 Ark. Acts 164, § 2; Ark. Code Ann. § 7–7–205(a)(2).  In this Order, the Court refers to this as the "three percent requirement."

---

[15]  The parties' joint stipulations of fact state, in pertinent part, that the parties stipulate that these "facts are true and correct for the purpose of the Court's consideration of the Plaintiffs' Motion for Preliminary Injunction filed herein on May 3, 2019, or for any subsequent Motions for Summary Judgement filed by either party. . . ." (Dkt. No. 22, at 1).

95.     To be placed on the ballot with a party label, a political party must be certified by the Arkansas Secretary of State.  *See* Ark. Code Ann. §§ 7–7–101–102; 7–5–207(d)(1).

96.     Prior to the passage of Act 164, a petition for a new political party in Arkansas needed the signatures of "at least ten thousand (10,000) registered voters in the state."  Ark. Code Ann. § 7–7–205(a)(2) (amended February 18, 2019).

97.     The laws governing the timing of the filing of a new political party petition are found at Arkansas Code Annotated § 7–7–203, which was amended by Act 545 of 2019.  Prior to the passage of Act 545, the "party filing period" was a one–week period "ending at 12:00 noon on the first day in March and beginning at 12:00 noon one (1) week prior to the first day in March."  Ark. Code Ann. § 7–7–203(c)(1).  Per Act 545, however, § 7–7–203(c)(1) was amended to state that "[f]or years in which the office of President of the United State[s] will appear on the ballot at the general election," the party filing period begins "at 12:00 noon on the first Monday in November preceding the general primary election and end[s] at 12:00 noon on the seventh day thereafter."  2019 Ark. Acts 545, § 2.

98.     A new party petition must be filed at least 60 days before the party filing period.  Ark. Code Ann. § 7–7–205(a)(6).  Furthermore, the signatures on the filed petition must not be more than 90 days old at the time the petition is filed.  Ark. Code Ann. § 7–7–205(a)(4)(B).  Throughout this Order, the Court refers to this as the "90–day window."

99.     A new political party that files a petition with enough signatures and is certified must nominate its candidates "by convention" rather than by primary election for the first General Election after certification of a sufficient petition.  Ark. Code Ann. § 7–7–205(c)(2)(A).

100.     Certificates of nomination for those nominated at a new party convention "shall be filed with the [Arkansas] Secretary of State or the county clerk no later than 12:00 noon on the date of the preferential primary election."  Ark. Code Ann. § 7–7–205(c)(2)(B)(ii).

101.     In the event a new political party is certified, placed on the ballot, and receives three percent of the total votes cast for the office of Governor or nominees for presidential electors at the first General Election after the new political party is certified, then the new political party shall nominate its candidates in a party primary as set forth in Arkansas Code Annotated § 7–7–101 *et seq*.  Ark. Code Ann. § 7–7–205(c)(4).

102.     Candidates who wish to be placed upon the ballot as an independent with no political party affiliation in the county, township, or district in which the person is seeking office may do so by filing a petition "signed by not less than three percent (3%) of the qualified electors in the county, township, or district in which the person is seeking office, but in no event shall more than two thousand (2,000) signatures be required for a district, county, or township office."  Ark. Code Ann. § 7–7–103(b)(1)(A).  If the independent candidate is seeking a statewide office or any office for which a statewide race is required, that candidate's petition must either have 10,000 signatures or meet the three percent requirement, whichever is lesser.  Ark. Code Ann. § 7–7–103(b)(1)(B).

103.     Additionally, any political group or independent candidate "desiring to have the names of its candidates [or candidate] for President and Vice President printed on the ballot shall file a petition with the [Arkansas] Secretary of State by noon on the first Monday of August of the

year of the election," and the petition must contain the signatures of 5,000 registered voters of Arkansas.  Ark. Code Ann. § 7–8–302(5)(B).[16]

104.    Richard Winger, an individual who considers himself an expert in the field of minor political parties, independent candidates, and election and ballot access laws in the United States, has presented an affidavit in this case (Dkt. No. 21–1, ¶ 2).  Mr. Winger has testified as an expert witness in two prior ballot access challenges in the Eastern District of Arkansas (*Id.*, ¶ 4).

105.    Mr. Winger asserts that, prior to 1971 in Arkansas, no petition was needed for a political party to be placed on the General Election ballot for all offices (Dkt. No. 21–1, ¶ 6).  He further asserts that, in 1971, the Arkansas General Assembly imposed a petition requirement on political parties that had not polled as much as seven percent of the vote in the last election.  He states that no new political party ever succeeded in satisfying the seven percent requirement (*Id.*).

106.    Mr. Winger further asserts that, between 1977 and 2007, with the three percent requirement in force, no new political party successfully petitioned for ballot access without court intervention, even with 150 days in which to collect petition signatures (Dkt. No. 21–2, ¶ 6).

107.    Mr. Winger states that only three independent candidates have successfully gathered the 10,000 valid signatures necessary to run for statewide office as an independent (*Id.*).

108.    Mr. Winger maintains that, from 2007 through 2018, when Arkansas law allowed a new political party to be recognized with 10,000 valid signatures, only one new political party qualified by petition in 2008, 2010, 2016, and 2018 (Dkt. No. 21–1, ¶ 8).  In 2012 and 2014, only two new political parties qualified by petition (*Id.*).

---

[16] At the time this Court entered its preliminary injunction Order, the number of signatures required was 1,000; the statute has been amended since that time to now require 5,000 signatures. Ark. Code Ann. § 7–8–302(5)(B).

109.    Mr. Winger further asserts that, in 2016, only 34 of Arkansas' 100 state House seats had a contested election (Dkt. No. 21–2, ¶ 8).  Additionally, Mr. Winger asserts that, in three out of the four United States congressional races held in 2016 in Arkansas, the only candidates on the ballot were nominees from the Republican Party and the LPAR (*Id.*).

110.    Dr. Pakko, the present chair of the LPAR, testified that the LPAR is currently a nonprofit organization dedicated to putting the LPAR on the ballot again.  He testified that, prior to the law passed in late February 2019, the law was that 10,000 valid signatures of Arkansas voters were required to establish a new political party with a deadline of 60 days prior to the candidate filing period and a 90–day petitioning window of the party's choosing.  Dr. Pakko also testified that, prior to late February 2019, the LPAR had started fundraising and announced an intent to seek to become a new political party once again before 2020.

111.    Dr. Pakko also testified about the "retention requirement."  He testified that retention conditions depend on the year and that, when the presidential election is taking place, the requirement is to obtain three percent of the votes in the presidential election and, in other races, it is three percent of the vote in the gubernatorial election.

112.    Dr. Pakko testified that the LPAR was able to meet the 10,000–signature requirement in 2012, 2014, 2016, and 2018.  He also stated that the LPAR's 2018 gubernatorial candidate gained 2.9 percent of the vote, which was as close as the LPAR had ever come to meeting the three percent requirement.  Dr. Pakko testified that, if the gubernatorial candidate had met the three percent requirement, then the LPAR would have been declared a political party and granted the same status as the Republicans and the Democrats.  If the LPAR had met the three percent requirement, Dr. Pakko testified that it would have had to select its nominees for the next election in a preferential primary.

113.    Dr. Pakko testified that, in the alternative, if the LPAR did not meet the three percent requirement and had to petition for ballot access, the law requires it to nominate its candidates by convention.  He also testified that, in the event the LPAR is recognized for the 2020 election, it would nominate its candidates at a convention.  Dr. Pakko explained that, under current law, a nominating convention must be held prior to the preferential primary.

114.    Dr. Pakko testified that he became aware of Senate Bill 163—later passed as Act 164 of 2019—due to calls from reporters.  As a result, he began to lobby the General Assembly by attending hearings of both the Senate and House Government Affairs Committee, writing emails to state Senators, and organizing a letter–writing campaign for LPAR members to contact their state Representatives.  He further testified that he spoke to members of the General Assembly and informed them that the proposed law seemed to conflict with precedent and appeared to be a targeted action against the LPAR.

115.    Dr. Pakko explained that there is some perception that the LPAR draws votes away from the Republican Party, though he noted that he has not seen documented evidence of this phenomenon.  According to Dr. Pakko, the Senate Bill 163 was passed in the state Senate almost exactly along partisan political lines, with all the Republicans Party senators voting for the bill and only one Democratic Party senator voting for it.  He noted that the situation in the state House was more complicated but that support was overwhelmingly Republican while the Democratic caucus overwhelmingly voted against Senate Bill 163.

116.    He also testified that the House version of Senate Bill 163 contained an emergency clause, but the emergency clause did not initially pass.  A second vote was required to pass the emergency clause.  Dr. Pakko explained that, if the emergency clause had not been passed, the LPAR likely would have been able to achieve ballot access before the law took effect.

117.    Dr. Pakko also testified about his experience in the past with petition drives.  He noted that he has personally collected signatures and that the 10,000–signature requirement is a challenging endeavor.  He testified that there are limited venues for canvassing for signatures and that significant manpower is required to collect 10,000 signatures in 90 days.  He admitted that this is difficult to accomplish with a volunteer effort alone, so some professional canvassers are paid for with donated money.

118.    Dr. Pakko testified that the Green Party of Arkansas ("GPA") was not able to comply with the 10,000–signature requirement that has now been eliminated.  Specifically, the GPA was unable to get the 10,000 signatures required to be on the ballot either in 2016 or in 2018.

119.    Dr. Pakko testified that, as of June 4, 2019, the LPAR's petition drive had received approximately 15,700 signatures.  He further testified that validity checks are suggesting that the LPAR has somewhere around 74 percent to 75 percent valid signatures, which indicates that they have approximately 10,880 valid signatures.  He noted that this number of signatures is barely sufficient under the old law.  He also noted that the Arkansas Secretary of State determines the validity of the signatures.

120.    Dr. Pakko stated that the LPAR began its petition drive in April 2019 because they wanted to get started early enough to avoid the hot summer months.  He further testified that they wanted to make sure that they started the petition drive in time to petition on college campuses. He also noted that the LPAR wanted to petition at times when people are in town and not on vacation during the summer months.

121.    Dr. Pakko further testified that inclement weather impedes the petition process. Specifically, he testified that, if it is raining or if there is other inclement weather, those are wasted

days for the petition process.  He noted that the number of signatures goes up and down with the weather.

122.    Dr. Pakko explained that each of the LPAR's past petition drives has required at least $30,000.00 in cash plus a considerable volunteer effort.  He further explained that the LPAR is financed mostly from independent small donors across the state and across the nation.

123.    Dr. Pakko also testified that he has experience, as chair of the LPAR, with petition drives that are closer to the primary and General Elections.  He stated that the interest in an election increases as you get closer to it.  As for petition drives that are farther from an election, Dr. Pakko testified that it is more difficult to get people to stop and take some time out of their day on something that is not as imminent as it might be if the petitions were being collected closer to election time.  He did concede that people are still willing to sign a petition.

124.    Dr. Pakko testified that he did not see any reason why a small new party would need to participate in a primary election, and he noted that he did not know if the LPAR would have much participation in a primary election.  He also noted that, when a new party is recognized and a nominating convention is held, the first time a LPAR candidate appears on a ballot is in the first ballot of the General Election.  He explained that potential LPAR candidates must file with the state during the candidate filing period and notify the LPAR that they are interested in seeking the nomination of the LPAR.

125.    Dr. Pakko testified about the process for an independent candidate to be placed on a ballot.  He testified that an independent candidate may do so by collecting 10,000 petition signatures.  He further testified that an independent candidate only appears on the General Election ballot.  Dr. Pakko testified that independent candidates are listed as independent and cannot have party labels listed on the ballot.

126.    Dr. Pakko testified that he does not see any reason why the deadlines have been accelerated for new political parties that obtain ballot access by collecting signatures.  He explained that, because the LPAR does not participate in the primaries, there is no reason for the LPAR candidates to have to provide paperwork during the party filing period.  Rather, he testified that the only effective deadline or practical deadline for the LPAR is to have LPAR candidates selected in time that the candidates can be printed on the ballots, which occurs much later in the process.

127.    Dr. Pakko further testified about the process for a new political party to have a candidate placed on the ballot for President of the United States.  According to Dr. Pakko, any group that seeks to have a candidate for President appear on the ballot must collect only 1,000 signatures, which was the amount in-effect at the time of the preliminary injunction hearing when Dr. Pakko offered this testimony.[17]  He testified that the deadline for such signatures is sometime in the middle of the year of the election.  Dr. Pakko stated that he did not understand why this rule existed for the President but for no other public offices.

128.    Dr. Pakko also testified that the Arkansas Secretary of State will not accept petitions for ballot access that are not facially sufficient.  Dr. Pakko explained that he does not believe that the Arkansas Secretary of State will accept the LPAR's petition for ballot access if it contains less than 26,746 signatures.

129.    Dr. Pakko testified that he understood that population increase was one justification for the increased signature requirement, but he testified that he pointed out to a state House committee that, from 2007 to the present, the population of Arkansas has increased by six percent

---

[17]  At the time this Court entered its preliminary injunction Order, the number of signatures required was 1,000; the statute has been amended since that time to now require 5,000 signatures. Ark. Code Ann. § 7–8–302(5)(B).

33

and that, to index properly for population growth, the signature requirement would need to be increased only to 10,600 signatures.

130.    Dr. Pakko also testified that in 2018, of the 100 members of the state House, 54 members were unopposed, even with the LPAR on the ballot.  He testified that, had it not been for the LPAR, 59 percent of the state House races would have been uncontested.  Dr. Pakko further stated that, in 2016, the LPAR was the only opposition in three out of four of Arkansas' federal congressional races.  Dr. Pakko explained that, if the LPAR is not able to gain ballot access as a new political party, the LPAR's only recourse would be to place only a presidential candidate on the ballot, but he noted that this would not allow the LPAR to run candidates in races for the General Assembly or county and township offices.

131.    Dr. Pakko further testified that the LPAR is collecting signatures as quickly as the LPAR can and that if the LPAR was to count every signature collected from April 1, 2019, then June 28, 2019, would be the 90–day deadline to turn in those signatures to the Arkansas Secretary of State.  Dr. Pakko noted that it would not be feasible to attain valid 26,746 signatures given where the LPAR is after two months of working as hard as possible.  He elaborated that, in the time before June 28, 2019, the LPAR could probably collect another 6,000 to 7,000 signatures, which would give the LPAR a raw signature count of approximately 22,000 or 23,000.  He noted, however, that the more quickly the LPAR collects signatures, the higher the invalid numbers are going to be.

132.    Dr. Pakko stated that, to satisfy the three percent requirement, the LPAR would require an infusion of more resources in the form of more canvassers and financing.

133.    Dr. Pakko also discussed the difference between a new political party petitioning for ballot access and an initiative petition.  He noted that an initiative petition is due approximately

34

60 or 90 days before the election, so sometime during the summer of the year of the election.  He also testified that there is no limitation on how long signatures for an initiative petition may be collected.  Further, he testified that there is a cure period for initiative petition proponents to collect more signatures if there is an insufficient number of signatures on an initiative petition.  He noted that a handful of initiatives have been able to get on the ballot in each election.

134.    Dr. Pakko conceded that gathering signatures for a ballot access petition has different requirements than gathering signatures for an initiative petition.  Specifically, he conceded that the canvasser's signature and a notary are not required when gathering signatures for a ballot access petition.  He admitted that a canvasser for a ballot access petition does not have to be a registered voter.  He also admitted that signatures for a ballot access petition can come from anywhere in the state.

135.    Dr. Pakko explained that there is a form for gathering signatures for a ballot access petition.  Dr. Pakko stated that the form says that the undersigned seek to form a political party to appear on the General Election ballot in 2020 and that there is a space for ten signatures per page on the form.  He also stated that the person signing the petition must identify the date on which the person is signing the form.  Dr. Pakko also testified that all the canvassers are Libertarians and that some of them are from out of state.  He noted that some of the canvassers are being compensated at the low end of the scale because they believe in the LPAR's cause.  Specifically, he noted that they have five paid canvassers.

136.    As for volunteer canvassers, Dr. Pakko testified that approximately 150 individuals are assisting with canvassing.  Dr. Pakko admitted that he has asked more than 150 individuals to assist with canvassing.  Dr. Pakko also described a form on the LPAR's website that anyone can

use to sign the petition, though he noted that only half a dozen responses have come from this method.

137.    Dr. Pakko testified that the paid canvassers are not going door–to–door but instead are going to public places to obtain signatures.  He stated that the paid canvassers go to government buildings, public festivals, farmers' markets, and other gatherings on public property.  He noted that four of the paid canvassers are in Little Rock, though they travel to other parts of the state, and another is in Fort Smith.  Dr. Pakko did not know for certain if his canvassers would attend certain events in the future.  Dr. Pakko did admit that he and other canvassers gathered signatures at the Toad Suck Days festivals and that signatures were collected at the Bentonville Film Festival. Dr. Pakko stated that he did not believe any canvassers had been sent to the Magnolia Blossom Festival.  Dr. Pakko explained that a common issue at large events is that there are many participants from out of state.  Dr. Pakko said that he believes the LPAR has canvassers at Oaklawn in Hot Springs, Arkansas.  Dr. Pakko noted that his canvassers have had some problems collecting signatures at license offices, college campuses, public libraries, and post offices due to purported restrictions on access.

138.    Dr. Pakko also stated that the paid canvassers are not employees but are instead independent contractors who use their judgment as to where they can collect the most signatures. He noted that the paid canvassers look at event calendars and ask for input from local people regarding events.  The paid canvassers choose the most productive venue they can find.  Dr. Pakko admitted that he does consult with the paid canvassers.

139.    As for searching for volunteers, Dr. Pakko stated that the LPAR utilizes Facebook and Twitter, though it does not have a presence on Craigslist or Nextdoor.  Dr. Pakko also testified that the LPAR has a website where volunteers can sign up to canvass.

140.    The Court also heard testimony from Michael Kalagias, a registered voter in Arkansas and a past LPAR candidate.  Mr. Kalagias testified that he once received more than three percent of the vote in a race for the state House, though he failed to meet the three percent threshold in a race for a federal congressional seat.  Mr. Kalagias is the chair of the Benton County Libertarian Party and is an affiliate for the state party for Benton County, Arkansas.

141.    Mr. Kalagias testified that he has petitioned for signatures and that the Walmart shareholders meeting is a difficult place for him to gather signatures due to the number of non–Arkansas residents who attend the meeting.  Mr. Kalagias also testified that the weather has impacted the current petition drive; specifically, he noted that the Bentonville First Friday festival was cancelled due to weather.  He explained that his role as a firefighter had impacted his ability to petition in the 90–day window.

142.    Mr. Kalagias also testified about his experience canvassing far in advance of an election.  He testified that people are not as interested in canvassing until an election is near.  Specifically, he testified about an incident where he sought permission to canvass a farmer's market and was told that the market would prefer to wait to host political events like canvassers until closer to the political season.  Mr. Kalagias explained that this is not helpful for the LPAR's volunteers.

143.    Mr. Kalagias also testified that something unforeseen would have to occur for the LPAR to collect the signatures necessary to satisfy the three percent requirement.  He noted that the LPAR does not get many financial contributions, which makes it difficult for them to afford canvassers.  He further noted that most of the LPAR's time and resources are spent on ballot access and on petitioning rather than on being able to campaign for officers or finding candidates for office.

144.    Mr. Kalagias testified that he had turned in approximately 30 to 40 signatures.

145.    The Court also heard testimony from Mr. Olson, a registered voter in Arkansas and the vice chair of the LPAR.  Mr. Olson testified that he had only collected a handful of signatures.  Mr. Olson concurred that weather has a negative effect upon collecting signatures, though he conceded that he did not have a current plan to collect additional signatures.

146.    The Court heard testimony from Mr. Murphy, a staff attorney with the Arkansas Secretary of State's office, whose duties include advising about election laws related to party petitions and initiative petitions.  Mr. Murphy testified that the LPAR obtained access to General Election ballots in Arkansas in 2012, 2014, 2016, and 2018.  He also testified that the GPA gained ballot access in 2012 and 2014 but not in 2016 or 2018.  He conceded that neither the LPAR nor the GPA had ever obtained at least three percent of the popular vote during a gubernatorial or presidential election.  If the LPAR had met the three percent requirement, Mr. Murphy testified that the LPAR would not need to petition to become a new party.  Mr. Murphy explained that, to his knowledge, for each election cycle, the LPAR had to present 10,000 signatures for ballot access.  He noted that any registered voter could sign a ballot access petition.

147.    Mr. Murphy explained that the current requirement for a new party to gain ballot access is three percent of the number of voters in the last gubernatorial election.  For an initiated act to be placed on the ballot, Mr. Murphy stated that a petition with signatures equaling at least eight percent of the votes cast in the last gubernatorial election is required.  For a constitutional amendment to be placed on the ballot, the threshold is 10 percent.  There are also geographical limitations as to where the signatures for an initiative petition may come from; Mr. Murphy explained that an initiative petition requires that half of the required signatures be collected in 15 different counties.  He also explained that canvassers for initiative petitions must pass a

background check, sign affidavits, and provide sample signatures to the Arkansas Secretary of State's office.  He further explained that each sheet of collected signatures for an initiative petition must be signed by the canvasser and notarized.  He also testified that there is a 30–day period after the first time an initiative petition is submitted in which the submitter has an opportunity to cure any defects.  None of these requirements apply to ballot access petitions or canvassers.

148.   Mr. Murphy also testified about the laws governing independent candidates who seek ballot access.  He testified that, for a statewide independent candidate to obtain ballot access, that candidate must submit signatures satisfying the three percent requirement or collecting up to 10,000 signatures.  Mr. Murphy also testified that independent candidates have a 90–day window to collect signatures.

149.   Mr. Murphy offered testimony on how signatures on a ballot access petition might be invalidated.  He testified that a signature might be invalidated because the signor was not a registered voter.  A duplicate signature by someone who had already signed the petition would be invalidated.  After reviewing data from the Arkansas Secretary of State's office, Mr. Murphy testified that the LPAR had a validation rate of 76.3 percent in 2016.  He also testified that the LPAR had a validation rate of 84.4 percent in 2018.

150.   On the other hand, Mr. Murphy testified that the 2016 casino petition only had a 71 percent validity rate.  Similarly, he testified that the validity rate for the first 2018 casino petition was 73 percent and that the validity rate for the second 2018 casino petition was 68 percent.  Mr. Murphy testified that, for the two medical marijuana petitions in 2016, one had a validity rate of 65.9 percent and the other had a validity rate of 72.9 percent.  He also testified that the validity rate for the 2018 minimum wage petition was 75.7 for the initial submission and 73.1 for the

second submission.  Finally, he testified that the validity rate for the 2018 term limits petition was 68.5 percent.

151.    Mr. Murphy further testified that initiative petitions have successfully been placed on the ballot in the 2014, 2016, and 2018 elections.  Mr. Murphy conceded that the deadline for initiative petitions is four months before the General Election.  He conceded that it is possible that voter interest is higher the summer before an election compared to a year before the election.  He also noted that, in prior election cycles, initiative petitions could be circulated for any amount of time, so long as they had been approved by the Attorney General.  He acknowledged that there is no cure period for ballot access petitions that fail to include the required number of signatures.

152.    Mr. Murphy also explained the process the Arkansas Secretary of State's office uses to validate ballot access petitions.  First, the office checks each signature to see if the signor is a registered voter.  This requires the Arkansas Secretary of State to verify that each signature is by a registered voter.  Next, the office tallies each page and generates a total number of valid signatures.

153.    Mr. Murphy testified that the new party filing period is now in November 2019 because the preferential primary was moved from May 2020 to March 2020.  He noted that the preferential primary was moved to March 2020 so that Arkansas could participate in Super Tuesday primaries.

154.    Mr. Murphy testified that any candidate who wants to run for office in November 2020 must fill out a Political Practices Pledge and a Candidate Information Form.

155.    Mr. Murphy testified that there are 1,750,077 registered voters in Arkansas.

156.    Mr. Murphy testified that, to his knowledge, the only independent candidate who has successfully petitioned for statewide office is Trevor Drown in 2010.  Mr. Winger's affidavit

agrees that Mr. Drown qualified for the ballot as an independent candidate by satisfying the 10,000–signature requirement, but he also avers that two other independent candidates satisfied the 10,000–signature requirement between 1977 and 2006 (Dkt. No. 21–1, ¶ 6).

157.    The Court also heard testimony from Meghan Cox, who is co–founder of Lincoln Strategy Group and who specializes as a national political consultant in ballot access.  Ms. Cox testified that, through her work, she has certified candidates, ballot measures, and initiatives in 34 states, including Arkansas' 2016 tort reform measure.  Ms. Cox testified that, during the 2016 tort reform petition drive, it took 40 days to collect approximately 148,000 valid signatures.  Ms. Cox testified that this was possible because, in coordinating this effort through her employment, she used at least 80 canvassers brought in from out–of–state as well as local canvassers.

158.    Ms. Cox also testified about a ballot access measure she worked on in Nebraska where she oversaw the collection of 166,692 signatures in 82 days.  She noted that approximately 42,000 of those signatures were collected by volunteers.  The measure at issue there related to the death penalty, and Ms. Cox noted that there was a lot of controversy.  Ms. Cox explained that, in her opinion, people are less willing to sign a petition that is controversial.

159.    Ms. Cox opined that it is much easier for the LPAR to collect signatures for a ballot access petition than an initiative petition because of the lack of a geographic disbursement requirement and because there are very strict rules that govern initiative petitions in Arkansas.

160.    Ms. Cox explained how she collected signatures in Nebraska.  According to her, in coordinating this effort through her employment, she trained volunteers on verification and how to circulate petitions by using massive field trainings with town halls using screens to train remotely canvassers.  She noted that this effort required constantly calling and following up with

the volunteers.  Furthermore, she agreed that a high degree of organization was necessary in the Nebraska petition drive.

161.    Ms. Cox further testified that most referendums take place in 90 days.  She also stated that it is not uncommon for there to be a 60–day period to collect signatures.  Ms. Cox also testified that, in one situation, her company through its efforts collected 66,000 signatures in a week.

162.    Ms. Cox also stated that she and her company have organized ballot access petitions for political candidates.  She stated that it is probably easier to get a signature for an unknown candidate than someone who is well known, in her experience.

163.    Ms. Cox opined that the laws governing new party ballot access in Arkansas are relatively easy to satisfy.  She also opined that she believed that the LPAR needs to collect between 35,000 to 37,000 signatures to satisfy the three percent requirement and that this is a very achievable requirement.  She later stated that, at a 78 percent validity rating, the LPAR would need approximately 35,000 signatures to satisfy the three percent requirement.

164.    Ms. Cox testified that, if the LPAR were to hire her company, she would presume the validation rate to be between 75 and 78 percent.  She also testified that, if she were running the LPAR's ballot access drive, she would first convene an entire master list of events and parades through September 4, 2019.  She noted that, in the past, her company has been able to collect 9,000 to 10,000 signatures on a single day in a state like Arkansas by organizing all the volunteers.  She further stated that 2019 might be a better time to collect petition signatures because the increased demand for canvassers in 2020 would increase the price of a petition drive in 2020.  Ms. Cox also stated that she does not agree that registered voters are not interested in politics a year before an election.

165.    Ms. Cox explained that, if she were running the LPAR's ballot access drive, she would be very aggressive with the volunteer base.  She hypothesized that, assuming each canvasser could collect 25 signatures per day, with 19 canvassers the LPAR's petition drive could be completed in 75 days.  She conceded that such an effort would require diligence.

166.    As for hiring paid canvassers, Ms. Cox testified that she would use Facebook sites that are dedicated to ballot access drives.  She stated that she would advertise on such sites and attract canvassers from out–of–state.  She further stated that she would create a list of events and tell the paid canvassers to choose which events they wanted to cover.  Additionally, if she realized that there was not enough coverage by the paid canvassers, Ms. Cox testified that she would use volunteers.

167.    Ms. Cox testified that she would never run a ballot access drive for a full 90 days due to weather challenges.  Therefore, she looked at 75–day and 60–day petition drive scenarios.  She noted that paid canvassers collect approximately 50 signatures a day and that she generally pays canvassers per signature.

168.    Ms. Cox then testified about a series of projected budgets based upon various scenarios.  First, she assumed that, if every canvasser were part time and collected 25 signatures a day, then 16 canvassers would be needed to meet the 90–day requirement.  Alternatively, she testified that if those canvassers were full–time, the LPAR would only need eight canvassers.  For a 75–day project, Ms. Cox testified that the LPAR would need to collect 467 signatures per day.  To accomplish this, she testified that the LPAR would need to hire seven canvassers to collect 70 signatures per day or nine canvassers to collect 50 signatures per day.  Alternatively, if the canvassers were part–time, then Ms. Cox testified that the LPAR would need to hire 19 canvassers.  Finally, for a 60–day project, Ms. Cox testified that the LPAR would need to collect 583 signatures

per day.  She testified that eight full–time canvassers would be needed to collect 70 signatures per day or 12 canvassers to collect 50 signatures per day.

169.    Ms. Cox testified that it would be feasible to hire canvassers for a statewide petition. She also testified that it was not burdensome to collect 26,740 valid signatures in 90 days.  She was not sure that the LPAR was doing all it could to recruit canvassers, based on her observations of the testimony.  She noted that the LPAR should seek out local canvassers as opposed to out–of–state ones since having local talent means that the LPAR will not have to pay extra lodging expenses for out–of–state canvassers.

170.    Ms. Cox also testified that her projected budgets assume that paid canvassers are paid $5.00 per signature.  She testified that if the LPAR only needed paid canvassers to collect half of the required signatures, the cost would be approximately $98,000.00.  If the LPAR were able to rely entirely upon volunteers, Ms. Cox testified that the ballot access drive would cost approximately $3,000.00.

171.    Ms. Cox also presented a third scenario in which she speculated that the LPAR would use 40 percent paid canvassers and 60 percent volunteer canvassers.  She also assumed that the paid canvassers in this scenario would be paid $3.00 per signature.  She stated that this scenario would cost the LPAR approximately $55,000.00.

172.    Ms. Cox conceded that her calculations were based upon the LPAR's validity rates from 2016 and 2018, not from her own company's validity rates.  Ms. Cox also testified that, in some situations, paid staff follow up with volunteers on petition drives.

173.    Ms. Cox also testified that it is fairly reasonable to expect a volunteer to collect 25 signatures a day, though she did not testify as to how many hours a volunteer would need to work to collect 25 signature a day.  She notes that two of her recent petition drives involved an anti–

dark money campaign and the death penalty and that the volunteer base was potentially energized because those issues are controversial.  She also testified that it is reasonable for a volunteer to collect 25 signatures a day for 90 days.  She noted that the average amount of signatures a volunteer collects a day is approximately 25.  She did clarify that she did not anticipate that volunteers would need to work 90 consecutive days to meet her projections.

174.    The Court heard testimony from M.V. Hood III, a professor of political science from the University of Georgia.  Dr. Hood testified that the laws challenged by the LPAR in this case do not prevent the LPAR from participating in the electoral process.  Dr. Hood noted that the LPAR was not able to achieve a three percent statewide vote share in 2012, 2014, 2016, or 2018. He also noted that the party petition deadline was moved to September 2019 so that the preferential primary could be held in March 2020.

175.    Dr. Hood also explained his understanding of Arkansas' current election laws regarding political party ballot access.  He testified that a political party is a group that can achieve at least three percent of the statewide vote at either a gubernatorial election or a presidential election.  He also testified that, if a political party fails to garner at least three percent of the total votes cast, that group would have to go back to the petition process.  He noted that, if a political party does garner three percent of the electorate in a statewide election, then that political party is allowed to nominate candidates for positions up and down the ballot and that those nominees appear on the ballot with a party label.

176.    Dr. Hood explained that the LPAR is not a recognized political party in Arkansas because the LPAR failed to meet the three percent retention requirement in the 2018 gubernatorial election.  He further explained that, if the LPAR can collect 26,746 signatures in the LPAR's petition drive, then the LPAR will be able to nominate candidates for any open office that is on

the ballot in 2020.  Dr. Hood also explained that a presidential candidate can get on the ballot with a party label with only a thousand signatures in Arkansas.  He also noted that, if the LPAR candidate for President were to garner three percent of the statewide vote, then the LPAR would be a recognized political party in the next election cycle.

177.    Dr. Hood stated that the LPAR's candidate for President received 1.52 percent of the total statewide vote in Arkansas in 2012, 2.03 percent in 2014, 2.64 percent in 2016, and 2.9 percent in 2018.

178.    Dr. Hood explained that anyone can run as an independent candidate in Arkansas by collecting 10,000 signatures for a statewide office.  He noted that, for a district, county, or township election in Arkansas, the signature requirement for independent candidates is capped at 2,000 signatures.  He did concede that independent candidates do not have a party label on the ballot; instead, he testified that independent candidates appear on the ballot with an "I" by their name.  He also testified that it is possible that an independent candidate could be a member of a political party.  He noted that he has seen this in certain states.

179.    Dr. Hood also testified that his research from Tennessee and Alabama shows that, regardless of whether a non–major party candidate has a third–party label or is listed as an independent, there is no difference for non–major party candidates in terms of the share of the vote.

180.    Dr. Hood explained that, for the LPAR to gain the ballot access in Tennessee, the LPAR would have to gather signatures equaling two–and–a–half percent of the gubernatorial vote.

181.    Dr. Hood testified about the differences between political party petitions, referendums, and initiatives in Arkansas.  He explained that an initiative is a process where citizens can directly place either legislation or a constitutional amendment on the ballot.  As for a

referendum, he testified that a referendum is a vote to reject or accept legislation recently passed by the General Assembly.  He noted that he was not able to find any instances in the last 20 years of a referendum getting on the ballot in Arkansas, but he did note that 14 initiatives have been placed on the Arkansas ballot through citizen petitions in the last 20 years.

182.    Dr. Hood also discussed the signatures required to place referenda or initiatives on the ballot in Arkansas.  He testified that, based upon the number of votes in the last gubernatorial election in Arkansas, an initiated legislative act would require 71,324 signatures.  As for an initiated constitutional amendment, he testified that 89,155 signatures would be required.  For a referendum, he testified that 53,493 signatures would be required.  Dr. Hood also noted that referendum petitions must be completed within 90 days following the adjournment of the General Assembly.

183.    Dr. Hood explained that, in Alabama, the Libertarian Party has complied with a three percent requirement.  Regarding Tennessee, Dr. Hood stated that he believed it was correct that minor parties had to file their petitions for ballot access 90 days before the General Election.  He also conceded that the longer a group has to collect petition signatures, the more petition signatures that group may be able to collect.

184.    When asked if there was a necessary reason for new political party petitions to meet the three percent requirement in Arkansas, Dr. Hood testified that it does bring the signature requirement for new party petitions in line with the retention requirement.  When asked if the ballot access requirement and the retention requirement must be identical, Dr. Hood stated that they do not have to be identical.

185.    When asked if a ballot is overcrowded due to the presence of three or four political parties on the ballot, Dr. Hood answered that, no, it was not overcrowded.  He also testified that

having a Libertarian, a Democrat, and a Republican on a ballot would not create an overcrowded ballot.

### IV.   Legal Standards

#### A.   Summary Judgment

Summary judgment is appropriate if there is no genuine issue of material fact for trial. *UnitedHealth Group Inc. v. Exec. Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Fed. R. Civ. P. 56).  Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In ruling on a motion for summary judgment '[t]he district court must base the determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'" *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923–24 (8th Cir. 2004) (internal citations omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non–moving party, there is no genuine issue for trial." *Johnson Reg'l Med. Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *See Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (citation omitted).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *See Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material

fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish

that there is a genuine issue to be determined at trial.  *See Prudential Ins. Co. v. Hinkel*, 121 F.3d

364, 366 (8th Cir. 1997), *cert. denied*, 522 U.S. 1048 (1998).  "The evidence of the non–movant

is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

### B.    Injunctive Relief

"The standard for granting a permanent injunction is essentially the same as for a

preliminary injunction, except that to obtain a permanent injunction the movant must attain success

on the merits."  *Bank One, Utah v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999) (citing *Amoco Prod.

Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987)).  Typically, when determining

whether to grant a motion for preliminary injunction, this Court considers:  "(1) the threat of

irreparable harm to the movant; (2) the state of the balance between this harm and the injury that

granting the injunction will inflict on other parties litigant; (3) the probability that movant will

succeed on the merits; and (4) the public interest."  *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir.

2013) (quoting *Dataphase Sys. Inc. v. CL Sys.*, 640 F.2d 109, 113 (8th Cir. 1981)).  As movants,

plaintiffs bear the burden of showing the *Dataphase* factors weigh in their favor before an

injunction can issue.  *See, e.g.*, *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).  "When

a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements

for obtaining a preliminary injunction are generally deemed to have been satisfied."  *Minn. Citizens

Concerned for Life v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (citation omitted).

The Eighth Circuit revised the *Dataphase* test when applied to challenges to laws passed

through the democratic process.  Those laws are entitled to a "higher degree of deference."

*Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008).

### C.     The Type Of Challenge

Plaintiffs assert both facial and as–applied challenges.  A plaintiff brings a facial challenge "to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question."  *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999).  By contrast, "[a]n as–applied challenge consists of a challenge to the statute's application only as–applied to the party before the court."  *Phelps–Roper v. Ricketts*, 867 F.3d 883, 896 (8th Cir. 2017) (quoting *Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 790 (8th Cir. 2004)).  A successful as–applied challenge, then, means "the statute may not be applied to the challenger, but is otherwise enforceable."  *Id.*(quoting *Klobuchar*, 381 F.3d at 790)).  Plaintiffs' claims have "'characteristics of both' challenges."  *Iowa Right to Life Comm., Inc. v. Tooker*, 717 F.3d 576, 587 (8th Cir. 2013) (concluding that the court could "consider each challenged. . . requirement in isolation, and, if necessary, apply the 'normal rule that partial, rather than facial, invalidation is the required course.'").

"[T]he 'label is not what matters.'"  *Tooker*, 717 F.3d at 587 (quoting *Doe v. Reed*, 561 U.S. 186, 194 (2010)); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) ("[T]he distinction between facial and as–applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge.").  Instead, "[t]he 'important' inquiry is whether the 'claim and the relief that would follow. . . reach beyond the particular circumstances of the[ ] plaintiffs.'"  *Tooker*, 717 F.3d at 587 (quoting *Reed*, 561 U.S. at 194).

### V.     Analysis Of Claims

Plaintiffs argue that the ballot access statutes governing new political parties in Arkansas unconstitutionally deny them equal protection of the laws, the right to political association, the

right to petition for political party recognition, and the right to cast their vote effectively for all the candidates of their choice in Arkansas' elections and specifically, as alleged in their complaint, the November 2020 General Election (Dkt. No. 1).  Plaintiffs argue that three interrelated election laws are unconstitutional as applied to them:  (1) the three percent requirement found at Arkansas Code Annotated § 7–7–205(a)(2); (2) the 90–day window for collecting the required number of signatures set forth at Arkansas Code Annotated § 7–7–205(a)(4)(B); and (3) the deadline for submitting the signatures, which the parties agree was moved to September 5, 2019, for political party formation for the 2019–2020 election cycle, December 24, 2021, for political party formation for the 2021–2022 election cycle, and September 7, 2023, for political party formation for the 2023–2024 election cycle (Dkt. No. 72, ¶ 40).

Plaintiffs maintain that the issue is "whether Arkansas may require a minor political party to submit petition signatures for party recognition which are at least 2.6 times what was previously required and in effect for almost twelve years and with petition submission deadlines (e.g., September 5, 2019 or December 24, 2021, or September 7, 2023) 319 or 425 days before the General Election and more than five and a half months or five months before the major parties select their nominees (unless they are subject to a runoff at the general primary election) at a preference primary election, and with a limit of a 90–day petitioning period." (Dkt. No. 64, at 7). Plaintiffs argue that this "poses the constitutional issue of whether the Arkansas requirements in question are necessary to further a compelling state interest." (*Id.*).  Defendant denies that any relief is appropriate for plaintiffs, argues for a lesser standard of review for the challenged Arkansas laws and, at a minimum, distinguishes between impacts of Arkansas' challenged election laws during years when the office of United States President appears on the ballot and years when the officer of Governor appears on the ballot (Dkt. No. 71).

Plaintiffs seek a declaratory judgment that Arkansas Code Annotated §§ 7–7–101, 7–7–203(c)(1), 7–7–205(a)(2), 7–7–205(a)(4)(B), 7–7–205(a)(6), and 7–7–205(c)(3) are unconstitutional, both facially and as applied to plaintiffs, for the 2019–2020 Arkansas General Election cycle and for all subsequent General Election cycles in Arkansas "and the facts and circumstances relating thereto as set forth" in their complaint are in violation of the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983 (Dkt. No. 1, at 13).  Along with a declaratory judgment and such further relief as to which plaintiffs may be entitled and which this Court may deem equitable and just, plaintiffs seek a permanent injunction to prevent defendant from enforcing these laws (*Id.*, at 13–14).

## A.   Fundamental Rights Claims Under The First And Fourteenth Amendments

Plaintiffs first challenge the constitutionality of the ballot access statutes governing new political parties in Arkansas, arguing that those statutes unduly burden their First and Fourteenth Amendment fundamental rights.   State ballot access restrictions, though not always unconstitutional, burden two kinds of rights:   "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).  As the Supreme Court has explained, these rights "rank among our most precious freedoms." *Id.*  Indeed, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which . . . we must live." *Id.* (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964)).  The Supreme Court concluded that "[o]ther rights, even the most basic, are illusory if the right to vote is undermined." *Id.* (quoting *Wesberry*, 376 U.S. at 17).

When considering the constitutionality of ballot access laws, "[i]t has been recognized. . . that the entire election scheme must be analyzed to determine whether undue constraints on access

to the ballot exist." *Libertarian Party v. Bond*, 764 F.2d 538, 541 (8th Cir. 1985) (citations omitted). Courts apply the framework established in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and later refined in *Burdick v. Takushi*, 504 U.S. 428 (1992). Under the *Anderson–Burdick* framework, the Court first considers "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Moore v. Martin*, 854 F.3d 1021, 1025 (8th Cir. 2017) (internal quotations omitted).

Next, the Court "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule, determining not only the legitimacy and strength of each of those interests but also the extent to which those interests make it necessary to burden the plaintiff[s'] rights." *Id.*; *see also Moore v. Thurston*, 928 F.3d 753, 756 (8th Cir. 2019) ("The test requires the court to first determine whether the challenged statute imposes a burden of some substance on a plaintiff's rights and then to evaluate the State's justification for the statute, determining whether the challenged statute is narrowly drawn to serve the State's compelling interest.") (internal quotations and citations omitted)); *Moore v. Martin*, 854 F.3d at 1025; *Whitfield v. Thurston*, 468 F. Supp. 3d 1064, 1078 (E.D. Ark. 2020), *appeal dismissed as moot*, 3 F.4th 1045 (8th Cir. 2021).

The Court must "review the statute under a form of strict scrutiny referred to as the 'compelling state interest test' by first determining whether the challenged statute causes a burden of some substance on a plaintiff's rights, and if so, upholding the statute only if it is 'narrowly drawn to serve a compelling state interest.'" *Libertarian Party of Ark. v. Thurston*, 962 F.3d 390, 402 (8th Cir. 2020); *Moore v. Martin*, 854 F.3d at 1026 (quoting *Libertarian Party of N.D. v. Jaeger*, 659 F.3d 687, 693 (8th Cir. 2011) (internal quotes omitted)). The Court acknowledges that, because states enjoy broad regulatory power over the election process, "[l]esser burdens. . .

trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Libertarian Party of Ark.*, 962 F.3d at 398 (quoting *Timmons*, 520 U.S. at 358 (quoting *Burdick*, 504 U.S. at 434).

Based upon the Court's review of the previous challenges, other relevant precedent, and the record before it, the Court concludes that plaintiffs have met their burden of demonstrating that Arkansas Code Annotated §§ 7–7–101, 7–7–203(c)(1), 7–7–205(a)(2), 7–7–205(a)(4)(B), 7–7–205(a)(6), and 7–7–205(c)(3), facially and as applied to plaintiffs for the 2019–2020 Arkansas General Election cycle and for all subsequent General Election cycles in the State of Arkansas, collectively impose a severe burden on plaintiffs' rights under the First and Fourteenth Amendments and that the State of Arkansas is unable to demonstrate that the statutes are narrowly drawn to serve a compelling state interest.

### 1.  Burdens Imposed On Plaintiffs

The Court first analyzes the record evidence to determine the scope of the burdens, if any, imposed upon plaintiffs, as well as the evidence and precedents from other jurisdictions.  Based upon this review, the Court concludes that plaintiffs have demonstrated that the burdens imposed upon them by Arkansas Code Annotated §§ 7–7–101, 7–7–203(c)(1), 7–7–205(a)(2), 7–7–205(a)(4)(B), 7–7–205(a)(6), and 7–7–205(c)(3), facially and as applied to plaintiffs for the 2019–2020 Arkansas General Election cycle and for all subsequent General Election cycles in the State of Arkansas, collectively are a severe burden upon plaintiffs' First and Fourteenth Amendment rights.

Having examined the entire record before it and all filings, this Court concludes, as in *Moore*, that strict scrutiny applies.  As the Eighth Circuit observed when examining the preliminary injunction entered by this Court:

> The interests to be protected through an independent candidate petitioning regime, as was at issue in *Moore*, are the interests of the voters and the independent candidate.  The party petitioning restrictions at issue in the present case go farther and tread upon the collective interests of party members in associating to advance political beliefs. . . .  Further, the requirements at issue in *Moore* were less demanding:  a smaller signature requirement and a deadline 250 days prior to the election (rather than 425). . . .  We easily conclude the current statutory requirements impose "a burden of some substance on a plaintiff's rights."

*Libertarian Party of Ark.*, 962 F.3d at 402 (internal citations omitted); *see also Moore v. Martin*, 854 F.3d at 1025.

Secretary Thurston urges the Court to reject strict scrutiny at this stage of the litigation and to apply a less exacting standard of review, arguing that plaintiffs fail to demonstrate a burden of some substance even during presidential election years and that the calendar and process for midterm election years under Arkansas law weakens this Court's prior finding with respect to presidential election years and compels the Court to reach a different result.  The Court disagrees.

Here, the requirements imposed by the calendar and process for midterm election years are still more demanding than the requirements at issue in *Moore v. Martin*; the current Arkansas laws at issue impose a higher signature requirement and a deadline of 319 days prior to the election for midterm election years.  Overall, these requirements for midterm election years, coupled with the requirements for presidential election years of a higher signature requirement and a deadline of 425 days prior to the election, leads this Court to conclude that the current statutory requirements collectively impose a burden of some substance on plaintiffs' rights.

Further, in reaching this conclusion, the Court has considered each of the factors outlined by the Eighth Circuit in *Libertarian Party of Arkansas*.  *See* 962 F.3d at 399–400.  The Court has not engaged in a mere mechanical comparison of numbers and dates.  Instead, the Court has examined the non–numerical factors identified by the Eighth Circuit as follows:

First, some restrictions are acceptable, both in terms of numerosity and deadlines, even if those restrictions favor the two–party system. . . .  Second, no one factor stands alone; rather, requirements must be viewed collectively to assess the overall burden. . . .  Third, parties' past success or failure in a particular state under extant or prior requirements is relevant to show the necessity or burdensomeness of the restrictions, and such history is also material to the question of whether the statutes are narrowly tailored to a compelling state interest. . . .  Fourth, the availability of alternative paths to party certification should be considered. . . .  Fifth, the lack or presence of geographic restrictions on the signature pool is relevant as is the ability of voters to sign multiple petitions and sign petitions without pledging votes. . . . Sixth, the existence of similar or different restrictions on petitioning requirements for party access, independent access, ballot initiative access, or constitutional amendment access are relevant, in part, when assessing whether restrictions are narrowly drawn, but differences permissibly may exist between these schemes given the differences underlying the efforts in each area. . . .  And seventh, the existence of provisions that allow a party to register for individual races, or that allow individuals to run as independents rather than as party members, do not relieve the state of its burden to make restrictions on whole–ballot party access reasonable.

*Id.* (internal citations omitted).  In assessing all of these factors based on the current record evidence before it, the Court makes the following determinations.

### a.    LPAR's History In Arkansas

"Past experience will be a helpful, if not always an unerring, guide:  it will be one thing if [the Libertarian Party has] qualified with some regularity, and quite a different matter if [it has] not."  *Storer v. Brown*, 415 U.S. 724, 742 (1974).  This is not the first challenge to Arkansas' ballot access statutes.  This Court previously recited the history of prior challenges to Arkansas' new political party ballot access statutes and, although not repeated, incorporates that analysis as a part of the Court's decision (Dkt. No. 31, at 30–33).  The Court also previously recited the history of prior challenges to Arkansas' independent candidate ballot access statutes and, although not repeated, incorporates that analysis as a part of the Court's decision (*Id.*, at 33–36).

The record evidence shows that the LPAR has never been able to gather enough signatures to meet the three percent requirement; rather, its past successes in 2012, 2014, 2016, and 2018

gaining ballot access have been through the 10,000–signature requirement.  Indeed, the LPAR has never been able to garner three percent of the vote in a statewide election.  Another court in this district noted that, since 1977, only "one party has obtained ballot access by submitting" a petition that met the three percent signature requirement:  the Reform Party in 1996.  *Green Party of Arkansas v. Daniels*, 445 F. Supp. 2d 1056, 1058 (E.D. Ark. 2006).  Additionally, the record evidence is that the GPA was unable to satisfy even the 10,000–signature requirement in 2016 or 2018.

Nothing in the current record before the Court changes this.

### b.     The Signature Requirement And The 90–Day Window

Secretary Thurston focuses heavily on the signature requirement and the 90–day window to argue his case.  On the record before it, the Court determines that plaintiffs have made a sufficient showing of the actual burdensomeness of the current regime on their own particular ability or inability to comply.

This conclusion is buttressed by the record evidence before the Court related to LPAR's petition drive prior to the preliminary injunction hearing; that evidence remains unchanged.  Further, the Court's preliminary injunction has remained in effect, meaning that any petition drive conducted since that date is not particularly instructive to the Court's overall determination of burdensomeness.

The record evidence is that the LPAR had, as of the date of the preliminary injunction hearing, been able to collect approximately 15,700 signatures from its start on April 1, 2019.  Further, the record evidence is that, even with additional petitioning efforts, the LPAR would be unable to meet the three percent requirement by June 28, 2019, which is 90 days past April 1, 2019, when the LPAR began collecting signatures.  Indeed, Dr. Pakko testified that the LPAR

would require an infusion of resources in the form of money and canvassers to meet the three percent requirement.  Dr. Pakko also noted that each of the LPAR's past petition drives for ballot access had consumed approximately $30,000.00 and required a considerable volunteer effort.

Dr. Pakko affirmed that the LPAR was collecting signatures as quickly as it could and that if the LPAR were to count every signature collected from April 1, 2019, the 90–day deadline to turn in those signatures to the Arkansas Secretary of State would be June 28, 2019.  Dr. Pakko noted that it would not be feasible to attain 26,746 signatures given where the LPAR was after two months of working as hard as its members had to collect signatures.  He elaborated that, in the time from the hearing to June 28, 2019, the LPAR could probably collect another 6,000 or 7,000 signatures, which would give the LPAR a raw signature count of around 22,000 or 23,000.

Having studied her testimony and projections, the Court remains skeptical of Ms. Cox's projections about the LPAR's ability to collect 26,746 valid signatures.  Ms. Cox estimated that LPAR would need to collect 35,000 raw signatures to produce 26,746 valid signatures.  Ms. Cox presented several budgets to the Court which explained the cost to the LPAR to collect the 26,746 valid signatures.  The budgets contained different time frames and were based upon different estimates regarding the use of paid and volunteer canvassers.

Further, Ms. Cox conceded that she would not use her 90–day projection, given the possibility of inclement weather.  Instead, she opted to utilize a 75–day projection and a 60–day projection to estimate the work required to meet the goal.  The Court observes that Ms. Cox's discounting of the 90–day window to a period of 75 or even 60 days lends credence to LPAR's claims about inclement weather and other external factors impacting canvassing ability.

For her 75–day projection, Ms. Cox testified that the LPAR would need to hire seven canvassers to collect 70 signatures per day or nine canvassers to collect 50 signatures per day.

Alternatively, if the canvassers were part–time, then Ms. Cox testified that the LPAR would need to hire 19 canvassers.  Finally, for a 60–day project, Ms. Cox testified that the LPAR would need to collect 583 signatures per day.  She testified that eight full–time canvassers would be needed to collect 70 signatures per day or 12 canvassers to collect 50 signatures per day.  Ms. Cox testified that it would be feasible to hire canvassers for a statewide petition.  She also testified that, in her opinion, it was not burdensome to collect 26,746 valid signatures in 90 days.

She said that she was not sure that the LPAR was doing all it could to recruit canvassers. She also noted that the LPAR should seek out local canvassers, as opposed to out–of–state ones, since having local talent means not being required to pay extra lodging expenses that would be associated with out–of–state circulators, recognizing the potential added financial burden.

Ms. Cox also testified that, if volunteers could be recruited to collect half of the signatures, the LPAR would need to pay approximately $98,000.00 for paid canvassers.  She also hypothesized that, if the LPAR could collect 60 percent of the signatures with volunteers and pay a reduced rate to collect the remaining signatures, then the LPAR would need to pay approximately $55,000.00 for paid canvassers.  She also noted that, if the LPAR was able to find enough volunteers, collecting all the signatures would only cost them approximately $3,000.00.

There remains no record evidence that the LPAR has the financial resources or volunteer base necessary to achieve Ms. Cox's projections, and the LPAR's witnesses testified at the preliminary injunction hearing subject to cross examination.  The record evidence is that the LPAR currently has approximately 150 volunteer canvassers and five paid canvassers.  For her 75–day petition drive projection, Ms. Cox testified that the LPAR would need to collect 467 signatures per day; for her 60–day projection, she testified that the LPAR would need to collect 583 signatures per day.  Each of Ms. Cox's projections assume that at least half of the necessary signatures will

be collected by volunteers; if half of the signatures need to be collected by volunteers, then—according to the Court's calculation—those volunteers would need to collect approximately 233 or 291 signatures per day.[18]  Since Ms. Cox testified that it was not unreasonable for a volunteer to collect 25 signatures a day, the Court infers that the LPAR would require approximately nine volunteers working per day to collect 233.5 signatures a day for 75 days or 11 volunteers working per day to collect 291.5 signatures a day for 60 days.[19]  Given that the LPAR had only been able to collect approximately 15,700 signatures utilizing its 150 volunteers and 5 paid canvassers during the relevant period, the Court is not persuaded that the LPAR could find enough additional volunteers to collect the number of signatures required to satisfy Ms. Cox's projections.

Put another way, the volunteer labor hours demanded by Ms. Cox's projects remain unrealistic and illustrate the burden the three percent requirement and 90–day window places upon plaintiffs.  Assuming that at least half of the 35,000 required raw signatures must be collected by volunteers, and that each volunteer can reasonably collect 25 signatures a day, the LPAR must find volunteers who can provide 700 days of volunteer work.[20]  If a volunteer must work an eight–hour day to collect 25 signatures, the Court further infers that Ms. Cox's projections would require approximately 5,600 hours of volunteer time in order to collect half of the raw signatures.[21]  Even if each volunteer must only work a four–hour day to collect 25 signatures, the Court infers that

---

[18]  467/2=233.5 and 583/2=291.5.

[19]  233.5/25=9.34 and 291.5/25=11.66.

[20]  35000/2=17,500 and 17,500/25=700.

[21]  700*8=5,600.

Ms. Cox's projections would require 2,800 hours of volunteer time in order to collect half of the raw signatures.[22]

There is no record evidence before the Court that the LPAR has access to volunteers who can provide approximately 5,600 or 2,800 hours of volunteer time. If each of the LPAR's 150 volunteers were to commit an equal amount of volunteer time, Ms. Cox's projections would require each of them to volunteer approximately 37 manhours under the eight–hour work–day projection.[23] Alternatively, the same projections would require each volunteer to volunteer approximately 18 manhours under the four–hour work day projection.[24] In the Court's view, requiring the LPAR to find 150 volunteers who can, on average, each give up anywhere from 18 to 37 hours of work to canvass for signatures during a set period is a burden of some substance on the LPAR.

Even if the LPAR were able to find the requisite number of volunteers who could collect half of the signatures required to meet the three percent requirement, the Court concludes that the financial burden of collecting the remaining half of the necessary signatures would place a burden of some substance upon the LPAR. Ms. Cox testified that it would cost the LPAR $98,000.00 to pay canvassers to collect half of the required signatures. Ms. Cox also testified that, if paid canvassers were required to collect only 40 percent of the required signatures—an assumption that would increase the required number of volunteer manhours—and if those canvassers were paid at a lower rate, then the cost to the LPAR would be approximately $55,000.00.

---

[22]  $700*4=2,800$.

[23]  $5,600/150=37.3$.

[24]  $2,800/150=18.7$.

The record evidence before the Court is that the LPAR's past petition drives have cost approximately $30,000.00.  There is no record evidence that the LPAR has additional financial resources that would allow it to pay to collect even 40 percent of the signatures required to meet the three percent requirement; the parties have submitted this case to the Court on cross motions for summary judgment on this record.  Mr. Kalagias testified that the LPAR does not get many financial contributions, which makes it difficult for them to afford canvassers.  Further, Dr. Pakko testified that the LPAR would require more resources to meet the three percent requirement within 90 days.  Ms. Cox's projections do not include slightly more money being required by the LPAR; they include significantly more money being required by the LPAR.  The petition signature requirements plaintiffs currently challenge are "at least 2.6 times what was previously required and in effect for almost twelve years" (Dkt. No. 64, at 7).

LPAR officials testified that they would not be able to meet the requirements, and their statements were fully consistent with past experience.  Past experience showed that the 10,000 signature threshold and more forgiving deadlines were not an insurmountable bar but that no party in Arkansas could meet the more stringent requirements.  Nothing Secretary Thurston has presented in the record evidence compels a rejection of the LPAR's evidence, even at this stage of the litigation.  *See Libertarian Party of Ark.*, 962 F.3d at 404–05.

### c.    The Petition Deadline

The three percent requirement within a 90–day petitioning window, however, does not stand alone in this case.  Instead, the Arkansas statutes challenged by plaintiffs set the petition deadline for submitting the signatures to September 5, 2019, for political party formation for the 2019–2020 election cycle; December 24, 2021, for political party formation for the 2021–2022 election cycle; and September 7, 2023, for political party formation for the 2023–2024 election

cycle (Dkt. No. 72, ¶ 40), and the Court has been tasked with examining the combined effects of the challenged Arkansas statutes.

The Court determines that the petition filing deadlines—which is the first time a new political party candidate is placed on a ballot—severely burdens plaintiffs' fundamental rights based on controlling law. In *Williams v. Rhodes*, the Supreme Court struck down a 15 percent signature requirement in conjunction with a deadline to file signatures the February before the General Election. 393 U.S. 23, 33 (1968). The Supreme Court later upheld Georgia's June filing deadline for new political party petitions, noting that, unlike in *Williams*, "Georgia does not fix an unreasonably early filing deadline for candidates not endorsed by established parties." *Jenness v. Fortson*, 403 U.S. 431, 438 (1971). While the Court is cognizant that "[c]onstitutional challenges to specific provisions of a State's election laws . . . cannot be solved by any 'litmus–paper–test' that will separate valid from invalid restrictions," the Court notes that the filing deadlines here when the challenged Arkansas election laws are examined overall are far earlier than other filing deadlines for candidates not endorsed by established parties struck down by the Supreme Court. *Anderson*, 460 U.S. 780, 789.

With respect to Secretary Thurston and the LPAR's views of *Williams* and Supreme Court precedent in this area, the Eighth Circuit, in reviewing this Court's preliminary injunction, stated:

> The value and importance of *Williams* in the present analysis is questionable because additional, uncommon statutory requirements were at issue in that case and the numerosity requirement was much higher than the current requirements. *Jenness* is significant in that the signatures required as a percentage of eligible voters was greater than in the present case, but the filing deadline was much more forgiving. The State relies heavily on *Jenness* noting that the current 3% requirement in the present case is "effectively" a 1.5% requirement when looking at the entire pool of eligible voters in Arkansas, as contrasted with the 5% requirement in *Jenness*. The State also argues the current signature requirement should be viewed favorably due to the absence of any geographic restrictions or limits on the number of petitions a voter may sign. . . . The Libertarian Party counters that *Anderson*, coming after *Williams*, and *Jenness* and requiring only

5,000 signatures by March 20, demonstrates the Court's view that pushing the signature requirement too far back in the election year is unconstitutional even with an otherwise acceptable numerosity requirement.

*Libertarian Party of Ark.*, 962 F.3d at 401 (internal citations omitted).   The Eighth Circuit proceeded to examine its own cases in this area and concluded, "Our own cases appear to comport with the Libertarian Party's interpretation of the Court's guideposts."   *Id*.

As the Eighth Circuit explained:

[D]eadlines far before election day are problematic because of the general disinterest of potential voters so far removed from elections.   [*McLain v. Meier*, 637 F.2d 1159,]1164 [8th Cir. 1980 ("*McLain I*")] ("[M]ost voters in fact look to third party alternatives only when they have become dissatisfied with the platforms and candidates put forward by the established political parties.   This dissatisfaction often will not crystalize until party nominees are known. . . .   [I]t is important that voters be permitted to express their support for independent and new party candidates during the time of the major parties' campaigning and for some time after the selection of candidates by party primary.").   Early filing deadlines pose heavy burdens on minor parties and independent candidates, in part, because they are likely to impact the ability of parties or independent candidates to procure signatures.   *See Anderson*, 460 U.S. at 791–92, 103 S.Ct. 1564 ("An early filing deadline may have a substantial impact on independent–minded voters. . . .   [I]ssues simply do not remain static over time. . . .   It also burdens the signature–gathering efforts of independents who decide to run in time to meet the deadline. When the primary campaigns are far in the future and the election itself is even more remote, the obstacles facing an independent candidate's organizing efforts are compounded. Volunteers are more difficult to recruit and retain, media publicity and campaign contributions are more difficult to secure, and voters are less interested in the campaign.").

In general, petition deadlines earlier than spring of election year are problematic even when coupled with a generally permissible 10,000 signature requirement.   By comparison, Arkansas's present requirement for 27,000 signatures, 425 days prior to the election and with a rolling 90 day window to obtain the signatures sets a much higher bar.

*Libertarian Party of Ark.*, 962 F.3d at 400.   Further, as this Court explained, the requirements imposed by the calendar and process for midterm elections does not appreciably change how high this bar is.   The Arkansas requirement for midterm elections is still approximately 27,000 signatures, 319 days prior to the election, and with a rolling 90–day window to obtain the

signatures.  These requirements derive from the challenged statutes and, when the overall impact of the challenged statutes are considered, impose a burden of some substance on LPAR's ballot access.

This determination is supported by the current record evidence.  There is evidence in the record that the LPAR has had some difficultly canvassing in certain public places like a farmer's market because those venues asked that political activity be restricted or limited until closer to the political season.  There also is some record evidence that certain people are not interested in signing petitions this far in advance, outside of the political season.  This evidence supports LPAR's claim that the early dates the LPAR is required to gather signatures also impacts its ability to meet the newly imposed statutory requirements.

Accordingly, in conjunction with the burdens created by the three percent requirement and the 90–day petitioning window, the Court concludes that plaintiffs have demonstrated that the filing deadlines here when the challenged Arkansas election laws are examined overall create a severe burden on plaintiff's constitutional rights.

### d.      Initiative And Referendum Petitions In Arkansas

The record evidence regarding other petition drives in Arkansas does not convince the Court that the burdens facing plaintiffs are trivial or otherwise not severe.

First, as to the record evidence regarding initiative petition drives in Arkansas, while such petitions have successfully garnered far more than 26,746 signatures, the circumstances surrounding the gathering of those signatures are far different than those facing the LPAR. Notably, there is no limitation on how long signatures for an initiative petition may be collected, and the record evidence shows that such signatures may be collected well into the summer of an election year.  Additionally, initiative petitions, if insufficient, have the benefit of a 30–day cure

period.  Similarly, to the extent the record evidence shows that it is possible to obtain 26,746 valid signatures in Arkansas in a 90–day petitioning window more than a year prior to a General Election, the Court notes that there is no evidence before the Court regarding the cost of such an endeavor.

As to referendum petitions, Dr. Hood testified that he was unaware of any instance of a successful referendum petition in Arkansas in the last 20 years, and the Court notes that referendum petitions, unlike initiative petitions, require that signatures be collected in a 90–day petitioning window following the adjournment of the General Assembly.  Ark. Const. Art. 5, § 1 ("Such petition shall be filed with the Arkansas Secretary of State not later than ninety days after the final adjournment of the session at which such Act was passed . . . .").

In other words, the record evidence relating to initiative and referendum petitions in Arkansas tends to show that successful petitions are those that have more than 90 days to collect signatures.  Accordingly, to the extent the State of Arkansas argues that plaintiffs are not facing a severe burden because initiative petitions have successfully garnered more than 26,746 valid signatures, the Court rejects that argument.

### e.    Petition Drives In Other Jurisdictions

Furthermore, the record evidence regarding petition drives in other states does not convince the Court that Arkansas' ballot access statutes do not impose a severe burden on plaintiffs' First and Fourteenth Amendment rights.  Ms. Cox testified that she, through her work, organized an effort to collect over 166,000 signatures in 82 days in Nebraska, but she also noted that this was in relation to a controversial topic and did not testify as to how far in advance of an election those signatures were collected.  Ms. Cox explained that a high degree of organization was needed in the Nebraska effort and that her company had to organize trainings for canvassers in that effort.

Additionally, there is no record evidence regarding the amount of money necessary to finance those efforts in Nebraska.  Since both the cost and the full extent of the restrictions, or lack thereof, placed on petition efforts in Nebraska are unknown, the Court is not persuaded that the evidence regarding Ms. Cox's efforts in Nebraska undermines plaintiffs' argument that the challenged Arkansas statutes impose a severe burden on their First and Fourteenth Amendment rights.

Similarly, the case law cited by the Secretary Thurston  does not convince the Court that Arkansas' new political party ballot access laws do not impose a severe burden on plaintiffs. LPAR addresses these cases in its reply (Dkt. Nos. 76, at 18–22; 76–1, ¶¶ 13–15).  Further, the Court addressed prior cases cited by Secretary Thurston in its preliminary injunction Order, and although not repeated here, the Court incorporates that analysis into this Order (Dkt. No. 31, at 45–47).  Secretary Thurston lumps together deadlines in these other states, rarely notes that many of these states include differences between the requirements for a major political party and a minor political party when compared to Arkansas laws, and overlooks differences in signature requirements and petitioning times as compared to Arkansas law (Dkt. Nos. 76, at 22–27; 76–1, ¶¶ 13–15).  The Court concludes as to the ballot election laws cited by Secretary Thurston, "all of the State's cases are readily distinguishable as involving much more forgiving deadlines or other mitigating factors."  *Libertarian Party of Ark.*, 962 F.3d at 404 n.6.

### f.    Alternative Means For Ballot Access In Arkansas

The Court also rejects at this stage of the litigation and on the record before it the State of Arkansas' argument that the alternative means of gaining ballot access—independent candidacy or a party label for a presidential candidate—somehow reduce any burden upon plaintiffs' constitutional rights.  Arkansas law allows any individual to run statewide as an independent candidate by satisfying the three percent requirement or by presenting 10,000 valid signatures.

Ark. Code Ann. § 7–7–103(b)(1)(A).  Additionally, any candidate may run as an independent for a county, township, or district race if they present at least 2,000 valid signatures.  *Id.*  The Court concedes that it appears that the LPAR's candidates could appear on the ballot as independent candidates for statewide races by presenting 10,000 signatures and on local races by presenting 2,000 signatures each.

As Dr. Pakko explained, to run multiple candidates under this alternative, the LPAR would need to run multiple petition campaigns over various geographic districts, with additional costs and complications (Dkt. No. 76–1, ¶ 7).  He also explained that a candidate with a party label on the ballot is distinctly different than an independent candidate, even if that candidate is endorsed by a nonexistent political party, because the political party label gives the potential voter more information about the candidate and is not deceptive in labeling a political party candidate as an independent (Dkt. No. 76–1, ¶ 7).  This alternate path to run as an independent does not reduce the burden on plaintiffs' associational rights to advance their political beliefs by identifying themselves as members of the LPAR on the ballot, as this option specifically denies minor party candidates the right to a party label on the ballot.  *Moore v. Martin*, 854 F.3d at 1025 ("Ballot access restrictions implicate not only the rights of potential candidates for political office, but also the First and Fourteenth Amendment rights of voters to cast their ballots for a candidate of their choice and to associate for the purpose of advancing their political beliefs.") (citation omitted). Furthermore, this argument would essentially force LPAR candidates to run as independents, which would burden the right of qualified voters "to cast their votes effectively" by identifying the party affiliation of the individuals running for office.  *Williams*, 393 U.S. at 30; *see Storer*, 415 U.S. at 745 ("[T]he political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other.").

The Court reaches the same conclusion as to the option for the LPAR to gain ballot access for presidential and vice presidential candidates by filing a petition with 5,000 signatures. *See* Ark. Code Ann. § 7–8–302(5)(B).[25]  While this option undoubtedly allows for the LPAR to place two candidates on the ballot with party labels, this opportunity only arises once every four years. This option does not allow the LPAR to field candidates for other offices with a party label.  In effect, this option denies the LPAR the right to present its candidates to the voters in the majority of electoral races in Arkansas.  Further, only if such candidates received "at least three percent (3%) of the entire vote cast for the office," then LPAR would qualify as a "political party" with across–the–board ballot access in the following election. Ark. Code Ann. § 7–1–101(27)(A).  The Court therefore concludes that the option to run a candidate with a party label for only the offices of President and Vice President by filing a petition with 5,000 signatures does not diminish the burdens otherwise imposed by the challenged Arkansas statutes.

For all the reasons discussed above, and based upon the record evidence before the Court, the Court concludes that plaintiffs have demonstrated that Arkansas Code Annotated §§ 7–7–101, 7–7–203(c)(1), 7–7–205(a)(2), 7–7–205(a)(4)(B), 7–7–205(a)(6), and 7–7–205(c)(3), facially and as applied to plaintiffs for the 2019–2020 Arkansas General Election cycle and for all subsequent General Election cycles in the State of Arkansas, collectively impose a severe burden upon plaintiffs' rights under the First and Fourteenth Amendments.  Accordingly, the Court will apply strict scrutiny to the challenged ballot access statutes.

      **2.**      **Compelling State Interest And Arkansas' Protection of Such Interests**

---

[25]  At the time this Court entered its preliminary injunction Order, the number of signatures required was 1,000; the statute has been amended since that time to now require 5,000 signatures. Ark. Code Ann. § 7–8–302(5)(B).

Since the burdens placed upon plaintiffs by the challenged Arkansas ballot access statutes are "severe," the laws "must be 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).

### a.       Asserted State Interests

At the preliminary injunction stage of this litigation, although the State repeatedly invoked the phrase "compelling state interest" in its filings, the State failed to articulate clearly a compelling state interest to be examined, leaving this Court to speculate as to what the State's interests may be (Dkt. No. 31, at 48–52).  On appeal of the preliminary injunction, Secretary Thurston appeared to adopt these alleged interests.  *Libertarian Party of Ark.*, 962 F.3d at 402–403.

At this stage of the litigation, Secretary Thurston again appears to adopt the interests the Court previously examined and asserts that those interests justify the challenged statutes (Dkt. No. 71, at 20–24) (asserting the interests of preventing "frivolous candidacies," reducing "voter confusion," and ensuring "elections are fair, honest, and orderly")).  This Court acknowledges that the State of Arkansas does have "an interest in limiting the size of the ballot, avoiding voter confusion, and protecting the integrity of the elections process" and that those interests are "protected by requiring a certain number of signatures on a petition to demonstrate a modicum of public support." *Citizens To Establish a Reform Party in Arkansas*, 970 F. Supp. at 699 (citing *Lubin v. Panish*, 415 U.S. 709, 714 (1974); *Jenness*, 403 U.S. at 442).  However, the measures adopted by the State "must be justified by reference to a compelling state interest[] and may not go beyond what the state's compelling interests actually require . . . because the fundamental right to vote is inseparable from the right to place the candidate of one's choice on the ballot . . . ." *McLain I*, 637 F.2d at 1163 (citation omitted).

Secretary Thurston asserts that the Supreme Court has recognized that the interest in keeping "frivolous candidates" off the ballot gives a state "the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot." *Anderson*, 460 U.S. at 788–89 n.9.  To the extent Secretary Thurston argues that the comparatively low vote total minor parties have attained in prior elections renders their candidates frivolous and therefore damaging to the integrity of the election, the Eighth Circuit observed:

> It is doubtful that the repeated failure to attain the retention vote share in an election is an appropriate basis for characterizing minor parties as frivolous given the effect that minor vote share additions and detractions might have on the outcome in close contests between the major parties.

*Libertarian Party of Ark.*, 962 F.3d at 403 at n.5.

The Court, like the Eighth Circuit, acknowledges that Secretary Thurston also has asserted in this litigation that the Libertarian Party placed an Elvis Presley impersonator on the ballot for an office and listed the candidate as Elvis Presley.  *Id.*  However, LPAR asserts that this was in fact the candidate's legal name (Dkt. Nos. 76, at 29; 76–1, ¶ 16).  Further, this is the only instance cited by Secretary Thurston and occurred several elections cycles back according to LPAR (*Id.*).  LPAR argues that "[i]t would not be fair to judge an entire political party by one or several incidents," especially given that "Republicans and Democrats in Arkansas and throughout the country have occasionally had frivolous candidates" (*Id.*).

As for the 90–day limit and election integrity, LPAR points out that Secretary Thurston offers no examples as to specific election fraud or integrity issues in Arkansas (Dkt. No. 76, at 28–29).

In support of his position, Secretary Thurston also offers Peyton Murphy's testimony that setting the preferential primary in the March before a General Election would allow Arkansas to participate in "Super Tuesday."  However, under Arkansas law governing the certification of new

political parties, "[a] new political party formed by the petition process shall nominate candidates by convention for the first general election after certification."   Ark. Code Ann. § 7–7–205(c)(2)(A).   Additionally, "[i]f the new party maintains party status by obtaining three percent (3%) of the total votes cast for the office of Governor or nominees for presidential electors at the first general election after certification, the new political party shall nominate candidates in the party primary as set forth in § 7–7–101 et seq."  Ark. Code Ann. § 7–7–205(c)(4).   Accordingly, this explanation is a *non sequitur* since new political parties that qualify for the ballot by collecting signatures nominate their candidates by convention, rather than by participation in the preferential primary election.   According to Arkansas law, the first time candidates from the LPAR would appear on a primary ballot would be *after* a General Election in which the LPAR satisfied the three percent retention requirement.   Thus, it is not clear to the Court why a change in the primary calendar should affect new political parties that qualify for the ballot by collecting signatures and that do not participate in primaries.

While the State of Arkansas did not raise the issue, Arkansas law does provide that a nominating convention for a party formed by the petition process "shall be held no later than 12:00 noon on the date of the preferential primary election."   Ark. Code Ann. § 7–7–205(c)(2)(B)(i). Furthermore, Arkansas law provides that "[c]ertificates of nomination [for candidates seeking the nomination of a new political party] shall be filed with the Secretary of State or the county clerk no later than 12:00 noon on the date of the preferential primary election."   *Id*. § 7–7–205(c)(2)(B)(ii).  Additionally, "[a] candidate to be nominated by convention shall file a political practices pledge . . . during the party filing period."  *Id*. at § 7–7–205(c)(3).  It is possible, therefore, that the State of Arkansas could have argued that the State has an interest in setting the deadline for filing new political party petitions 60 days in advance of the party filing period so that a newly

certified political party would have time to prepare Political Practices Pledges and to hold a nominating convention.  This argument, however, raises the question as to why new political party Political Practices Pledges or nominating conventions must be held before a primary election in which the new political party would not appear on the ballot.

There is no record evidence of ballot overcrowding.  In fact, Dr. Hood, the State of Arkansas' own expert, conceded that a ballot with only a Democrat, a Republican, and a Libertarian would not be an overcrowded ballot.

The Eighth Circuit, when evaluating Secretary Thurston's asserted interests at the preliminary injunction stage, explained:

> We harbor serious doubt that the generalized desire to maintain the integrity of elections and prevent ballot overcrowding can be viewed as a compelling state interest when the prior version of the statute undisputedly succeeded at preventing ballot overcrowding.  The evidence at the hearing showed that no party previously achieved access during the years in which Arkansas had a 3 percent requirement, and even during the many years in which Arkansas had a 10,000 signature requirement coupled with a more forgiving deadline, there was no crowding of the ballot.  The state's own expert witness acknowledged that only one or two new parties had ever qualified by petition under the 10,000 signature requirement.  In fact, he opined that a ballot with two major parties and two additional parties appearing on a whole–ballot basis would not be crowded.

*Libertarian Party of Ark.*, 962 F.3d at 403.  Secretary Thurston's asserted interests have not changed, and the record evidence before the Court has not changed appreciably.  As a result, this Court reaches the same conclusion.

### b.  Whether Laws Are Narrowly Drawn

Even assuming that the State of Arkansas has demonstrated a State interest and that such an interest is compelling, the Court finds that plaintiffs prevail on their argument that Arkansas' ballot access statutes, as applied to plaintiffs, are not narrowly drawn to protect those interests.

Act 164 states that "[i]t is found and determined by the General Assembly . . . that the current laws concerning signature requirements for certain petitions are insufficient to reflect the will of the voters of Arkansas . . . ."  2019 Ark. Acts 164, § 2.  The record evidence also shows that Act 164 more than doubled the number of signatures required for a new political party to gain ballot access, and the record evidence does not provide any basis for this increase.  There is no record evidence that explains what facts made it necessary or even advisable to more than double the signatures required for a new political party to gain ballot access.  In fact, the record evidence shows that the GPA was unable to meet even the 10,000–signature requirement in 2016 and 2018.  Since strict scrutiny applies, the Court must apply a "more exacting judicial scrutiny" to Arkansas' ballot access laws.  *See U.S. v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938).  Accordingly, as in *Green Party of Arkansas v. Daniels*, the Court concludes that the record evidence shows that "[t]he 10,000 signature threshold is a sufficient modicum of support to serve the state's interest in avoiding cluttered ballots . . . ."  445 F. Supp. 2d 1056, 1062 (E.D. Ark. 2006).  The Court therefore concludes that plaintiffs have demonstrated that Act 164 is not narrowly drawn to protect a compelling state interest.

When addressing this case on appeal of this Court's preliminary injunction Order, as to its prior decision in *Green Party of Arkansas v. Martin*, 649 F.3d 675 (8th Cir. 2011), the Eighth Circuit explained:

> [I]n *Martin*, our primary focus was not on Arkansas's statutory petition requirement.  649 F.3d at 679.  Rather, we addressed the alternative path for a party in Arkansas to gain recognition:  securing 3% of the vote in a gubernatorial election.  In rejecting the Green Party's claim that the election–vote–share retention path was unconstitutional, we repeatedly emphasized the importance of alternative paths for new–party recognition and held that the retention requirement was permissible because, "[a]lternative parties not certified as a political party may secure ballot access for their entire slate of candidates by filing a petition comprised of the signatures of 10,000 registered Arkansas voters, or roughly six–tenths of one percent of all registered Arkansas voters."  *Id.* at 685.  This "failsafe" alternative

path, however, is precisely the statutory path that Arkansas now has made more demanding and that the Libertarian Party challenges.    Therefore, Arkansas's recently heightened requirements for petitioning parties not only call into question the constitutionality of the petitioning requirements themselves, they call into question the continuing validity of our decision in *Martin*.

*Libertarian Party of Ark.*, 962 F.3d at 401–02.

Additionally, the timeframe for the collection of signatures for a new party petition is not narrowly drawn to protect a compelling state interest.    As for the 90–day limit and election integrity, along with Secretary Thurston's failure to offer examples as to specific election fraud or integrity issues in Arkansas, LPAR correctly observes that there is no 90–day limit with respect to the presidential candidate or the initiative petitioning processes under Arkansas law (Dkt. No. 76, at 28–29).    In an effort to deflect this argument, Secretary Thurston asserts that the interests are different with presidential candidates and that other safeguards are in place during the initiative petitioning process, including required qualifications for paid canvassers for this work pursuant to Ark. Code Ann. § 7–9–601(a)(1) (Dkt. No. 77, at 7–8).

Secretary Thurston suggests that "[n]othing in the record, and indeed no case law, suggests that Arkansas's interest in electoral fairness does not extend to applying its election calendar uniformly as between new and established parties, or LPAR specifically." (Dkt. No. 71, at 22).    Based on the record before the Court, Arkansas's ballot access laws and election calendar do not apply uniformly as between new and established parties by design.    As discussed above, per Arkansas Code Annotated §§ 7–7–205(c)(2)(A) and 7–7–205(c)(4), candidates affiliated with new political parties who gain ballot access by collecting signatures are not placed on the ballots for preferential or general primary elections; instead, they are nominated by convention.    Therefore, as discussed, candidates affiliated with new political parties who qualify for the ballot by collecting signatures in Arkansas do not appear on primary ballots; rather, they first appear on General

Election ballots.  There is no record evidence before the Court that explains why the State of Arkansas must certify new political parties at the same time as pre–existing political parties. Similarly, as discussed, there is no record evidence that explains why other requirements for new political parties and their candidates—such as the deadline for the filing of Political Practices Pledges or the holding of nominating conventions—are tied to the dates for the party filing period or primary elections.  Accordingly, as Secretary Thurston has failed to meet his burden of showing that the challenged statutes are narrowly drawn to serve the State's compelling interest, *Moore v. Martin*, 854 F.3d at 1026, the Court concludes that plaintiffs have demonstrated that the deadlines for submitting new political party petitions are not narrowly drawn to protect a compelling state interest.

With respect to the election calendar, Secretary Thurston argues that midterm election cycle deadlines "have been unchanged for a decade." (Dkt. No. 71, at 23).  This argument overlooks the newly enacted increased signature requirement for new political parties, which applies to midterm election cycles as well as presidential election cycles.  The midterm election cycle deadlines may be the same, but the number of signatures required by new political parties is not.  Further, the requirements imposed by the calendar and process for midterm election years are still more demanding than the requirements at issue in *Moore v. Martin*; the current Arkansas laws at issue impose a higher signature requirement and a deadline of 319 days prior to the election for midterm election years and a higher signature requirement and a deadline of 425 days prior to the election for presidential election years.

Secretary Thurston also asserts that the Eighth Circuit, in *McLain v. Meier*, acknowledged the interest asserted by the State of Arkansas of giving itself time to verify the signatures on petitions and to print absentee ballots, upholding a petition–filing deadline 200 days before the

General Election because it was a consequence of rescheduling the primary. 851 F.2d 1045 1050 (8th Cir. 1988) ("*McLain II*"). In addition, Secretary Thurston asserts that LPAR's claim on this point should fail because LPAR has not offered alternative dates for deadlines LPAR would consider permissible for either the presidential election cycles or midterm election cycles and that this Court should require it to do so to prevail (Dkt. No. 71, at 23–24).

That was not the conclusion reached by the Eighth Circuit when examining these issues at the preliminary injunction stage. The Eighth Circuit determined:

> [A]ssuming a compelling interest exists, and taking the general boundaries established by the cases discussed above, a regime containing (1) a substantial signature requirement, (2) a limited rolling window for obtaining signatures, and (3) a deadline 425 days removed from the general election is not narrowly tailored to a generalized interest in regulating the integrity of elections. This outcome is clear when the unprecedented time between the deadline and the election is not based on anything particular to petitioning parties, but instead is a date adopted by reference to other deadlines as applicable only to established parties. The asserted desire to move the primary date for established parties to Super Tuesday is unrelated to the process for new–party certification or new–party candidate selection via convention. And while there always will be some degree of arbitrariness in the precise selection of dates, the deadline in the present case is far beyond anything we previously have permitted. *See McLain II*, 851 F.2d at 1050 ("As with any percentage or numerical requirement, the precise date of the primary is to some extent 'necessarily arbitrary.'" (quoting *Am. Party of Tex. v. White*, 415 U.S. 767, 783, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974))).

*Libertarian Party of Ark.*, 962 F.3d at 402–03. The Court determines, on the record before it and examining all authorities presented by the parties, that this same conclusion regardless of whether the Court considers the process for qualifying for midterm election cycles or presidential election cycles under Arkansas law.

For these reasons, the Court concludes that plaintiffs have demonstrated that Arkansas Code Annotated §§ 7–7–101, 7–7–203(c)(1), 7–7–205(a)(2), 7–7–205(a)(4)(B), 7–7–205(a)(6), and 7–7–205(c)(3), facially and as applied to plaintiffs for the 2019–2020 Arkansas General Election cycle and for all subsequent General Election cycles in the State of Arkansas, collectively

are not narrowly drawn to serve a compelling state interest and, therefore, fail the strict scrutiny test and cannot stand.

### B.    Equal Protection Claim

The Court next turns to plaintiffs' claim that Arkansas' ballot access statutes, as applied to plaintiffs, unequally discriminate against plaintiffs in violation of the Equal Protection Clause of the Fourteenth Amendment (Dkt. No. 1, ¶ 26).   Plaintiffs claim that the Arkansas statutory scheme's unnecessarily early petition deadline, coupled with the recently increased high petition signature requirement, unequally and unfairly impacts in a discriminatory manner the right of small, minor, unrecognized political parties in Arkansas who seek petition signatures for party formation in Arkansas (*Id.*, ¶ 28).

"To determine whether or not a statute violates the Equal Protection Clause, [the court] must consider 'the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.'" *Libertarian Party of N.D.*, 659 F.3d at 701 (quoting *Williams*, 393 U.S. at 30).   The Court must "first look at the state's interests," which include "protecting the integrity of the political process from frivolous or fraudulent candidacies, ensuring the election process is efficient, avoiding voter confusion caused by an overcrowded ballot, and avoiding the expense and burden of run–off elections." *Libertarian Party of N.D.*, 659 F.3d at 701.   Further, the Court must consider "whether the law disadvantages one group over another so as to result in unequal treatment and whether this unequal treatment is justified by a compelling interest." *Id.* (citing *Williams*, 393 U.S. at 30).

> Although "reasonable election regulations may, in practice, favor the traditional two–party system," . . . , they may not serve the purpose of allowing the same two parties "to retain a permanent monopoly on the right to have people vote for or against them." *Williams*, 393 U.S. at 32.  "Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms. New parties struggling for their place must have the time and opportunity to

organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past." *Id.*

*Libertarian Party of S.D. v. Krebs*, 290 F. Supp. 3d 902, 915 (D.S.D. 2018) (examining an Equal Protection claim regarding ballot access).

The Eighth Circuit held previously in an unpublished decision that an independent candidate's Equal Protection claims were properly dismissed because "[t]he Equal Protection Clause does not mandate that [an independent candidate] be treated the same as new political parties or initiated acts." *Langguth v. McCuen*, Case No. 93–3413; 1994 WL 411736 , at *2 (8th Cir. 1994). In a later decision, the Eighth Circuit engaged in an Equal Protection analysis when a minor political party and its candidates challenged North Dakota's election laws. *Libertarian Party of N.D.*, 659 F.3d at 701–703. In a more recent decision, a district court determined that certain ballot access laws in South Dakota discriminated against new party candidates in seeking certain state office, resulting in unequal treatment that was not justified by a compelling state interest in violation of the Equal Protection Clause. *Krebs*, 290 F. Supp. 3d at 915.

The Court examines plaintiffs' Equal Protection claim to Arkansas's ballot access laws by first considering the same *Anderson–Burdick* balancing framework as it applied to their First and Fourteenth Amendment claims. *See Libertarian Party of N.D.*, 659 F.3d at 702 (citing *Williams*, 393 U.S. at 30); *see also Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789. The *Anderson–Burdick* framework considers "the character and magnitude of the asserted injury to the rights protected by the First and *Fourteenth* Amendments that the plaintiff seeks to vindicate." *Moore v. Martin*, 854 F.3d at 1025 (emphasis added) (internal quotations omitted). The Court has engaged in this analysis.

Then, the Court engages in further considerations, namely whether the law disadvantages one group over another so as to result in unequal treatment and whether this unequal treatment is

justified by a compelling interest.  *Libertarian Party of N.D.*, 659 F.3d at 702 (citing *Williams*, 393 U.S. at 30 ("We have. . . held many times that 'invidious' distinctions cannot be enacted without a violation of the Equal Protection Clause.").

The law at issue in *Williams* required parties to obtain petitions signed by qualified electors totaling 15 percent of the number of ballots cast in the last preceding gubernatorial election in addition to complying with a number of other requirements before it could be considered a party in the subsequent election.  In contrast, another law permitted those parties who received 10 percent of the votes in the last gubernatorial election to retain their party status for the election, avoiding the 15 percent signature requirement and other technical requirements.  The Supreme Court determined these laws created an unequal treatment between minor and major parties and rejected the state's argument that the laws applied to all parties equally.  The Supreme Court recognized that, in application, this scheme resulted in the two major parties consistently retaining party status and avoiding the signature requirement while minor parties on numerous occasions tried and failed to become a new party on the ballot.  The Supreme Court later interpreting its holding in *Williams* opined:  "Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike, a truism well illustrated in *Williams v. Rhodes.*"  *Jenness,* 403 U.S. at 442.

In an effort to justify the challenged Arkansas laws as narrowly draft, Secretary Thurston suggests that "[n]othing in the record, and indeed no case law, suggests that Arkansas's interest in electoral fairness does not extend to applying its election calendar uniformly as between new and established parties, or LPAR specifically." (Dkt. No. 71, at 22).  However, Arkansas's ballot access laws and election calendar do not apply uniformly as between new and established parties by design.  As discussed above, per Arkansas Code Annotated §§ 7–7–205(c)(2)(A) and 7–7–

205(c)(4), candidates affiliated with new political parties who gain ballot access by collecting signatures are not placed on the ballots for preferential or general primary elections; instead, they are nominated by convention.  Therefore, as discussed, candidates affiliated with new political parties who qualify for the ballot by collecting signatures in Arkansas do not appear on primary ballots; rather, they first appear on General Election ballots.  There is no record evidence before the Court that explains why the State of Arkansas must certify new political parties at the same time as pre–existing political parties.  Similarly, as discussed, there is no record evidence that explains why other requirements for new political parties and their candidates—such as the deadline for the filing of Political Practices Pledges or the holding of nominating conventions— are tied to the dates for the party filing period or primary elections.

The Eighth Circuit, when examining an Equal Protection claim at the motion to dismiss stage, observed:

> As the Supreme Court has stated, "it will be one thing if [minor party] candidates have qualified with some regularity and quite a different matter if they have not." *Storer,* 415 U.S. at 742, 94 S.Ct. 1274.  A disparate impact that "operate[s] to freeze the political status quo" to a two-party system violates the Equal Protection Clause. *Jenness,* 403 U.S. at 438, 91 S.Ct. 1970.

*Libertarian Party of N.D.*, 659 F.3d at 703.  This Court concludes, for the reasons explained in this Order, that those facts are present as demonstrated by plaintiffs when the Court considers collectively the impact of the challenged Arkansas laws on new political parties and their candidates.  For these reasons, the Court grants plaintiffs' motion for summary judgment on their Equal Protection claim and denies Secretary Thurston's motion on this claim.

## VI.     Irreparable Harm, Balance Of Equities, And Public Interest

Secretary Thurston argues that plaintiffs have failed to show a threat of irreparable harm (Dkt. No. 30, at 17).  Secretary Thurston asserts that plaintiffs have offered only "hypothetical

difficulties that [they] might face in gathering the required number of signatures." (*Id*.).  Plaintiffs argue, on the other hand, that they will suffer immediate and irreparable injury if Arkansas' ballot access statutes prevent them from casting votes for their candidates of choice in the 2020 General Election and all subsequent election cycles (Dkt. No. 12, at 2).

A threat of irreparable harm exists when a party demonstrates a harm that may not be compensated by money damages in an action at law.  *See Kroupa*, 731 F.3d at 820; *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371–72 (8th Cir. 1991).  Here, the record evidence demonstrates that plaintiffs face irreparable harm:  the inability to gain ballot access for the LPAR due Arkansas' ballot access requirements and the inability to cast votes for candidates of choice.  The Court therefore concludes that the record evidence before it demonstrates a threat of irreparable harm to plaintiffs.

The Court also concludes that, based upon the record evidence, the threat of irreparable harm to plaintiffs and the public interest outweigh the immediate interests of the State of Arkansas and any potential harm to the State of Arkansas caused by the entry of a permanent injunction. There is no record evidence that the State of Arkansas will be financially harmed if these laws are enjoined.  The Court must examine the record evidence in the context of the relative injuries to the parties and to the public.  *Dataphase*, 640 F.2d at 114.

## VII.    Conclusion

The Court concludes that plaintiffs have met their burden to obtain declaratory and injunctive relief under the First and Fourteenth Amendment claims against Secretary Thurston in his official capacity.  For the reasons explained, the Court concludes that, because of the combined effect of the early petition deadline, the 90–day petitioning period, the three percent petition requirement, the requirement that new party candidates declare before the major party candidates

are selected, and that new parties select their candidates at a party convention and not at a primary or runoff election, the Court grants plaintiffs' motion for summary judgment and denies Secretary Thurston's motion for summary judgment (Dkt. Nos. 62, 70).

Accordingly, the Court declares unconstitutional Arkansas Code Annotated §§ 7–7–101, 7–7–203(c)(1), 7–7–205(a)(2), 7–7–205(a)(4)(B), 7–7–205(a)(6), and 7–7–205(c)(3) both facially and as applied to plaintiffs for the 2019–2020 and all subsequent Arkansas General Election cycles.

Secretary Thurston, in his official capacity as Arkansas Secretary of State, together with his agents, servants, and employees, and all persons in active concert or participation with him, are enjoined from enforcing Arkansas Code Annotated §§ 7–7–101, 7–7–203(c)(1), 7–7–205(a)(2), 7–7–205(a)(4)(B), 7–7–205(a)(6), and 7–7–205(c)(3) consistent with the terms of this Order.

It is so ordered this 30th day of September, 2022.


_____
Kristine G. Baker
United States District Judge